# EXHIBIT 3



**Planet Depos**
We Make It Happen™

# Transcript of SGT. James Ciukaj, Jr.

**Date:** March 21, 2017
**Case:** Bolton -v- The Sheriff of Cook County, et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of SGT. James Ciukaj, Jr.                    1 (1 to 4)
Conducted on March 21, 2017

**Page 1**

```
1   IN THE UNITED STATES DISTRICT COURT FOR THE
        NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION
3   LITROY BOLTON,                    )
4        Plaintiff,                   )
5   v.                                )   No. 16-cv-5012
6   THE SHERIFF OF COOK COUNTY,       )   Hon. Judge
    individually and in his official )   Ronald A. Guzman
7   capacity; COOK COUNTY; DR. NNEKA  )
    JONES TAPIA, individually and in  )   Hon. Mag. Judge
8   her official capacity as          )   Maria Valdez
    Executive Director of the Cook    )
9   County Department of Corrections; )
    SGT. JAMES CIUKAJ; Correctional   )
10  Officers MIGUEL ORTIZ, RODRIGO    )
    RAMOS, CODY LETTIERE,             )
11  CHRISTOPHER IVORY and UNKNOWN     )
    EMPLOYEES OF COOK COUNTY JAIL;    )
12  Internal Affairs Investigator     )
    JULIAN DIAZ; Internal Affairs     )
13  Investigator ESTHER MONTANEZ;     )
    UNKNOWN EMPLOYEES OF COOK         )
14  COUNTY; UNKNOWN EMPLOYEES OF      )
    THE OFFICE OF PROFESSIONAL        )
15  REVIEW OF THE COOK COUNTY         )
16  SHERIFF'S OFFICE,                 )
        Defendants.                   )
17
18       The deposition of SGT. JAMES CIUKAJ, JR.,
19  taken before David J. Demski, Certified Shorthand
    Reporter, and Notary Public, pursuant to the
20  provisions of the Rules of Civil Procedure of the
    State of Illinois and the Rules of the Supreme Court
21  thereof, pertaining to the taking of depositions
22  for the purpose of discovery, at the Law Offices of
23  Loevy & Loevy, 311 North Aberdeen Street, Chicago,
24  Illinois, at 2:00 p.m. on Tuesday, March 21, 2017.
```

**Page 2**

```
1   APPEARANCES:
2        LOEVY & LOEVY
3        BY: MR. VINCENZO FIELD
4            311 North Aberdeen Street
5            Chicago, Illinois 60607
6            (312)243-5900
7            E-mail: vince@loevy.com
8                 Appearing on behalf of the Plaintiff
9
10       LAW OFFICES OF JOHN C. COYNE
11       BY: MR. JOHN C. COYNE
12           53 West Jackson Boulevard
13           Chicago, Illinois 60604
14           (312)583-9500
15           E-mail: jcc@johncoynelaw.com
16                Appearing on behalf of the Defendants
17
18       COOK COUNTY STATE'S ATTORNEY
19       BY: MS. MEGAN MCGRATH
20           500 Richard J. Daley Center
21           Chicago, Illinois 60601
22           (312)603-5967
23           E-mail: meganmcgrath@cookcountyil.gov
24                Appearing on behalf of the Defendants
```

**Page 3**

```
1                    I N D E X
2   WITNESS                              PAGE
3   SGT. JAMES CIUKAJ, JR.
4   Examination by Mr. Field               4
    Examination by Mr. Coyne              97
5   Reexamination by Mr. Field           100
6                  E X H I B I T S
7             (None Offered)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1              SGT. JAMES CIUKAJ, JR.
2   having been first duly sworn by the court reporter,
3   was examined and testified on his oath as follows:
4                    EXAMINATION
5   BY MR. FIELD:
6       Q   Sergeant, can you please state and spell
7   your full name, for the record?
8       A   James A. Ciukaj, C-i-u-k-a-j, Jr.
9       Q   Have you been deposed before?
10      A   Yes.
11      Q   How many times have you been deposed
12  before?
13      A   At least twice.
14      Q   When was the last time previous to today?
15      A   A couple years.
16      Q   Was it in relation to your work at the
17  Cook County Jail?
18      A   I'm trying to remember. I work for
19  another police department so it was probably for
20  that. No, I've not been -- anything here at Cook
21  County Jail.
22      Q   I know you said you've been deposed a
23  couple times before. I'll just go over the basic
24  rules so we can get through this as quickly
```

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

**Page 5**

1   and efficiently as possible. If you need a break
2   at any time, just let me know and we can take a
3   break. I'll just ask that you would answer any
4   pending question before we take that break. I'm
5   going to assume that you understand my questions if
6   you answer them. So, please, if I ask a question
7   that doesn't make sense or you're not exactly sure
8   what it is that I'm asking you, please just let me
9   know and I'll rephrase it or try to explain it.
10  For the sake of the court reporter, if you can give
11  verbal oral answers, rather than sort of nodding
12  your head or saying uh-huh, or that kind of thing,
13  again just so the court reporter get down all of
14  your testimony. And I'll just ask that you let me
15  finish asking a question before you start answering
16  it and I will do the same thing, I won't ask a
17  question until you're finished answering. Again,
18  just so the court reporter can get everything that
19  we say down here today. Does all that make sense
20  to you?
21   **A   Yes.**
22   Q   You're currently employed at Cook County
23  Jail, is that correct?
24   **A   That's correct.**

**Page 6**

1   Q   What is your position?
2   **A   Correctional sergeant.**
3   Q   How long have you been in that position?
4   **A   Since August of 2011.**
5   Q   Previous to that were you employed at
6   Cook County Jail?
7   **A   Yes, I was.**
8   Q   What was your position?
9   **A   Correctional officer.**
10  Q   How long were a correctional officer at
11  Cook County Jail before you became a sergeant?
12   **A   Thirteen years. From -- I believe it's**
13  **13 years. From 1998 until 2011.**
14  Q   Was that full time?
15   **A   Yes.**
16  Q   Same thing in the period of time that you
17  served as a sergeant, was that full time?
18   **A   Yes.**
19  Q   A minute ago you talked about doing a
20  deposition in another case, maybe a couple of years
21  ago?
22   **A   Over five years ago. Correct.**
23  Q   Over five years ago?
24   **A   Yes.**

**Page 7**

1   Q   As you sit here today, you believe that
2   that was related to your work at a different police
3   department and not with Cook County?
4   **A   That's correct.**
5   Q   It would have been before the time that
6   you became a corrections officer at Cook County
7   Jail?
8   **A   Not that long ago.**
9   Q   Was there any period of time when you
10  worked full time as a corrections officer at Cook
11  County Jail that you also worked for a different
12  jail or police department?
13   **A   Another police department. Yes, sir.**
14  Q   When was that?
15   **A   From 1993 to 2011.**
16  Q   What was your position?
17   **A   Part-time sergeant.**
18  Q   Where was that?
19   **A   Village of Crestwood.**
20  Q   As a -- Village of Crestwood police
21  department?
22   **A   Yes.**
23  Q   What were your hours as a part-time
24  sergeant?

**Page 8**

1   **A   They varied. So, two to three days a**
2   **week, eight hours, days.**
3   Q   What are your hours or what were your
4   hours as a corrections officer at Cook County Jail?
5   **A   Again varies, depending on with bids and**
6   **stuff. It's eight-hour shifts, five days a week.**
7   Q   What shift were you on during the period
8   of time that you served as a corrections officer at
9   Cook County Jail?
10   **A   I've been on all three shifts. I've been**
11  **on days, afternoons, and midnights, so it varies.**
12  Q   During the period of time that you worked
13  both as corrections officer and as a part-time
14  sergeant for the Village of Crestwood, were there
15  any days where you did both of those jobs in the
16  same day?
17   **A   Yes.**
18  Q   So those would have been days that you
19  worked something approximating 16 hours?
20   **A   Yes.**
21  Q   How often would you say that occurred?
22   **A   One to two days a week.**
23  Q   Before you were a corrections officer at
24  Cook County Jail, have you served in any other

Transcript of SGT. James Ciukaj, Jr.

3 (9 to 12)

Conducted on March 21, 2017

---

9

1 capacity at the jail?
2   A   No.
3   Q   I'm going to ask you some questions about
4 where a sergeant falls within the chain of command.
5 Who is your immediate supervisor?
6   A   It would be the lieutenant.
7   Q   Who reports directly to you as sergeant?
8   A   The officers that I would be in charge of.
9   Q   So it would be COs or corrections
10 officers, correct?
11   A   Yes.
12   Q   Any other position that would report
13 directly to the sergeant?
14   A   No.
15   Q   Does the lieutenant that you report to
16 change depending on your assignment or are you
17 always reporting to the same person?
18   A   Depends on the assignment.
19   Q   Let's go quickly through your educational
20 background. We can do this however you want. You
21 can just sort of list high school and everything
22 beyond or I can go one by one. If you just want to
23 describe it, that's fine too?
24   A   How do you mean? You want me to --

---

10

1   Q   Where did you go to high school? Let's
2 start with that.
3   A   I went to St. Rita High School.
4   Q   You graduated from St. Rita?
5   A   Yes.
6   Q   What year was that?
7   A   1989.
8   Q   And after high school do you have any --
9   A   I have some college.
10   Q   Where did go to college?
11   A   University of Illinois Circle Campus and
12 then, from there, just whatever the academy gave me.
13   Q   How much time did you spend at the
14 University of Illinois?
15   A   One semester.
16   Q   What were you studying?
17   A   Just general.
18   Q   What year was that?
19   A   In '89.
20   Q   When you say whatever the academy gave
21 you, what do you mean by that?
22   A   You get college credits for going to the
23 academy so --
24   Q   How many college credits have you

---

11

1 obtained in that way?
2   A   I think I'm up to 46 college credit hours.
3   Q   If you obtain a certain number of
4 credits, are you able to obtain a college degree?
5   A   Yes.
6   Q   How many credits is that, do you know?
7   A   Sixty.
8   Q   As a sergeant is there an ongoing
9 training requirement?
10   A   We have mandatory training, yearly
11 training.
12   Q   What does that consist of?
13   A   It's a one week training that consists
14 of mandated training that they impose on us, CPR,
15 firearms, qualification, use of force, sexual
16 harassment.
17   Q   So the use of force is part of this
18 mandatory yearly training?
19   A   Yes.
20   Q   What does the use of force training
21 consist of?
22   A   Reporting procedures, identifying what
23 type of subjects that you're encountering, as well
24 as officer response to those subjects.

---

12

1   Q   When you say identifying what type of
2 subjects you're encountering, what do you mean by
3 that?
4   A   Whether they're cooperative, resistive, or
5 assail. Three subjects identified through our use
6 of force policy.
7   Q   Can you describe for me what each of
8 those categories refers to? So we can start with
9 cooperative. What is a cooperative --
10   A   Cooperative is either by presence or a
11 verbal command, the person does as expected or told
12 to do. So, they -- if they're doing something, they
13 see the officer in uniform, they stop doing what
14 they're doing. You ask them to turn around and put
15 their hands behind their back, they comply without
16 any type of problems.
17   Q   How about the second category, did you
18 say it was resistive?
19   A   Resister.
20   Q   Resister, okay. Go ahead.
21   A   So with the resister you have the one that
22 doesn't move to verbal commands, to whereas they
23 basically become stiff, deadweight. If you attempt
24 to escort them they just don't go with you. They

---

Transcript of SGT. James Ciukaj, Jr.                4 (13 to 16)
Conducted on March 21, 2017

13

1 don't pull away. It's almost like your protester.
2 The second part of the resister is your moving
3 resister. When you attempt to obtain control of the
4 subject they move away. It could be a simple move
5 away to full flight. So those are your two
6 resisters.
7    Q    What about the next category?
8    A    Okay. Assailant is broken down into three
9 categories. A low-level assailant which would be
10 somebody who possibly can cause you harm, fighting
11 stance, boxer stance, threatening demeanor,
12 thousand-yard stare. Midlevel assailant is they're
13 actually going to attack you or are attacking you.
14 And, then, the third level would be the deadly force
15 assailant which is usually armed with a weapon.
16    Q    For the cooperating individual are
17 there -- is there any subcategories within that?
18    A    No.
19    Q    It's just the resister and the assailant
20 that have subcategories?
21    A    That's correct.
22    Q    In the subcategories that you discussed
23 for the assailant, you mentioned about the types of
24 harm that they may cause, is that correct? Each

14

1 one is sort of characterized by the level of harm
2 that person may cause to the officer?
3    A    Well, it can be -- on any type of
4 assailant so -- but a low-level assailant is a
5 person who's taking a fighting stance. So I never
6 said there was any harm with that one, but there's
7 a potential of harm.
8    Q    I'm sorry if I've phrased it incorrectly.
9 That's what I meant, there was a potential for
10 harm?
11    A    Right.
12    Q    What about in the resister category, is
13 there -- is it characterized as well by a potential
14 for harm?
15    A    Yes.
16    Q    What are -- how are those categories
17 described in terms of the potential for harm?
18    A    Any time you have to put your hands on an
19 individual, there's always a risk of something going
20 wrong, somebody getting hurt. So there's always
21 going to be that likelihood of an injury, either to
22 the subject and or to the officer.
23    Q    Now, for each of these different types of
24 individuals, are you trained about what is the

15

1 appropriate response for that type of individual?
2    A    Yes.
3    Q    As part of the use of force annual
4 training?
5    A    Yes.
6    Q    What's the appropriate response for the
7 cooperating individual?
8    A    Would be verbal commands and officer
9 presence, so those are your responses. So
10 cooperative handcuffing, escorting the person to
11 where they need to go without resistance. So those
12 are pretty much for a cooperative person.
13    Q    Just so the record is clear. When you
14 say cooperative handcuffing, you mean if you tell
15 the person you're going to handcuff them and they
16 give up their hands and allow you to put the cuffs
17 on, is that a fair description?
18    A    Yes.
19    Q    What about for the resister? What's the
20 appropriate response for -- you can go through each
21 of those subcategories if you want?
22    A    It varies because we have a model that we
23 use. So it depends on where the person's at and
24 it's kind of a shaded area of what our response is.

16

1 So we can use escort holds, pressures sensitive
2 areas which is pressure points, joint manipulation,
3 OC spray, and taser.
4    Q    OC spray, is that pepper spray?
5    A    Yes, it is.
6    Q    Are there -- well, let me ask it this
7 way. Are there types of responses that are never
8 appropriate in the resister category?
9    A    Yeah. The -- for a resister you wouldn't
10 do a closed fist punch.
11    Q    Any other types of response?
12    A    Yes. There would be no blunt impact to
13 the head, no kicking. So anything direct mechanical
14 so -- you know, that you would you actually
15 physically punch somebody or physically kick them,
16 that would not be an appropriate response to a
17 resister.
18    Q    That's the type of response that would be
19 saved for an assailant of some type?
20    A    That's correct.
21    Q    I meant to ask you this at the beginning.
22 Did you review any documents in preparation for
23 your deposition today?
24    A    I briefly looked at them last week.

Transcript of SGT. James Ciukaj, Jr.                    5 (17 to 20)
Conducted on March 21, 2017

17

1    Q    What documents did you review in
2  preparation?
3    A    Just the use of force reports.
4    Q    When you say the use of force reports, do
5  you mean the use of force reports related to the
6  incident that's at issue in this case?
7    A    Yes.
8    Q    The incident involving Mr. Bolton and
9  Officer Ortiz?
10   A    Yes.
11   Q    Any other documents that you reviewed in
12 preparation for today?
13   A    No, not that I can recall.
14   Q    Did you review any of the Cook County
15 Sheriff Department's policies or procedures in
16 preparation for today?
17   A    No, I did not.
18   Q    Is there a requirement -- I know we were
19 talking about annual training. Is there a
20 requirement to review Cook County Sheriff
21 Department policies and procedures? Is there,
22 like, an annual requirement for reviewing policies
23 or anything like that?
24   A    No. Just when they're issued out

18

1  to -- you know, when new policies are issued it's
2  our responsibility to look at them on our own.
3    Q    How are staff members at the jail made
4  aware of a new policy being issued?
5    A    Under current status, it's under -- by
6  e-mail.
7    Q    As part of the annual training do you
8  review the department's use of force policies?
9    A    Yes.
10   Q    Are you required to sign off on the
11 review of those policies during the annual
12 training?
13   A    Yes. There is an acknowledgment form for
14 the use of force.
15   Q    You mentioned that you -- when we were
16 talking about the annual training, that there's
17 also training on filling out use of force reports,
18 is that correct?
19   A    Well, it's part of the actual use of force
20 training itself, so there's a brief block on it.
21   Q    What does that training consist of?
22   A    Honestly, I don't remember in
23 regards -- in regards to that question.
24   Q    Let me ask it this way. Does the Cook

19

1  County Sheriff's Department have a written policy
2  on filling out use of force reports?
3    A    Yes. It's all underneath the actual use
4  of force order, yes.
5    Q    That use of force order contains
6  information on how to properly fill out a use of
7  force report?
8    A    You have to identify the use of force
9  itself, what the person did in response to your
10 actions.
11   Q    It's probably -- I'm probably asking the
12 question vaguely. I'm asking a slightly different
13 question. I want to know if information on how to
14 properly fill out a use of force report is
15 contained in this policy that we're talking about,
16 the use of force policy. Does it contain
17 information that basically describes how you should
18 fill out that form?
19   A    I'd have to look at the policy because I'm
20 not 100-percent sure.
21   Q    If it is in that policy, that would be
22 something that you reviewed during this annual
23 training?
24   A    If it was in a policy, yes.

20

1    Q    What is the -- I just mean generally
2  speaking here, not in relation to any particular
3  incident. What is the purpose of the use of force
4  report?
5    A    It is to identify the person's
6  participation in a situation, where they have to
7  actually go hands down with an individual.
8    Q    When they have to go hands what? I'm
9  sorry, I didn't --
10   A    Hands on with an individual.
11   Q    So any time that occurs at the jail,
12 the corrections officer or whatever staff member is
13 required to fill out a use of force report, is that
14 correct?
15   A    For their participation, yes. For
16 their -- or what they've done in regards to it. So
17 if somebody didn't see something that happened or
18 wasn't involved in that incident, they would only
19 write the report and what their actions were.
20   Q    Okay. So I'll give an example and just
21 so -- I want to make sure that I understand. If a
22 corrections officer has to take an inmate to the
23 ground in order to handcuff that individual and
24 while he's on the ground handcuffing him another

Transcript of SGT. James Ciukaj, Jr.

6 (21 to 24)

Conducted on March 21, 2017

---

21

1 corrections officer walks around the corner and
2 sees them on the ground getting handcuffed. That
3 second corrections officer, his report would only
4 be about what he witnessed which is the
5 on-the-ground handcuffing, is that right?
6   **A   The second officer would only be writing a**
7 **witness statement because he was not involved in the**
8 **use of force so —**
9   Q   That's a different form, correct?
10   **A   That's correct.**
11   Q   What about if the second officer came
12 around the corner after they've already gone to the
13 ground and then assisted that first officer in
14 handcuffing the individual, what would the second
15 officer's report have to be -- have to report on?
16   **A   He would have to put in there that**
17 **he -- that he came across the situation and that he**
18 **assisted in whatever. If he grabbed a left arm,**
19 **helped apply the handicuffs, whatever that person**
20 **actually did.**
21   Q   If he witnessed the inmate sort of
22 flailing around on the ground while they were
23 trying to handcuff him, would that go into the use
24 of force report?

---

22

1   **A   It should, yes.**
2   Q   And if he witnessed the first corrections
3 officer punching the inmate as he was flailing
4 around on the ground, would that information have
5 to go into the use of force report?
6   **A   If he witnessed it, sure. I mean the**
7 **dynamics are so fast sometimes you don't see**
8 **everything.**
9   Q   Right. But if he witnessed it, it should
10 go into the report?
11   **A   If it was witnessed, it probably**
12 **should've.**
13   Q   Well, when you mean -- you said probably
14 should've. I just want to make sure that I'm clear
15 on the policy. If he witnesses it, does the policy
16 require him to report on that in his use of force
17 report?
18   **A   If he witnessed it absolutely. So --**
19   Q   Again just generally speaking about use
20 of force reports. Is there a policy or practice
21 for when those are supposed to be filled out? I
22 mean whatever the incident is, is there a policy
23 for, you know, how soon afterwards, when, where,
24 that kind of thing?

---

23

1   **A   Yes, there is.**
2   Q   What is the policy or practice on filling
3 out a use of force report out?
4   **A   Normally it's done before the end of your**
5 **shift, if at all practical.**
6   Q   What other kinds of -- well, strike that.
7 When you say by the end of your shift, if it's at
8 all practicable, you mean it would be done the same
9 day, correct?
10   **A   Yes.**
11   Q   That's the policy, as long as it's
12 possible to do it the same day, it should be done
13 the same day?
14   **A   Yes.**
15   Q   Where are the use of force reports, like
16 the blank forms, where are those kept?
17   **A   Usually in the office. They're already**
18 **stapled into a packet.**
19   Q   So a corrections officer would have to go
20 to the office to get one of these forms to fill
21 out, is that correct?
22   **A   Back then, yes. Now everything's done on**
23 **a computer. It's a whole new system.**
24   Q   When you say back then, are you referring

---

24

1 to the -- again the incident that's the focus of
2 this case with Mr. Bolton and Officer Ortiz?
3   **A   Yes.**
4   Q   At that time the system was to fill out a
5 paper form, is that correct?
6   **A   That's correct.**
7   Q   And your testimony is now it's
8 electronic?
9   **A   Correct.**
10   Q   Currently, with the electronic system, is
11 there still a requirement to fill out that form
12 before the end of your shift, if at all possible?
13   **A   Yes.**
14   Q   Are there computer terminals in the jail
15 to allow officers to do that?
16   **A   Yes.**
17   Q   Is there a policy or practice in terms of
18 when during your shift that should be filled out?
19 So, for example, is it the practice usually to wait
20 to the end of your shift to fill out those types of
21 reports? Should it be done as soon as possible
22 after the incident? Is there some of kind of
23 policy or practice in relation to that?
24   **A   Well, as soon as possible. But there's**

---

Transcript of SGT. James Ciukaj, Jr.

Conducted on March 21, 2017

**25**

1 always extenuating circumstances where it can't be
2 done immediately due to not being able to relieve
3 the officer from their assignment, or maybe the
4 officer was injured and they had to go seek medical
5 attention. So there's -- there's always some leeway
6 with it.
7    Q   Sure. I mean the officers are there
8 because they're on shift, correct?
9    A   Correct.
10    Q   So they obviously have other duties that
11 go along with being on shift?
12    A   Correct.
13    Q   So they can't necessarily step away from
14 those duties to fill out a form, is that fair?
15    A   That's correct.
16    Q   So if they can be relieved by another
17 officer and they have time to fill out the form
18 immediately thereafter, that's when they'll do it,
19 but if not, it may have to wait to the end of the
20 shift. Is that a fair characterization?
21    A   Yes.
22    Q   What about -- you mentioned the witness
23 report earlier. Is it the same sort of requirement
24 in terms of when that gets filled out? Is it to

**26**

1 try to fill it out on your shift, if at all
2 possible?
3    A   Yes.
4    Q   Going back to the use of force reports.
5 If a corrections officer has to fill out a use of
6 force report, who do they submit that report to?
7    A   Everything gets turned in to the sergeant
8 who then looks it over, signs off on it as long as
9 it's completed, and then turned over to the watch
10 commander for assessment.
11    Q   The sergeant would turn it over to the
12 watch commander?
13    A   Yes.
14    Q   Is there any kind of requirement -- well,
15 if three officers are involved in a use of force
16 incident and they are -- all three of them are
17 required to fill out a form, is there any
18 requirement that they fill out those forms
19 separately from each other, that they not discuss
20 the incident or anything like that?
21    A   No. I don't think so.
22    Q   Would you agree with me that it's
23 important to be accurate in the details that you
24 provide in the use of force report?

**27**

1    A   Yes.
2    Q   Would you agree that it's important to
3 provide as much detail as possible when filling out
4 a use of force report?
5    A   Yes.
6    Q   Does the -- the jail's policy in relation
7 to filling out use of force reports require that
8 they be filled out accurately and in as much detail
9 as possible?
10    A   Well, it's in all reports. Yes.
11    Q   Going back to the training. We talked
12 about the annual -- some of the annual training
13 requirements. Are there any other training
14 requirements beyond what we talked about? I know
15 we focused on the use of force, but I mean beyond
16 the annual refresher training, is there anything
17 else that you can think of?
18    A   I can't remember what -- because every
19 year it changes for the in-service. So I can't
20 honestly -- or be honest with you and tell you
21 what's -- what it is.
22    Q   But the annual training, that's for all
23 corrections officers?
24    A   Yes.

**28**

1    Q   And that would include sergeants?
2    A   Yes.
3    Q   Does it include lieutenants?
4    A   Yes.
5    Q   I'm not sure if you can put a number on
6 this, but how many times as a sergeant at Cook
7 County Jail have you had to fill out a use of force
8 report?
9    A   I can't answer that. I really don't
10 have -- really don't have the number. Weekly,
11 bi-weekly, I really don't know.
12    Q   When you say weekly, you mean maybe once
13 per week?
14    A   Yes.
15    Q   What about as a corrections officer, was
16 it more than when you were -- than as a sergeant or
17 less?
18    A   If I had to guess, probably less. Because
19 I'm a sergeant, I have a wide area so I respond to
20 more stuff. So -- I'm not really 100-percent sure.
21    Q   Sure. I see some questions about the
22 January 17th, 2014 incident involving Mr. Bolton.
23 Where within the jail did that incident occur?
24    A   Division eight, RTU.

Transcript of SGT. James Ciukaj, Jr.

Conducted on March 21, 2017

8 (29 to 32)

---

29

1    Q    What does the RTU stand for, just for the
2  record?
3    A    Residential Treatment Unit.
4    Q    What is the Residential Treatment Unit?
5    A    And I'm not sure if they were housing the
6  type of inmate there at the time, because I don't
7  know when it actually transitioned from general
8  population over.  It was females on the fifth floor
9  with mental health status.  Males on the fourth
10  floor with mental health status, which would be
11  their -- I'm trying to think of what it is now,
12  intermediate psych, psychiatric.  Third floor was
13  the medical wing which was dormitory setting with
14  inmates that had some sort of apparatus, whether it
15  be canes or wheelchairs or things like that, and
16  then the second floor was overflow I believe,
17  general population.  Really can't remember exactly
18  back then because it's changed so much throughout
19  the months what was actually housed -- who was
20  actually housed on the second floor.
21    Q    The incident in question occurred on the
22  second floor?
23    A    Yes.
24    Q    This description that you just gave about

30

1  the third floor with the -- or I guess you said was
2  it the fifth floor that you had female inmates?
3    A    Yes.
4    Q    Is that a description of the residential
5  treatment unit or is that a description of when it
6  was general population?
7    A    No, when it turned into the residential
8  treatment.  When the building first opened since
9  that's the newest building on the compound, it was
10  just general population at the time, but then they
11  started transitioning into what it was actually
12  designed for which is the residential treatment for
13  mental health.
14    Q    There would be records indicating what
15  types of inmates were housed on that second floor
16  during that period of time, is that correct?
17    A    There should be.
18    Q    When the incident actually occurred or I
19  guess maybe when you were made aware the incident
20  had occurred, where were you within the jail?
21    A    I was in RTU at the time.  I was assigned
22  to RTU.
23    Q    Do you recall where within the RTU you
24  were when you were made aware of this incident with

31

1  Mr. Bolton?
2    A    I know I was assigned two floors that day,
3  which was the second and I'm not sure if it was the
4  third or fourth floor because there was only two
5  sergeants on duty.  So if there's four floors, so we
6  split the duties.
7    Q    Is that typical to have two sergeants
8  assigned to that division?
9    A    Yes.
10    Q    Do you believe as you sit here today
11  where exactly you were on either of those two
12  floors when you were made aware of this incident
13  about Mr. Bolton?
14    A    No, I do not.
15    Q    How were you made aware that this
16  incident had occurred?
17    A    Somebody called on the radio that I needed
18  to report down to the second floor.
19    Q    When you say that you had to report down
20  to the second floor, does that mean that you were
21  on whatever the other floor was that you were
22  assigned to that day?
23    A    Yes.
24    Q    Do you recall what floor that was?

32

1    A    No.
2    Q    Do you recall who it was that called over
3  the radio that you needed to report to the second
4  floor?
5    A    No, I do not.
6    Q    As you sit here today, do you have any
7  recollection how long it took you to get to the
8  second floor once you heard the call over the
9  radio?
10    A    No, I do not.
11    Q    If you had to estimate how long it took
12  you to get there could you do that?
13    A    No.  Because it would just be pure
14  speculation at this point.
15    Q    Okay.  Just generally speaking, in terms
16  of your practice as a sergeant, if a call like that
17  goes over the radio, is it your practice to respond
18  right away?
19    A    If they call me to report in person, yes.
20    Q    Previous to you being called over the
21  radio to report to the second floor, did you
22  receive -- did anyone contact you directly about
23  Mr. Bolton not wanting to enter his cell because it
24  was under a quarantine?

Transcript of SGT. James Ciukaj, Jr.

9 (33 to 36)

Conducted on March 21, 2017

---

33

1　A　No.
2　Q　Did anyone contact you about just
3　Mr. Bolton not wanting to enter a floor for any
4　reason previous to you being called down to that
5　second floor?
6　A　No.
7　Q　So the first time -- fair to say that the
8　first time that you were made aware of this
9　incident in any capacity was this call that you
10　just described, where you were asked to come down
11　to report down to the second floor, is that
12　correct?
13　A　That's correct.
14　Q　Your understanding is that that call
15　occurred after the incident with Mr. Bolton, is
16　that correct?
17　A　Yes.
18　Q　Do you recall when you arrived on the
19　second floor where Mr. Bolton was at that time?
20　A　I know he was in the hallway.
21　Q　Beyond him being in the hallway, any
22　recollection as you sit here today of where
23　specifically he was?
24　A　In front of the tier.

---

34

1　Q　Is that a specific memory that you have
2　or are you speculating or --
3　A　Well, I know he was in the hallway so it
4　would be in front of the tier.
5　Q　Do you recall if he was handcuffed when
6　you got to the second floor?
7　A　I don't remember.
8　Q　Do you recall if -- or let me ask this
9　first. Did Mr. Bolton say anything to you when you
10　arrived on the second floor?
11　A　I don't remember what he said.
12　Q　Okay. Do you remember him saying
13　something?
14　A　I interviewed him so, yeah, he did say
15　something.
16　Q　When did you interview him?
17　A　Right after I got on the scene.
18　Q　So it would have been right there in the
19　hallway?
20　A　Yes.
21　Q　There was a point in time after this
22　incident with Officer Ortiz that Mr. Bolton was
23　interviewed on camera, is that correct?
24　A　That would be correct.

---

35

1　Q　The interview that you just mentioned in
2　the hallway, is that the video recorded interview
3　or is this a separate interview?
4　A　No, it would be the video recorded
5　interview.
6　Q　Your testimony is that you did that
7　interview as soon as you arrived on the scene?
8　A　Yes.
9　Q　Did you do that interview with Mr. Bolton
10　prior to speaking to any of the corrections
11　officers who were on the scene?
12　A　I don't remember if I talked to them first
13　or talked to him first. I don't remember.
14　Q　Generally speaking, would it have been
15　your practice to interview the detainee or inmate
16　first before talking to your corrections officers
17　or to talk to the corrections officers first before
18　doing this on-camera interview?
19　A　I like to talk to -- or I like to do the
20　interview with the detainee or inmate, whatever you
21　want to call him, first so this way they don't
22　change their story or -- I get it while it's fresh.
23　So I like to put it right on camera right away.
24　Q　But your testimony is that you don't

---

36

1　recall as you sit here today whether you spoke to
2　the officers first or you did that interview with
3　Mr. Bolton first, is that correct?
4　A　That's correct.
5　Q　Do you recall what questions you asked
6　Mr. Bolton during that interview?
7　A　No, I do not.
8　Q　Do you recall what Mr. Bolton said in
9　response to your questions?
10　A　No, I do not.
11　Q　What camera was used to record that
12　video?
13　A　It would have been the Taser Axon Flex
14　camera, which is a body camera.
15　Q　It would have been your body camera?
16　A　It would have been -- yes. The camera
17　that I signed out that day.
18　Q　That's the camera associated with the
19　Taser, is that correct.
20　A　Correct.
21　Q　There's no specific Taser that is
22　assigned to you as a sergeant, you just sign one
23　out at the beginning of every shift, is that
24　correct?

---

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

37

1    A    That's correct.
2    Q    And at the end of your shift you turn
3 that Taser back in?
4    A    Yes.
5    Q    And then the next shift you would sign
6 out a Taser again, maybe the same one, maybe a
7 different one, is that correct?
8    A    Yes.
9    Q    Did you speak to the officers that were
10 involved in this incident at the scene?
11    A    I'm sure I did.
12    Q    As you sit here today, do you recall
13 speaking to them?
14    A    It's been over two years. I don't
15 remember talking to them specifically.
16    Q    But it would have been your practice to
17 talk to the officers involved in a use of force
18 incident at the scene itself?
19    A    Maybe not necessarily at the scene, but I
20 would have talked to them.
21    Q    When you arrived at the scene do you
22 recall if Officer Ortiz was there?
23    A    I don't remember if he was or not.
24    Q    It's fair to say that you don't recall as

38

1 you sit here today any conversation that you may or
2 may not have had with Officer Ortiz at the scene
3 itself?
4    A    I don't remember.
5    Q    If Officer Ortiz had said something to
6 you at the scene, you don't have any memory of that
7 as you sit here today, is that correct?
8    A    That's correct.
9    Q    That would be the same for Officer Ramos?
10    A    Yes.
11    Q    And the same answer for Officer Ivory?
12    A    Yes.
13    Q    Was Officer Lettiere on the scene as
14 well? I'm sorry if I'm not saying that name
15 correctly, but --
16    A    I don't know if he was there or not.
17    Q    So fair to say if you don't recall if he
18 was there, you also don't recall whether you had a
19 conversation with Officer Lettiere at the scene?
20    A    I don't remember.
21    Q    Do you recall talking to those officers
22 at some point after the incident, whether it was on
23 the scene or elsewhere?
24    A    I know I would have talked to them

39

1 sometime.
2    Q    As you sit here today, do you have any
3 recollection of talking to any of those officers
4 specifically about this incident, whether it was
5 on the scene or afterwards?
6    A    No.
7    Q    But it would have been your practice to
8 talk to officers involved in a use of force
9 incident, is that correct?
10    A    That's correct.
11    Q    So fair to say that you likely would have
12 talked to them, per your practice, you just don't
13 recall as you sit here today?
14    A    That's correct.
15    Q    The use of force reports that were
16 created as a result of this incident would have
17 been turned in to you as the sergeant, is that
18 correct?
19    A    Yes.
20    Q    Do you recall as you sit here today any
21 conversation that you had with Officer Ortiz at any
22 time in relation to the incident involving
23 Mr. Bolton?
24    A    No, I do not.

40

1    Q    What about as you sit here today, do you
2 recall any conversation you had at any time with
3 Officer Ramos in relation to the incident with
4 Mr. Bolton?
5    A    No, I do not.
6    Q    The same question for Officer Ivory?
7    A    No, I do not.
8    Q    The same question for Officer Lettiere?
9    A    No, I do not.
10    Q    What about with any of your supervisors,
11 do you recall whether or not you had any
12 conversations with them in relation to this
13 incident?
14    A    I know I would have spoke to the watch
15 commander in regards to it. I don't know what
16 specifically it would have been, but --
17    Q    But your practice was to speak to the
18 watch commander?
19    A    Correct.
20    Q    But as you sit here today, you don't
21 recall the conversation that you had with the watch
22 commander?
23    A    That's correct.
24    Q    But you think you can accurately

Transcript of SGT. James Ciukaj, Jr.

Conducted on March 21, 2017

11 (41 to 44)

41

1  represent that you spoke to him at some point about
2  the incident because that was your practice?
3      A   Yes.
4      Q   In terms of when you arrived on the
5  scene, we talked about that you would've
6  interviewed or that you did the on-camera interview
7  with Mr Bolton. As you sit here today, do you
8  recall any other conversations or actions that you
9  took on the scene in relation to this incident?
10     A   I would've sent him for medical attention.
11     Q   As sergeant, that would have been your
12 decision to do that?
13     A   That's a mandatory requirement any time
14 somebody's involved in an incident, is to get seen
15 by medical staff.
16     Q   Do you recall any other actions or
17 conversations that you took as you sit here today
18 in relation to the incident while you were on the
19 scene?
20     A   No.
21     Q   I'm going to ask you to look at group
22 Exhibit 1, it's starting on page 20 and going
23 through to page 28. If you could just take a
24 minute to review --

42

1      A   Are these numbered?
2      Q   Yeah, right done at the bottom here. I'm
3  sorry, I should I have said 0020. Just take a
4  minute to look at those or as much time as you need
5  to look at 20 through 28 and I'll have some
6  questions for you?
7      A   Is it okay to take the binder out?
8      Q   Yes, absolutely.
9      A   Okay. I've looked them over.
10     Q   Fair to say that these are the use of
11 force reports that were filled out in relation to
12 the January 17, 2014 incident with Mr. Bolton?
13     A   Yes.
14     Q   Your signature appears on each of these,
15 is that correct?
16     A   Yes.
17     Q   As the sergeant -- when you sign off on
18 this as a sergeant, you're signing off that you've
19 reviewed the document, is that correct?
20     A   Yes.
21     Q   Can you describe for me what the process
22 is in terms of you reviewing these documents before
23 you sign off on them?
24     A   I checked for completeness by looking at

43

1  it. I'm going to reference the front page, I'm
2  going to look at the dates that the CR number's on
3  there, which is the number that we get from the
4  sheriff's police in regards to the use of force.
5      Q   I'm sorry to interrupt you. Just to make
6  sure we're on the same page. What page are you
7  looking at?
8      A   I'm sorry. I'm looking at the front page
9  where it says response to resistance use of force
10 form.
11     Q   Is that page 20?
12     A   This is going to be page 26 that I just
13 pulled up.
14     Q   The same thing?
15     A   Yes.
16     Q   I just want to make sure we're on the
17 same page. Go ahead. We're on page 26?
18     A   Right. So I'm going to make sure that all
19 the officer's information is filled out properly,
20 that the subject's information is filled out
21 properly. And then I'm going to look at -- I'm
22 going to stop at that point and I'm going to look at
23 the back page which in this case would be page 27.
24 I'm going to read the narrative that the officer

44

1  wrote and then I'm going to come back to the front
2  page, which would be again back to 26 because it's
3  a bunch of double checking and I'm going to look and
4  see if what they wrote is described in the boxes
5  that they checked. So they put down that the
6  subject was a moving resister, that he pulled away,
7  moved to avoid physical control, create space
8  between officers reaching him and that it was an
9  imminent threat of battery. So, in regards to that,
10 I look at what the risk factors were. They marked
11 off in this one in particular gender, age, physical
12 attributes of the subject and apparent physical
13 ability of the subject. Then I looked at what their
14 responses were. Now, each officer that's involved
15 has their own form so it's -- they're only answering
16 what their responses are. So in this case they put
17 diffuse pressure strike or stun and then take down
18 emergency handcuffing, okay. So if everything
19 matched up, make sure the officer signed off on it
20 and then I would sign off on it and submit it to the
21 watch commander.
22     Q   So this page 26 and 27 that we're looking
23 at, this is the use of force or response to
24 resistance use of force form that was filled out by

Transcript of SGT. James Ciukaj, Jr.

12 (45 to 48)

Conducted on March 21, 2017

---

**45**

1 Officer Ivory, is that correct?

2    **A**   **That's correct.**

3    Q   The portion at the bottom of page 26 that

4 says officer's response, your testimony is that the

5 boxes that are checked off there relate only to

6 that particular officer who's filling out the

7 report, that officer's response, correct?

8    **A**   **It's supposed to be. Yes.**

9    Q   Not the response of any other officer

10 involved in that same incident, is that correct?

11    **A**   **That's correct.**

12    Q   So just to stick with the example of

13 Officer Ivory's response to resistance use of force

14 form. The diffuse pressure strike stun that he

15 checked off, as well as the takedown emergency

16 handcuffing that he checked off, those would refer

17 to the actions that Officer Ivory took in relation

18 to Mr. Bolton, is that correct?

19    **A**   **It's supposed to. Yes.**

20    Q   Your testimony is that you would compare

21 those check boxes to the description that is found

22 on page 27 under the narrative to make sure that

23 those things match up, is that correct?

24    **A**   **That's correct.**

---

**46**

1    Q   You would have done this same thing for

2 each of the use of force reports that are related

3 to this incident, is that correct?

4    **A**   **Yes.**

5    Q   Can you look at page 23 and 24? Is that

6 the response to resistance use of force form that

7 was completed by Officer Miguel Ortiz?

8    **A**   **Yes.**

9    Q   You would have reviewed this use of force

10 form in the same way that you reviewed Officer

11 Ivory's, that we just went through, is that

12 correct?

13    **A**   **Yes.**

14    Q   Looking at page 23, Officer Ortiz checked

15 in terms of the subject's actions, checked off the

16 same boxes that were checked off by Officer Ivory,

17 is that correct, meaning pull away, subject moves

18 to avoid control by officer, and then creates space

19 between the officer's reach and self, is that

20 correct?

21    **A**   **Yes.**

22    Q   And Officer Ortiz also checked off, just

23 as Officer Ivory did, immanent threat of battery,

24 is that correct?

---

**47**

1    **A**   **Yes.**

2    Q   In terms of Officer Ortiz's response, he

3 also checked off diffuse pressure strikes done,

4 takedown, emergency handcuffing, is that correct?

5    **A**   **Yes.**

6    Q   Can you look at page 24. Do you see in

7 the narrative on page 24 where Officer Ortiz wrote

8 responding -- does RO stand for responding officer,

9 by the way?

10    **A**   **Reporting officer.**

11    Q   Reporting officer struck inmate with a

12 closed fist to the head and face several times. Do

13 you see that on the second to last line?

14    **A**   **Yes.**

15    Q   Does striking an inmate with a closed

16 fist fall into the categories of response that were

17 checked of by Officer Ortiz, meaning a diffuse

18 pressure strike or stun or a takedown emergency

19 handcuffing?

20    **A**   **It would fall underneath the low-level**

21 **assailant for an immediate threat of battery that he**

22 **checked off. But yes, you're correct, he did not**

23 **check off the closed hand strike or punch on the**

24 **assailant low level box.**

---

**48**

1    Q   Per the description of or per the

2 description provided here by Officer Ortiz, fair to

3 say he should have checked off that box, closed

4 hand strike punch, is that correct?

5    **A**   **That's correct.**

6    Q   Also fair to say that you signed off on

7 this as being complete and accurate, you were in

8 error when you did that, is that correct?

9    **A**   **Yes, that would be correct.**

10    Q   Because Officer Ortiz again should have

11 checked off closed hand strike or punch as the

12 response that he had to this incident, is that

13 correct?

14    **A**   **Yes.**

15    Q   If we go back to page 20 and 21. This is

16 the use or the response to resistance use of force

17 form that was created by Officer Ramos, is that

18 correct?

19    **A**   **Yes.**

20    Q   You would have reviewed this form in the

21 same way that you reviewed Officer Ivory's that we

22 went through previously, is that correct?

23    **A**   **Yes.**

24    Q   I mean you would have matched up the

---

Transcript of SGT. James Ciukaj, Jr.

13 (49 to 52)

Conducted on March 21, 2017

---

**49**

1 boxes that they checked off the first page of the
2 report with their narrative on the second page, is
3 that correct?
4     A    Correct.
5     Q    Looking at page 21. Does Officer Ramos
6 include any description in his narrative of the
7 punches that were delivered to Mr. Bolton by
8 Officer Ortiz?
9     A    No.
10     Q    Fair to say that per the jail's policy,
11 he should have included a description of that,
12 Officer Ortiz's punches onto Mr. Bolton?
13     A    **It would be speculation. I don't know if**
14 **he saw it. So if he saw it, yes, but right now it's**
15 **speculation. I don't know what Officer Ramos had**
16 **saw.**
17     Q    But your testimony as you sit here today
18 is that if he witnessed Officer Ortiz strike
19 Mr. Bolton, that he should have included that in
20 his narrative on this response to resistance use of
21 force form, is that correct, if he witnessed it?
22     A    **Correct.**
23     Q    And if he witnessed it and he did not
24 include it in his narrative, that would have been

**50**

1 a violation of the jail's policy, is that correct?
2     A    **Correct.**
3     Q    If we go to page 26 and 27, the response
4 to resistance use of force form for Officer Ivory
5 that we went through a couple of minutes ago,
6 looking at page 27. Does Officer Ivory include in
7 his narrative any description of the strikes that
8 were delivered to Mr. Bolton by Officer Ortiz?
9     A    **No.**
10     Q    And just to be clear. Again because
11 Officer Ivory did not strike Mr. Bolton with a
12 closed fist, he had no -- he was under no
13 requirement for checking off closed hand strike
14 punch on his own use of force report form, is that
15 correct?
16     A    **Maybe he didn't see it. I don't know,**
17 **it's speculation at this point.**
18     Q    So maybe I was assuming -- I was assuming
19 too much. Going back to Officer Ramos. If he had
20 scene Officer Ortiz punching Mr. Bolton, was he
21 required to check off on his use of force report
22 closed hand strike punch?
23     A    **No. Because he did not do that closed**
24 **hand strike punch.**

**51**

1     Q    That's why I was asking about
2 officer -- I apologize. I probably didn't ask the
3 question correctly.
4     A    **Well, no, actually you asked me if he put**
5 **it in here. And if he didn't see it then, no, it**
6 **would not be in here. So, you know, I can't**
7 **speculate what they saw. I can only go by what they**
8 **memorialized and wrote on paper right now.**
9     Q    Sure. But just to be clear, again I
10 think it was because I didn't ask the question
11 correctly. But if Officer Ivory never struck
12 Mr. Bolton with a closed fist, he was under no
13 obligation to indicate on this form, to check out
14 closed punch, hand strike punch, is that correct?
15     A    **That's correct.**
16     Q    Because that was not his response?
17     A    **That's correct.**
18     Q    Okay. I understand your testimony is
19 that if he did not witness Officer Ortiz punching
20 Mr. Bolton, he would not have to include that in
21 his narrative, correct?
22     A    **That's correct.**
23     Q    Because the narrative is only for what
24 that particular officer witnessed?

**52**

1     A    **That's correct.**
2     Q    But similar -- the same question as I
3 asked you about Officer Ramos. If Officer Ivory
4 witnessed Officer Ortiz punching Mr. Bolton and he
5 did not include that information in his narrative,
6 that would be a violation of the jail's policy,
7 correct, again, if he witnessed it?
8     A    **If he witnessed it, sure.**
9     Q    When you review these forms -- well, let
10 me ask this first just to be clear. You were not
11 on the scene when this incident with Mr. Bolton
12 occurred, correct?
13     A    **That's correct.**
14     Q    So when you review these forms, you don't
15 know one way or another what each of the particular
16 officers witnessed, is that correct?
17     A    **That's correct.**
18     Q    When you review these forms do you speak
19 to the officers at all while you're reviewing them?
20     A    **Not while I'm reviewing them.**
21     Q    Do you recall when you reviewed Officer
22 Ortiz's form in this case? I know again it's going
23 back a couple of years. As you sit here today, do
24 you recall reviewing that form?

Transcript of SGT. James Ciukaj, Jr.

14 (53 to 56)

Conducted on March 21, 2017

---

53

1    A   It would have been the time I signed off
2  on it. So, for Ortiz, it would have been at 11:49
3  at night.
4    Q   Sure, but I guess I'm asking a different
5  question. Do you recall as you sit here today, do
6  you have an actual memory of reviewing that form?
7    A   No.
8    Q   If we go back to -- I'm not sure. What
9  page are you on there?
10   A   Ortiz's here.
11   Q   Let's look at Officer Ivory's, page 26
12 and 27. You mentioned earlier when we first went
13 through this form that you talked about the risk
14 factors that were checked off. Do you remember
15 giving that testimony?
16   A   Yes.
17   Q   The risk factors were gender, age,
18 physical attributes of subject, and then apparent
19 physical ability of subject, correct?
20   A   Correct.
21   Q   Do you take any steps when you review
22 these forms to determine whether or not those risk
23 factors are accurate?
24   A   No, I do not.

---

54

1    Q   You're depending on your officers being
2  truthful in their filling out of these forms,
3  correct?
4    A   That's correct.
5    Q   So if your officers tell you that they
6  thought that the person was a physical threat,
7  you're not doing anything to double check on that,
8  you just believe they'd be telling the truth on
9  that, correct?
10   A   Yes.
11   Q   And as a sergeant, if you're not on the
12 scene, you have to depend on your officers to
13 provide you with accurate information, correct?
14   A   Yes.
15   Q   Do you know what factors are taken into
16 consideration when determining whether or not to
17 check off we'll stick with the apparent physical
18 ability of subject. Are there certain factors that
19 are taken into consideration when determining
20 whether or not that's one of the risk factors?
21   A   It's up to the individual person.
22   Q   As a sergeant, how many use of force
23 reports have you reviewed?
24   A   I can't give you a number.

---

55

1    Q   Is it fair to say a lot of them?
2    A   Yes.
3    Q   As you sit here today, can you recall any
4  use of force report that you reviewed that did not
5  indicate as a use -- as a risk factor the apparent
6  physical ability of the subject?
7    A   I couldn't tell you. I don't know.
8    Q   What about as you sit here today, can you
9  recall any use of force report that you reviewed
10 that did not indicate the gender, age, or physical
11 attributes of the subject as a risk factor on a use
12 of force report?
13   A   I can't tell you that. I don't know.
14   Q   The incident between Officer Ortiz and
15 Mr. Bolton was captured on video at the jail, is
16 that correct?
17   A   Yes.
18   Q   Did you ever review that video?
19   A   I would have reviewed it that night with
20 the watch commander because I don't have access for
21 a playback.
22   Q   When you reviewed that video with the
23 watch commander, would that have been before or
24 after you reviewed and signed off on these use of

---

56

1  force reports?
2    A   Before.
3    Q   You would have reviewed the video
4  beforehand?
5    A   Yes.
6    Q   Can you describe to me what that video
7  portrays in terms of this incident, as you sit here
8  today what your memory of that video is?
9    A   I cannot. I have not seen it since that
10 night.
11   Q   Let me ask you this. If the video showed
12 clearly that Officer Ivory had witnessed Officer
13 Ortiz striking Mr. Bolton, but his use of force
14 report did not include that description in the
15 narrative and you signed off on that, would that
16 have been a violation of the jail's policy.
17       MR. COYNE: Speculation.
18       MS. MCGRATH: Objection, vague. Calls for
19   speculation.
20       THE WITNESS: I'm not going to answer that
21   one because I don't know what Ivory or any of
22   the officers saw.
23 BY MR. FIELD:
24   Q   Sure. I'm asking you -- this a

---

Transcript of SGT. James Ciukaj, Jr.

Conducted on March 21, 2017

15 (57 to 60)

57

1 hypothetical so I'm asking you to assume that
2 Officer Ivory witnessed Officer Ortiz striking
3 Mr. Bolton. If that information was not included
4 in his use of force report and you signed off on
5 that, would that have been a violation of the
6 jail's policies?
7      MS. MCGRATH: The same objection.
8      THE WITNESS: Yeah, I'm not going to
9    answer anything, assumption or speculation, in
10   regards to that. I'm sorry. I don't know.
11   All I can go by is what's on the report. This
12   is over two years old.
13 BY MR. FIELD:
14   Q  Sure.
15   **A  So you're trying to pick my mind and it's**
16 **just not working.**
17   Q  I understand that and I'm not asking you
18 to respond based on your memory. I'm asking to you
19 to assume some facts to be true and based on those
20 facts and your long history as a corrections
21 officer and as a sergeant, whether or not my
22 conclusion from those facts is accurate. So, I'll
23 ask again. If Officer Ivory had witnessed Officer
24 Ortiz striking Mr. Bolton, but when he filled out

58

1 his use of force report he did not include a
2 description of Officer Ortiz striking Mr. Bolton
3 and you signed off on that report, would you
4 signing off on that report have been a violation of
5 the jail's policies --
6   **A  Still it's assumption. I'm not --**
7   Q  Again assuming all those things --
8   **A  I'm not going to answer assumptions**
9 **because it's not a factual. That's not what we're**
10 **here for.**
11   Q  I understand. The deposition is a little
12 bit different than just having to answer questions
13 based on facts. So it's -- if you have some other
14 reason for not --
15   **A  Well, no. You're asking me for an**
16 **assumption so I'm not going to assume. It's yes or**
17 **no, facts. I'm not going to answer assumptions. We**
18 **can play what ifs and assumptions all day long.**
19 **That's not what happened.**
20   Q  Well, you're saying -- I'm asking you
21 hypothetical. You're saying you don't know what
22 happened?
23   **A  I don't know what happened.**
24   Q  Okay. So I'm asking you to assume for

59

1 the sake of my question what I'm telling you is
2 accurate. Is there some reason why you can't
3 answer based on these hypothetical facts? I mean
4 you spent -- you've been a sergeant since 2011.
5 I'm assuming that you got the knowledge of the
6 policies to answer the question, correct?
7   **A  But we're -- this is not what we're here**
8 **for in regards to this stuff. So it's a**
9 **hypothetical --**
10   Q  Sure.
11   **A  So can we move on?**
12   Q  I need you to answer my question.
13 There's only a couple of reasons why you can't
14 answer a question. One of them is if the answer is
15 privileged and the other one is if it will
16 incriminate you. And since neither of those things
17 are true, I need you to provide an answered before
18 we can move on?
19   **A  Well, my counselor already objected to it.**
20     MS. MCGRATH: And the objection's been
21   stated on the record. I'm really not sure, I
22   mean this is -- I'm not sure. What is the
23   point of just let's play games and speculate
24   about stuff.

60

1     MR. FIELD: But that's fine. Are you
2   telling your client not to answer?
3     MS. MCGRATH: I'm not telling him not to
4   answer. But I'm just saying can we just
5   do -- this is kind of pointless. Can we just
6   move on?
7     MR. FIELD: Once I get an answer to the
8   question we can move on.
9     THE WITNESS: I've already given you my
10   answer, sir.
11 BY MR. FIELD:
12   Q  But you have not answered the question.
13 You just said you're not willing to answer, but
14 that's not how a deposition works.
15   **A  I've given you my answer.**
16   Q  Again there's only two reasons why you
17 can refuse to answer a question, okay, and if you
18 want me to create a hypothetical that goes away
19 from any specific officer and any specific incident
20 I can do that, the question is going to be the
21 same. I'm asking you a general question. I
22 understand that you do not have specific knowledge
23 related to this incident, so let me ask it in a
24 different way and maybe we can get an answer that

Transcript of SGT. James Ciukaj, Jr.    16 (61 to 64)
Conducted on March 21, 2017

---

61

1  way. If Officer B has witnessed Officer A striking
2  a detainee and when Officer B fills out his use of
3  force report he does not include in his narrative
4  that Officer A struck the detainee. If a sergeant
5  signs off on that report, knowing that the officer
6  witnessed this, would that signing off on the
7  report be a violation of the jail's policy?
8        MS. MCGRATH: Objection. Calls for
9     speculation.
10       THE WITNESS: If the sergeant had
11    knowledge of it, yes.
12 BY MR. FIELD:
13    Q    I think you gave an answer to this
14 already, but I just want to be clear. After the
15 night of the incident, at no point after that did
16 you review the video again, is that correct?
17    A    That's correct.
18    Q    You reviewed the video that evening with
19 the watch commander?
20    A    That's correct.
21    Q    Do you recall who the watch commander was
22 on that day?
23    A    That would have been Cmdr. Pan.
24    Q    Can you to look at page 143 of that same

62

1  packet?
2     A    Sure.
3     Q    Take as much time as you need to look it
4  over. I just have a couple questions.
5     A    Okay.
6     Q    Does this document that you just
7  reviewed -- well, first of all, this is a Cook
8  County Sheriff's Office, Office of Professional
9  Review case notes, correct?
10    A    Yes.
11    Q    That document indicates that it is. This
12 document relates to an interview of yourself done
13 by an OPR inspector or investigator, is that
14 correct?
15    A    Yes.
16    Q    On that first line it says R slash
17 inspect. Is that reporting inspector?
18    A    Yes.
19    Q    In that interview -- when it says DS and
20 then it has your last name, what does the DS stand
21 for?
22    A    Deputy sergeant.
23    Q    Deputy sergeant, okay. Does this -- your
24 review of this document, does it refresh your

63

1  recollection as you sit here today as to when you
2  reviewed the video related to the incident with
3  Mr. Bolton?
4     A    No, it does not.
5     Q    Your testimony is, as you sit here today,
6  is that you reviewed the video that -- the same
7  evening as the incident with the watch commander,
8  is that correct?
9     A    Yes.
10    Q    I think this is the second to last
11 sentence, it says deputy sergeant did have the
12 ability sometime thereafter to review the tapes, to
13 which he stated that he stands by his assessments
14 he made relevant to incident and then it's got the
15 incident number. The portion stands by his
16 assessment, as you sit here today do you have any
17 idea what that refers to?
18    A    No, I do not.
19    Q    Beyond signing off on the use of force
20 reports, were you required as a sergeant to do any
21 other assessments of the incident?
22    A    Other than the interview with Mr. Bolton,
23 no. Turn it over to the watch commander.
24    Q    So you reviewed the use of force reports,

64

1  correct?
2     A    Yes.
3     Q    You signed off on those at some point,
4  correct?
5     A    Correct.
6     Q    Your testimony is, as you sit here today,
7  is that you signed off on those after you reviewed
8  the video with the watch commander, correct?
9     A    That's correct.
10    Q    Did you do any -- in relation to
11 your -- to this incident, did you take any other
12 steps in terms of investigating it or anything else
13 beyond what we've just gone through?
14    A    I'm not authorized to do any
15 investigation, that's what OPR is supposed to do.
16 The only thing that did happen afterwards was a
17 request for training was put in for Officer Ortiz,
18 remedial training request, and all three officers
19 were given employee discipline that night.
20    Q    Who's decision is it to give the
21 employees discipline?
22    A    The commander told me to do it and I
23 wrote -- I did the employee discipline.
24    Q    The command came from the watch

Transcript of SGT. James Ciukaj, Jr.

17 (65 to 68)

Conducted on March 21, 2017

---

**65**

1  commander?

2  A    That's correct.

3  Q    That would have been watch Cmdr. Pan?

4  A    Yes.

5  Q    What about the direction that Officer

6  Ortiz get remedial training, who did that come

7  from?

8  A    That was from me.

9  Q    That was from you?

10  A    Yes.

11  Q    As the sergeant, you have the authority

12  to determine whether or not a corrections officer

13  under you requires remedial training?

14  A    Yes. It's a request form that's filled

15  out and it's sent in with the packet.

16  Q    Understood. And then the individual

17  responsible for reviewing the packet will make the

18  decision on whether or not Officer Ortiz gets

19  remedial training, is that correct?

20  A    I believe so, yes.

21  Q    But the decision on filling out the

22  form to request that kind of -- that training

23  came -- would come from the sergeant?

24  A    That's correct.

---

**66**

1  Q    Or the immediate -- whoever the immediate

2  supervisor --

3  A    The immediate supervisor, yes.

4  Q    And for this incident you were the

5  immediate supervisor?

6  A    That's correct.

7  Q    I'm sorry, I went through the list of

8  things that you did in relation to this incident.

9  One of the other things that you did was talk to

10  officers at some point, I believe that was your

11  testimony, is that correct? You can't recall the

12  details of those conversations, but you believe

13  that you would have talked to the officers?

14  A    Yes.

15  Q    And again I understand your answers are

16  based on what you remember as you sit here today,

17  more than two years later. So obviously if you

18  think of something else, just feel free to say so.

19  The video interview that you did of Mr. Bolton

20  after the incident of the Taser camera, that video

21  didn't record or something -- there's a document

22  that indicates that there was no video of the

23  actual interview. Do you know what I'm referring

24  to?

---

**67**

1  A    I wasn't made aware of that.

2  Q    So as you sit here today, you were under

3  the belief that there should be video of this

4  interview that you did with Mr. Bolton, is that

5  correct?

6  A    Yes.

7  Q    And no one at any point made you aware

8  that the video camera, for whatever reason, didn't

9  operate properly and no video was recorded, is that

10  correct?

11  A    That's correct.

12  Q    Did you ever review the video of your

13  interview with Mr. Bolton?

14  A    No. I do not have access to that.

15  Q    Who's responsible for reviewing that

16  video?

17  A    Well, it gets submitted to the video

18  monitoring unit and I don't know who monitors it

19  from there.

20  Q    Can you look at page -- on that same

21  packet, page 34?

22  A    Thirty-four.

23  Q    This is an incident report, correct?

24  A    Yes.

---

**68**

1  Q    This is related to the same incident with

2  Mr. Bolton and Officer Ortiz, correct?

3  A    Correct.

4  Q    This is a document that gets filled out

5  electronically?

6  A    Yes.

7  Q    Where it says reporting officer and it

8  has R Ramos, do you see that up at the top?

9  A    Yes.

10  Q    Is that -- does that indicate the

11  individual who would have inputted this

12  information?

13  A    The initial report, yes.

14  Q    So this was not a report that you

15  created, is that correct?

16  A    That's correct.

17  Q    This would have been created by Officer

18  Ramos?

19  A    Yes.

20  Q    Is this something that you -- similar to

21  the use of force reports that you as a sergeant

22  have to review?

23  A    Yes. I would have reviewed it and then

24  submit it to the watch commander.

---

Transcript of SGT. James Ciukaj, Jr.

18 (69 to 72)

Conducted on March 21, 2017

---

69

1    Q   Just generally speaking, when is this
2 type of report filled out? I guess what I'm mostly
3 wondering is, you know, the difference between an
4 incident report and the sort of use of force
5 reports that we've already gone through. So we
6 know that Officer Ramos filled out a use of force
7 report. I'm interested in -- is just an incident
8 report is created for any incident in the jail and
9 then if it's a use of force, there's also a use of
10 force report? I'm just trying to figure out --
11    **A   Yes. All incident reports are generated**
12 **on -- well, now it's a newer system. This is an old**
13 **system. But any type of incident that occurs that's**
14 **a reportable incident is done on an incident report**
15 **and then a use of force would supplement the actual**
16 **incident report.**
17    Q   So it's possible, in other words, to have
18 an incident -- a reportable incident that's not a
19 use of force incident, is that correct?
20    **A   Yes.**
21    Q   So in that case the incident would get
22 filled out, but there would be no use of force
23 report forms, is that correct?
24    **A   Yes.**

70

1    Q   Thank you. When you reviewed the
2 incident that evening with Cmdr. Pan, do you recall
3 as you sit here today whether you could observe
4 Officer Ortiz in that video striking Mr. Bolton?
5    **A   I don't remember. I would have to see the**
6 **video again.**
7    Q   As you sit here today, you don't have any
8 recollection of what's on that video, is that
9 correct?
10    **A   That's correct.**
11    Q   Can a cell at the jail be placed under
12 quarantine?
13    **A   I don't -- rephrase that for me. Because**
14 **I'm not sure what you're trying to -- what you're**
15 **trying to get at with that one.**
16    Q   Well, let me ask it this way. Has there
17 ever been a time at the jail where a cell or
18 more than one cell has been under quarantine,
19 meaning that for whatever reason inmates could not
20 be -- inmates or staff members could not go in
21 there because -- whether it was related to some
22 sort of communicable disease or illness or
23 something else?
24    **A   I don't know.**

71

1    Q   At any time during the period of time
2 since I think you said 2011 that you were a
3 sergeant, do you recall any incident in which a
4 cell was put under quarantine?
5    **A   Not to my knowledge.**
6    Q   Do you as you sit here today have any
7 knowledge of any policy at the jail in relation to
8 cells being placed under quarantine?
9    **A   Not to -- no, not to my knowledge.**
10    Q   At any period of time that you were a
11 sergeant at the jail, do you recall any incident in
12 which inmates could not be placed in a certain cell
13 because other inmates in that cell were sick with
14 whatever illness?
15    **A   No, not to my knowledge.**
16    Q   Are you aware of any policies in relation
17 to not placing inmates in a cell where other
18 inmates are sick?
19    **A   That's at Cermak so it wouldn't pertain to**
20 **us.**
21    Q   Can you go back to page 34, that incident
22 report?
23    **A   Sure.**
24    Q   Is that the page that you're currently

72

1 on?
2    **A   Yes.**
3    Q   Under the assessment use of force
4 incident, about one-quarter of the way from the
5 top, the sentence starts said detainee overheard a
6 conversation between Officer Ramos and Ivory. The
7 cell which assigned to detainee was previous used
8 for quarantine and in brackets it says isolation,
9 but was disinfected and ready for general
10 population. Do you see that?
11    **A   Yes.**
12    Q   As you sit here today, do you have
13 any -- are you able to tell me what that's
14 referring to?
15    **A   No.**
16    Q   You indicated earlier that you would have
17 reviewed this document along with the use of force
18 reports, correct?
19    **A   That's not fully true on this one. The**
20 **assessment is not made by myself. The assessment is**
21 **made by the watch commander.**
22    Q   So this portion here under assessment
23 would have been filled out by watch Cmdr. Pan?
24    **A   That's correct.**

Transcript of SGT. James Ciukaj, Jr.

19 (73 to 76)

Conducted on March 21, 2017

---

73

1  Q   Which portion of this report would have
2  been filled out by Officer Ramos?
3  A   **The incident portion, the top portion.**
4  Q   When you reviewed the incident report, is
5  that the portion that you would have -- that would
6  have been available at that time for you to review?
7  A   **Yes. Just that top portion.**
8  Q   So this assessment was added to the
9  incident report after you -- after you reviewed it,
10 is that correct?
11 A   **That's correct.**
12 Q   Your testimony is that it was -- that
13 assessment was created by watch Cmdr. Pan, is that
14 correct?
15 A   **Yes.**
16 Q   Once Cmdr. Pan adds his assessment to
17 this report, there's no requirement for you as a
18 sergeant to review this?
19 A   **No. No, he outranks me. So chain of**
20 **command. He's higher on the food chain.**
21 Q   Just generally speaking, not specific to
22 this assessment, this -- where it's referring to
23 cells being quarantined or in isolation, that's not
24 something that you are familiar with based on your

74

1  background as a corrections officer and a sergeant
2  at the Cook County Jail, not something that you
3  dealt with before, is that correct?
4  A   **No, that's correct. All isolation as far**
5  **as I know goes to Cermak.**
6  Q   Can you look at page 135, the same
7  packet. This is an Office of Professional Review
8  witness complainant statement, is that correct?
9  A   **Yes.**
10 Q   This is a statement that was given by
11 Officer Ramos, is that correct? The top paragraph
12 it indicates that they interviewed Officer Ramos?
13 A   **Yes.**
14 Q   That interview was conducted by
15 investigators Montinez and Diaz, correct?
16 A   **That's correct.**
17 Q   In the second paragraph of that -- of the
18 narrative on this page, I believe it's the fourth
19 sentence, CO Ramos stated tier 2A housed detainees
20 that were sick. CO Ramos stated he could not house
21 detainee in the cell because the cell was not
22 cleared. Do you see that?
23 A   **I'm missing it somewhere. I apologize on**
24 **that. Okay, all right, I have it. I'm sorry.**

75

1  Q   So do you see that where it says CO Ramos
2  stated tier 2A housed detainees that were sick and
3  then -- CO stands for corrections officer, correct?
4  A   **Yes.**
5  Q   CO Ramos stated he could not house the
6  detainee in the cell because the cell was not
7  cleaned. Do you see that?
8  A   **Yes.**
9  Q   As you sit here today, do you have any
10 recollection of Officer Ramos informing you of
11 this after the incident itself, informing you that
12 the cell had inmates that were sick and that he
13 could not put Mr. Bolton in that cell?
14 A   **No.**
15 Q   You have no recollection of that?
16 A   **No.**
17 Q   Your testimony earlier was that you have
18 no recollection of any conversation with Officer
19 Ramos, is that correct?
20 A   **That's correct.**
21 Q   Related to this incident obviously?
22 A   **Correct.**
23 Q   So it's possible that he could have
24 provided you that information, but as you sit here

76

1  today you don't have any recollection, one way or
2  the other?
3  A   **That's possible, sure.**
4  Q   Just generally speaking, is this
5  something that you've dealt as either a corrections
6  officer or a sergeant, where a cell housed
7  detainees that were sick and other inmates could
8  not be placed in that cell?
9  A   **No.**
10 Q   Your testimony as you sit here today is
11 that that's something that gets dealt with at
12 Cermak, is that correct?
13 A   **That's correct.**
14 Q   So as you sit here today, you have no
15 knowledge one way or another whether the cell that
16 Officer Ortiz wanted to place Mr. Bolton in was
17 under quarantine, is that correct?
18     MS. MCGRATH: Objection to form.
19     THE WITNESS: That's correct.
20 BY MR. FIELD:
21 Q   So it may have been under quarantine, it
22 may not, as you sit here today you don't know one
23 way or the other, is that correct?
24 A   **That's correct.**

Transcript of SGT. James Ciukaj, Jr.                    20 (77 to 80)
Conducted on March 21, 2017

77

1    Q    Do you have any knowledge as you sit here
2 today, again in your role as sergeant, as to
3 whether there are any documents at the jail that
4 would indicate whether cells were under quarantine
5 or not?
6    A    I don't have that knowledge.
7    Q    There are cells assignment documents
8 though, correct -- strike the question. I'll ask a
9 different question. I'm sorry, it was a bad
10 question. Are there documents that indicate which
11 cells have inmates in them and which do not?
12   A    On the tier sheets, yes.
13   Q    Do those tier sheets indicate which
14 inmates are housed in which cells?
15   A    Yes.
16   Q    So if there was no inmates in a
17 particular cell, the their sheet would indicate
18 that there was no inmate in that cell, is that
19 correct?
20   A    That's correct.
21   Q    How often are those tier sheets updated?
22   A    I don't understand your question on that.
23 It's constant -- they're constantly evolving. So
24 when people come in, people leave, they're added in.

78

1 It's all computerized.
2    Q    Even at that time was it computerized?
3    A    Yes.
4    Q    As soon as movement is occurring, those
5 changes are being made, it's always basically
6 evolving in the system?
7    A    That's correct.
8    Q    Accurate track of where everybody is?
9    A    Have to. That's what we're in the
10 business for, is keeping track of our bodies.
11   Q    Right. Can you look at page 89 of that
12 packet -- well, actually it starts on page 88. I'm
13 sorry. Actually I guess it starts on page 87 and
14 then it runs through page 94, starting with
15 synopsis. Do you see that on page 87?
16   A    Yes.
17   Q    There's some signatures on page 93.
18 This is a synopsis of the investigation of
19 Officer Ortiz, is that correct?
20   A    I'm sorry. Can you repeat that?
21   Q    Sure. One of the signatures on page 93
22 is from an investigator Richard Ellis. Do you see
23 that?
24   A    Yes.

79

1    Q    He was the investigator from the Office
2 of Professional Review that did that investigation
3 of Officer Ortiz, is that correct?
4    A    I don't know. This is the first time I've
5 seen this document.
6    Q    You've never seen this before?
7    A    No.
8    Q    Can you just take a minute to flip
9 through it? I'll just have a couple of questions
10 for you. I just want to make sure that we're on
11 the same page on this.
12   A    I believe I'm ready.
13   Q    Your testimony is that this is the first
14 time that you've seen this document, is that
15 correct?
16   A    That's correct.
17   Q    On page 93, you see where the document is
18 signed off on by investigator Richard Ellis. Do
19 you see that?
20   A    Yes.
21   Q    It indicates here that he's from the
22 Office of Professional Review?
23   A    That's correct.
24   Q    Can you look at page 91? It says sort of

80

1 the third bolded title here is interview of
2 sergeant -- it's indicating that there was an
3 interview of you. Do you see that?
4    A    Yes.
5    Q    Do you recall being interviewed by anyone
6 from the Office of Professional Review in relation
7 to the incident with Officer Ortiz and Mr. Bolton?
8    A    I do not.
9    Q    So fair to say that it's possible that
10 you were interviewed, but as you sit here today you
11 do not recall?
12   A    That's correct.
13   Q    Can you look at page 89?
14   A    Okay.
15   Q    At the top of the page, it's the third
16 line. Can you just -- starting in the
17 administrative assessment. Do you see that?
18   A    Yes.
19   Q    Can you just review that sentence? I
20 just have a question for you in relation to that.
21   A    Okay.
22   Q    This indicates that in your
23 administrative assessment you documented that the
24 cell where they were going to put detainee Bolton

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

21 (81 to 84)

**81**

1 was previously quarantined, but that it had been
2 disinfected and ready for general population. Do
3 you see that?
4    A  I do.
5    Q  The administrative assessment, as you sit
6 here today do you have knowledge of what's that
7 referring to?
8    A  The watch commander's assessment to the
9 incident.
10    Q  Is your testimony as you sit here today
11 that is a -- where this indicates that you were the
12 one that documented this, that that's an error?
13    A  Yes.
14    Q  That should say that the watch commander
15 documented that?
16    A  That's correct.
17    Q  The assessment that's created by the
18 watch commander, where does he get the information
19 necessarily to fill that out?
20      MS. MCGRATH: Objection. Calls for
21   speculation.
22      THE WITNESS: I'm not sure.
23 BY MR. FIELD:
24    Q  Do you have any knowledge as you sit here

**82**

1 today whether watch Cmdr. Pan spoke to any of the
2 officers in relation to this incident before he
3 filled out that assessment?
4    A  I don't remember.
5    Q  The Cook County Jail has a use of force
6 early intervention program, correct?
7    A  Yes.
8    Q  What is your understanding of what that
9 program is?
10    A  My understanding would be if you are
11 involved in too many incidents, that you're
12 so-called counseled. I wouldn't say actually
13 counseled, it's nondisciplinary; to put you on
14 notice that you maybe need to take a step back on
15 what's going on.
16    Q  Who is responsible in the chain of
17 command for determining whether or not a
18 corrections officer will be placed in this early
19 intervention program?
20    A  I'm not sure. I know it's not my
21 responsibility in regards to it so I don't know.
22    Q  Fair to say, then, that as a sergeant you
23 have never placed a corrections officer into the
24 early intervention program?

**83**

1    A  That's correct.
2    Q  Your testimony is that it's not one of
3 your duties as sergeant to do that, is that
4 correct?
5    A  That's correct.
6    Q  Fair to say that it would be somebody in
7 the chain of command above yourself as sergeant?
8    A  Yes.
9    Q  But you're not sure as you sit here today
10 who that would be?
11    A  I'm not sure on that.
12    Q  Who is the -- is the watch commander the
13 sort of highest, in terms of the chain of command
14 just at the jail itself? I understand the sheriff
15 is over everybody, but is the watch commander the
16 highest authority in the jail at any given time?
17    A  No. That would be the executive director.
18    Q  Where does the watch commander fall below
19 the executive director?
20    A  Lieutenant or above. So it would be
21 lieutenant, commander, superintendent, assistant
22 director, director, and then first assistant
23 executive director -- I'm sorry, and then the
24 executive director and then chief of staff.

**84**

1    Q  Of the positions that you just mentioned,
2 as you sit here today, do you have any knowledge of
3 which members of that hierarchy can place the
4 corrections officer in the early intervention
5 program?
6    A  No, I do not.
7    Q  You indicated that your understanding of
8 the program is that if you've had too many
9 incidents you may be given some type of -- you said
10 it's not officially counseling, but some kind of
11 counseling, correct?
12    A  Yes.
13    Q  You said it's nondisciplinary, is that
14 your testimony?
15    A  Yes.
16    Q  Do you have any knowledge as you sit here
17 today in terms of the number of use of force
18 incidents you have to be involved in before you
19 would be considered for that program?
20    A  No, I do not.
21    Q  Have you as a corrections officer or
22 sergeant ever been placed in the early intervention
23 program?
24    A  Yes, I have.

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

22 (85 to 88)

85

1    Q    When was that?
2    A    About a year ago.
3    Q    Who placed you in that program?
4    A    I'm not sure.  I was given a notice from
5  my commander to report to the use of force review
6  unit.
7    Q    Who was your commander at the time that
8  gave you that notice?
9    A    Cmdr. Tate.
10   Q    What was his -- was he the watch
11 commander?
12   A    She is -- that's her actual title, is
13 commander.
14   Q    Okay, Cmdr. Tate.  And beyond giving you
15 this notice to show up to the use of force review
16 unit, did Cmdr. Tate have any other role in terms
17 of you being made aware of being placed in this
18 program?
19   A    No.
20   Q    So when you were -- at some point you
21 reported to the use of force review unit, correct?
22   A    That's correct.
23   Q    What were you informed when you reported
24 to the unit?

86

1    A    They just went over policy again, said
2  it's nondisciplinary.  Just want to make sure
3  everything's okay with me.
4    Q    At that point in time how many use of
5  force incidents did you have in your employee file
6  or disciplinary record?
7    A    I don't know.
8    Q    More than ten?
9    A    I'm sure.
10   Q    More than twenty?
11   A    I'm sure.
12   Q    More than fifty?
13   A    Probably.
14   Q    Does your disciplinary record -- would
15 that include every use of force incident, from
16 the time you started at Cook County Jail as a
17 corrections officer all the way to the present or
18 is it just the period of time that you've been a
19 sergeant?
20   A    No.  It would be the whole time.
21   Q    The whole time, okay.  And so that's from
22 1993 to the present, is that correct?
23   A    1998 with the county.
24   Q    1998.  I'm sorry.  '93 was the --

87

1    A    Police department, correct.
2    Q    1998 to the present, correct?
3    A    Yes.
4    Q    So when you reported to the use of force
5  review unit, is it possible that you had more than
6  a hundred use of force incidents on your record?
7    A    I couldn't tell you.  I don't know.
8    Q    But your testimony was that it was likely
9  more than fifty?
10   A    It's possible.
11   Q    In any case, your disciplinary record
12 would indicate the exact number, is that correct?
13   A    It wouldn't have any discipline in regards
14 to use of force under my record.
15   Q    But your employee file will list each
16 time that you were involved in a use of force
17 incident or am I wrong on that?
18   A    I don't know what's in my employee file.
19 I've never looked at it.
20   Q    But your testimony is that you've never
21 received any discipline in relation to a use of
22 force incident, correct?
23   A    That's correct.
24   Q    And that you -- I know you're guessing

88

1  here.  But you estimate you may have been involved
2  in as many as fifty use of force incidents, is that
3  correct?
4    A    That's possible.  Yes, that's correct.
5    Q    And again that's going back to 1998 to
6  the present?
7    A    Sure.
8    Q    So you said -- you testified that you
9  showed up at the use of force review unit and they
10 met with you.  How long was that meeting?
11   A    About an hour maybe.
12   Q    Beyond what you've already testified to,
13 do you recall what else was said to you at that
14 meeting?
15   A    No, I don't.
16   Q    After that meeting was there any follow
17 up in relation to you being placed in the early
18 intervention program?
19   A    No.
20   Q    It was just that one meeting?
21   A    That's correct.
22   Q    Is that the only time that you've been
23 placed in the use of force early intervention
24 program?

Transcript of SGT. James Ciukaj, Jr.

23 (89 to 92)

Conducted on March 21, 2017

89

1  A  Yes.

2  Q  I think your testimony was that that

3  was -- was that a couple of years ago or a year

4  ago?

5  A  Last year I believe it was.

6  Q  Thank you. Sorry about that. Was there

7  a particular use of force incident that triggered

8  you being placed in the program to your knowledge?

9  A  Not to my knowledge.

10  Q  Did they review any use of force

11  incidents that you had been involved in during your

12  meeting with the use of force review unit?

13  A  I don't remember the specifics.

14  Q  Just generally speaking, are there

15  any circumstances in which it would be

16  inappropriate -- in which it would be appropriate

17  for a detainee to ask a corrections officer to get

18  a sergeant or a lieutenant, just generally

19  speaking?

20  A  That would be inappropriate?

21  Q  Appropriate?

22  A  Appropriate? No. They can ask for us all

23  the time.

24  Q  Is there a policy at the jail for what a

90

1  corrections officer is supposed to do when an

2  inmate requests to speak to a sergeant or a

3  lieutenant?

4  A  Notify us.

5  Q  To your knowledge do detainees at Cook

6  County Jail receive any -- do they get any

7  information, any training, any kind of a list of

8  regulations that would explain to them when it's

9  appropriate to request the presence of a sergeant

10  or lieutenant, to your knowledge?

11  A  I know they get an inmate handbook when

12  they come in through intake, but I don't know what's

13  inside of it.

14  Q  As a sergeant, have you ever reviewed a

15  use of force report that then prompted you to

16  contact the OPR?

17  A  Yes.

18  Q  How often has that occurred?

19  A  I don't know.

20  Q  When was the last time that that

21  occurred?

22  A  It's been a while. I don't have a

23  specific time.

24  Q  Do you recall the incident that prompted

91

1  you to do that?

2  A  No, I don't, but I know I did contact OPR.

3  Q  And that was because you felt that the

4  officer involved had used excessive force?

5  A  Yes.

6  Q  As you sit here today, you don't recall

7  when that was?

8  A  No, I don't.

9  Q  Have you ever -- as you sit here today,

10  do you have any recollection of ever referring any

11  incident involving Officer Ortiz to the Office of

12  Professional Review?

13  A  I don't remember.

14  Q  Ask you to look at that second packet

15  finally?

16  MR. COYNE: Exhibit 2.

17  MR. FIELD: Yeah, group Exhibit 2.

18  BY MR. FIELD:

19  Q  I'm going to ask you a question

20  about -- it starts on page 204, the page number at

21  the bottom right-hand corner of the page. This is

22  Cook County Illinois Sheriff's Order 11.2.2.0,

23  response to resistance use of force duties,

24  notifications, and reporting procedures. Do you

92

1  see that?

2  A  Yes.

3  Q  This is a policy that you're familiar

4  with, correct?

5  A  Yes.

6  Q  The policy that we talked about at the

7  beginning of this deposition that gets reviewed on

8  an annual basis, is this that policy?

9  A  Yes.

10  Q  Can you turn to page 210. Letter C says

11  a supervisor who has been notified of a response to

12  resistance use of force incident must and then

13  number one reads, responds to the scene of the

14  incident and conduct a thorough inquiry into the

15  circumstance surrounding the response to resistance

16  and a justification for the officer's actions. Do

17  you see that?

18  A  Yes.

19  Q  For the incident that's at issue here,

20  the incident with Officer Ortiz and Mr. Bolton, you

21  were the supervisor, correct?

22  A  Yes.

23  Q  When you were made -- or when you were

24  notified of the use of force you responded to the

Transcript of SGT. James Ciukaj, Jr.    24 (93 to 96)
Conducted on March 21, 2017

**93**

1 scene, correct?
2    **A   I wasn't notified of the use of force**
3 **until I got to the scene. They just asked me to**
4 **come to the floor.**
5    Q   When you got to the scene you were
6 notified of the use of force, correct?
7    **A   Correct.**
8    Q   Now, here where it says conduct a
9 thorough inquiry into the circumstances surrounding
10 the response to resistance and the justification
11 for the officer's actions. We talked about how you
12 interviewed Mr. Bolton and your review of the use
13 of force reports?
14    **A   Correct.**
15    Q   And potentially speaking with the
16 officers involved. As you sit here today, you do
17 not recall one way or the other whether you did.
18 Beyond those three things, as you sit here today,
19 do you have a memory of any other action that you
20 took in terms of conducting a thorough inquiry into
21 the circumstance surrounding the response to
22 resistance and the justification for the officer's
23 actions?
24      MS. MCGRATH: Objection. Misstates

**94**

1    previous testimony.
2      THE WITNESS: Right, I've already answered
3    that. I found that the officer -- or we
4    disciplined the officers by employee discipline
5    and I sent a remedial training form out for
6    Officer Ortiz. So obviously that's part of my
7    inquiry into the use of force, so I did what I
8    was supposed to do in that regards.
9 BY MR. FIELD:
10    Q   I mean it's not particularly clear here
11 in terms of what an inquiry consists of so I'm more
12 just interested in the steps that you would take as
13 a sergeant. I'm using the incident at issue here
14 only because that's the example that we have.
15    **A   Sure.**
16    Q   You know, for some of these other things
17 it gives it sort of an A, B, C, D, E, of what
18 you're supposed to do, but this one doesn't. So I
19 just wanted to understand what that inquiry would
20 look like. You indicated that the officers
21 involved were disciplined, correct, or they were
22 given discipline?
23    **A   That's correct.**
24    Q   What was the discipline that those

**95**

1 officers were given?
2    **A   I believe it was failure to notify the**
3 **supervisor before using force on an individual.**
4    Q   Can you explain what that is and then
5 why -- yeah, let's start with can you explain what
6 that is exactly? Why would someone be given
7 discipline for that?
8    **A   Because the inmate detainee asked for a**
9 **supervisor and the supervisor wasn't notified and it**
10 **was at the recommendation of the watch commander**
11 **that that's the disciplinary action that be taken,**
12 **because we should have been notified first. It**
13 **could have possibly been prevented. Possibly, I**
14 **don't know. I wasn't there so I can't answer that.**
15    Q   But the discipline was decided on by the
16 watch commander, correct?
17    **A   That's correct.**
18    Q   Then you were the one as the sergeant to
19 issue that discipline?
20    **A   That's correct.**
21    Q   As you sit here today, your understanding
22 of why watch Cmdr. Pan decided to give that
23 discipline is because Mr. Bolton requested a
24 supervisor and before you were notified of that

**96**

1 request there was a use of force, is that correct?
2    **A   Yes.**
3    Q   Can you look at page 209? It's the same
4 policy I previously asked you about, the response
5 to resistance use of force, duties, notifications,
6 and reporting procedures.
7    **A   Okay.**
8    Q   On that page number three and this is
9 under letter B on page 208, which is the officer
10 involved in the use of force incident, whether on
11 duty or off duty, must perform the following.
12 Number three says, and again this is on page 209,
13 after completing his/her duties and after providing
14 sufficient information, the officer must remain
15 separated from other involved persons or witness
16 officers and may not discuss the incident with
17 anyone other than the immediate supervisor,
18 assigned investigators, and the employee's
19 representative. Do you see that?
20    **A   Yes.**
21    Q   I asked you a question earlier on in the
22 deposition about whether corrections officers were
23 required to fill out those use of force reports
24 separate from each other. Do you remember that

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

25 (97 to 100)

**97**

1 question?
2 **A  Yes.**
3   Q   Based on what I just read here, number
4 three on page 209, would you agree with me that in
5 the filling out of this report the officers remain
6 separate from each other?
7 **A  Yes.**
8        MR. FIELD:  Let's go off the record for a
9 second.
10       (Off record.)
11       MR. FIELD:  Back on the record.  I don't
12 have any other questions.  Thank you, Sergeant,
13 for being here.  I appreciate your time.
14       MR. COYNE:  I just have some, Sergeant.
15            EXAMINATION
16 BY MR. COYNE:
17   Q   If you'll look at bates 34, the incident
18 report?
19 **A  On exhibit one?  I'm sorry.**
20   Q   Group exhibit one.
21 **A  Okay.**
22   Q   There's a reference there to a
23 psychological evaluation that was provided to
24 Mr. Bolton.  Do you have any knowledge, one way or

**98**

1 the other, why he was referred for a psych eval?
2 **A  I'm not sure if he was given a discipline**
3 **report in regards to that.  So if that was the case,**
4 **he would have been psychiatric cleared to go into**
5 **the segregation, but I don't know if that's -- if**
6 **that's the case in this -- in this case.**
7   Q   Are you aware of any requests made by
8 officer Ortiz or Ramos, Ivory, or anyone else for
9 that matter, that he be referred for a psych eval?
10 **A  No.**
11   Q   It wasn't clear from the questions you
12 answered, you may have answered this.  But did you
13 have any contact at all with Mr. Bolton after
14 January 17th, 2014?
15 **A  No, I did not.**
16   Q   Are you aware of any efforts taken by
17 anyone employed by the Cook County Sheriff's
18 Department to cause Mr. Bolton to delay filing the
19 lawsuit he filed in this case?
20 **A  No, I do not.**
21   Q   Are you aware of any promises made to
22 Mr. Bolton by anyone employed by the Cook County
23 Sheriff's Department, that being provided benefits
24 in exchange for not filing a lawsuit as result of

**99**

1 this incident?
2 **A  No, I do not.**
3   Q   Are you aware of anyone -- anyone at all,
4 whether or not employed by the Cook County
5 Sheriff's Department, making any statements to
6 Mr. Bolton, the purpose of which would have caused
7 him to delay filing his lawsuit?
8 **A  No, I don't.**
9   Q   Did you have any participation in the
10 September 4th, 2014 visit to Mr. Bolton's home?
11 **A  Oh, no.  No.**
12   Q   I also understand that Mr. Bolton
13 participated in a lineup at some point where he
14 identified my client, Mr. Ortiz.  Do you have any
15 direct knowledge -- were you present at the time
16 that lineup took place?
17 **A  No, I wasn't.**
18   Q   Do you have any direct knowledge of any,
19 quote, unquote coverup made by anyone regarding the
20 incident that you've testified to here today?
21 **A  No, I don't.**
22   Q   Are you aware of any efforts made by
23 anyone to delay an investigation of the incident
24 that Mr. Bolton was involved in?

**100**

1 **A  No, I've not.**
2   Q   Do you know of any effort made by any
3 person whatsoever to delay or prevent Mr. Bolton
4 from filing a lawsuit in this case?
5 **A  No, I do not.**
6        MR. COYNE:  I don't have anything further.
7 Thank you, Sergeant.
8        MR. FIELD:  Just one follow-up question.
9 Do you want to go first?  I can --
10       MS. MCGRATH:  No, go ahead and ask your
11 follow up.
12            REEXAMINATION
13 BY MR. FIELD:
14   Q   The OPR investigation into this incident
15 after January 17th, 2014, you were not involved in
16 that investigation in any way, is that correct?
17 **A  That's correct.**
18       MR. FIELD:  Nothing else for me.
19       MS. MCGRATH:  John had the questions I was
20 going to ask.  Thank you.
21       (Concluded at 3:15 p.m.)
22
23
24

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

26 (101 to 104)

101

1          C E R T I F I C A T E
2      I, DAVID J. DEMSKI, Certified Shorthand
3   Reporter, in and for the County of Cook, State of
4   Illinois, do hereby certify that on the 21st day
5   of March, 2017, the deposition of the witness
6   SGT. JAMES CIUKAJ, JR., called by the defense,
7   was taken before me, reported stenographically
8   and was thereafter reduced to typewriting
9   through computer-aided transcription.
10      The said witness, SGT. JAMES CIUKAJ, JR., was
11  first duly sworn to tell the truth, the whole truth,
12  and nothing but the truth and was examined upon oral
13  interrogatories.
14      I further certify that the foregoing is a true,
15  accurate, and complete record of the questions asked
16  of and answers made by the said witness, at the time
17  and place hereinabove referred to.
18      Witness my official signature as Notary Public,
19  in and for Cook County, Illinois on this 13th day of
20  July 2017.
21
22
23          David J. Demski
24          CSR# 084-004386

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017                                27

| A | | | |
|---|---|---|---|
| **aberdeen** | **accurately** | 64:16 | 59:19, 60:9, |
| 1:36, 2:4 | 27:8, 40:24 | **again** | 61:14, 69:5, |
| **ability** | **acknowledgment** | 5:13, 5:17, | 88:12, 94:2 |
| 44:13, 53:19, | 18:13 | 8:5, 22:19, | **also** |
| 54:18, 55:6, | **across** | 24:1, 37:6, | 7:11, 18:17, |
| 63:12 | 21:17 | 44:2, 48:10, | 38:18, 46:22, |
| **able** | **action** | 50:10, 51:9, | 47:3, 48:6, |
| 11:4, 25:2, | 93:19, 95:11 | 52:7, 52:22, | 69:9, 99:12 |
| 72:13 | **actions** | 57:23, 58:7, | **always** |
| **about** | 19:10, 20:19, | 60:16, 61:16, | 9:17, 14:19, |
| 6:19, 9:3, | 41:8, 41:16, | 66:15, 70:6, | 14:20, 25:1, |
| 12:17, 13:7, | 45:17, 46:15, | 77:2, 86:1, | 25:5, 78:5 |
| 13:23, 14:12, | 92:16, 93:11, | 88:5, 96:12 | **annual** |
| 14:24, 15:19, | 93:23 | **age** | 15:3, 17:19, |
| 17:19, 18:16, | **actual** | 44:11, 53:17, | 17:22, 18:7, |
| 19:15, 21:4, | 18:19, 19:3, | 55:10 | 18:11, 18:16, |
| 21:11, 22:19, | 53:6, 66:23, | **ago** | 19:22, 27:12, |
| 25:22, 27:12, | 69:15, 85:12 | 6:19, 6:21, | 27:16, 27:22, |
| 27:14, 28:15, | **actually** | 6:22, 6:23, 7:8, | 92:8 |
| 28:21, 29:24, | 13:13, 16:14, | 50:5, 85:2, | **another** |
| 31:13, 32:22, | 20:7, 21:20, | 89:3, 89:4 | 4:19, 6:20, |
| 33:2, 39:4, | 29:7, 29:19, | **agree** | 7:13, 20:24, |
| 40:1, 40:10, | 29:20, 30:11, | 26:22, 27:2, | 25:16, 52:15, |
| 41:1, 41:5, | 30:18, 51:4, | 97:4 | 76:15 |
| 51:1, 52:3, | 78:12, 78:13, | **ahead** | **answer** |
| 53:13, 55:8, | 82:12 | 12:20, 43:17, | 5:3, 5:6, 28:9, |
| 59:24, 65:5, | **added** | 100:10 | 38:11, 56:20, |
| 72:4, 85:2, | 73:8, 77:24 | **all** | 57:9, 58:8, |
| 88:11, 89:6, | **adds** | 5:13, 5:19, | 58:12, 58:17, |
| 91:20, 92:6, | 73:16 | 8:10, 19:3, | 59:3, 59:6, |
| 93:11, 96:4, | **administrative** | 23:5, 23:8, | 59:12, 59:14, |
| 96:22 | 80:17, 80:23, | 24:12, 26:1, | 60:2, 60:4, |
| **above** | 81:5 | 26:16, 27:10, | 60:7, 60:10, |
| 83:7, 83:20 | **affairs** | 27:22, 43:18, | 60:13, 60:15, |
| **absolutely** | 1:19, 1:20 | 52:19, 57:11, | 60:17, 60:24, |
| 22:18, 42:8 | **after** | 58:7, 58:18, | 61:13, 69:14 |
| **academy** | 10:8, 21:12, | 62:7, 64:18, | **answered** |
| 10:12, 10:20, | 24:22, 33:15, | 69:11, 74:4, | 59:17, 60:12, |
| 10:23 | 34:17, 34:21, | 74:24, 78:1, | 94:2, 98:12 |
| **access** | 38:22, 55:24, | 86:17, 89:22, | **answering** |
| 55:20, 67:14 | 61:14, 61:15, | 98:13, 99:3 | 5:15, 5:17, |
| **accurate** | 64:7, 66:20, | **allow** | 44:15 |
| 26:23, 48:7, | 73:9, 75:11, | 15:16, 24:15 | **answers** |
| 53:23, 54:13, | 88:16, 96:13, | **almost** | 5:11, 66:15, |
| 57:22, 59:2, | 98:13, 100:15 | 13:1 | 101:16 |
| 78:8, 101:15 | **afternoons** | **along** | **any** |
| | 8:11 | 25:11, 72:17 | 5:2, 5:3, 7:9, |
| | **afterwards** | **already** | 8:15, 8:24, |
| | 22:23, 39:5, | 21:12, 23:17, | |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

28

9:12, 10:8,
12:16, 13:17,
14:3, 14:6,
14:18, 16:11,
16:22, 17:11,
17:14, 20:2,
20:11, 26:14,
26:17, 27:13,
32:6, 33:3,
33:9, 33:21,
35:10, 38:1,
38:6, 39:2,
39:3, 39:20,
39:21, 40:2,
40:10, 40:11,
41:8, 41:13,
41:16, 45:9,
49:6, 50:7,
53:21, 55:3,
55:9, 56:21,
60:19, 63:16,
63:20, 64:10,
64:11, 64:14,
67:7, 69:8,
69:13, 70:7,
71:1, 71:3,
71:6, 71:7,
71:10, 71:11,
71:16, 72:13,
75:9, 75:18,
76:1, 77:1,
77:3, 81:24,
82:1, 83:16,
84:2, 84:16,
85:16, 87:11,
87:13, 87:21,
88:16, 89:10,
89:15, 90:6,
90:7, 91:10,
93:19, 97:12,
97:24, 98:7,
98:13, 98:16,
98:21, 99:5,
99:9, 99:14,
99:18, 99:22,
100:2, 100:16
**anyone**
32:22, 33:2,

80:5, 96:17,
98:8, 98:17,
98:22, 99:3,
99:19, 99:23
**anything**
4:20, 16:13,
17:23, 26:20,
27:16, 34:9,
54:7, 57:9,
64:12, 100:6
**apologize**
51:2, 74:23
**apparatus**
29:14
**apparent**
44:12, 53:18,
54:17, 55:5
**appearances**
2:1
**appearing**
2:8, 2:16, 2:24
**appears**
42:14
**apply**
21:19
**appreciate**
97:13
**appropriate**
15:1, 15:6,
15:20, 16:8,
16:16, 89:16,
89:21, 89:22,
90:9
**approximating**
8:19
**area**
15:24, 28:19
**areas**
16:2
**arm**
21:18
**armed**
13:15
**around**
12:14, 21:1,
21:12, 21:22,
22:4
**arrived**
33:18, 34:10,

35:7, 37:21,
41:4
**asked**
33:10, 36:5,
51:4, 52:3,
93:3, 95:8,
96:4, 96:21,
101:15
**asking**
5:8, 5:15,
19:11, 19:12,
51:1, 53:4,
56:24, 57:1,
57:17, 57:18,
58:15, 58:20,
58:24, 60:21
**assail**
12:5
**assailant**
13:8, 13:9,
13:12, 13:15,
13:19, 13:23,
14:4, 16:19,
47:21, 47:24
**assessment**
26:10, 63:16,
72:3, 72:20,
72:22, 73:8,
73:13, 73:16,
73:22, 80:17,
80:23, 81:5,
81:8, 81:17,
82:3
**assessments**
63:13, 63:21
**assigned**
30:21, 31:2,
31:8, 31:22,
36:22, 72:7,
96:18
**assignment**
9:16, 9:18,
25:3, 77:7
**assistant**
83:21, 83:22
**assisted**
21:13, 21:18
**associated**
36:18

**assume**
5:5, 57:1,
57:19, 58:16,
58:24
**assuming**
50:18, 58:7,
59:5
**assumption**
57:9, 58:6,
58:16
**assumptions**
58:8, 58:17,
58:18
**attack**
13:13
**attacking**
13:13
**attempt**
12:23, 13:3
**attention**
25:5, 41:10
**attorney**
2:18
**attributes**
44:12, 53:18,
55:11
**august**
6:4
**authority**
65:11, 83:16
**authorized**
64:14
**available**
73:6
**avoid**
44:7, 46:18
**aware**
18:4, 30:19,
30:24, 31:12,
31:15, 33:8,
67:1, 67:7,
71:16, 85:17,
98:7, 98:16,
98:21, 99:3,
99:22
**away**
13:1, 13:4,
13:5, 25:13,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

29

32:18, 35:23,
44:6, 46:17,
60:18
**axon**
36:13

**B**

**back**
12:15, 23:22,
23:24, 26:4,
27:11, 29:18,
37:3, 43:23,
44:1, 44:2,
48:15, 50:19,
52:23, 53:8,
71:21, 82:14,
88:5, 97:11
**background**
9:20, 74:1
**bad**
77:9
**based**
57:18, 57:19,
58:13, 59:3,
66:16, 73:24,
97:3
**basic**
4:23
**basically**
12:23, 19:17,
78:5
**basis**
92:8
**bates**
97:17
**battery**
44:9, 46:23,
47:21
**became**
6:11, 7:6
**because**
15:22, 19:19,
21:7, 25:8,
27:18, 28:18,
29:6, 29:18,
31:4, 32:13,
32:23, 41:2,
44:2, 48:10,

50:10, 50:23,
51:10, 51:16,
51:23, 55:20,
56:21, 58:9,
70:13, 70:21,
71:13, 74:21,
75:6, 91:3,
94:14, 95:8,
95:12, 95:23
**become**
12:23
**been**
4:2, 4:9, 4:11,
4:20, 4:22, 6:3,
7:5, 8:10, 8:18,
34:18, 35:14,
36:13, 36:15,
36:16, 37:14,
37:16, 39:7,
39:17, 40:16,
41:11, 49:24,
53:1, 53:2,
55:23, 56:16,
57:5, 58:4,
59:4, 59:20,
61:23, 65:3,
68:17, 70:17,
70:18, 72:23,
73:2, 73:6,
76:21, 81:1,
84:22, 86:18,
88:1, 88:22,
89:11, 90:22,
92:11, 95:12,
95:13, 98:4
**before**
1:30, 4:9,
4:12, 4:23, 5:4,
5:15, 6:11, 7:5,
8:23, 23:4,
24:12, 35:16,
35:17, 42:22,
55:23, 56:2,
59:17, 74:3,
79:6, 82:2,
84:18, 95:3,
95:24, 101:7
**beforehand**
56:4

**beginning**
16:21, 36:23,
92:7
**behalf**
2:8, 2:16, 2:24
**behind**
12:15
**being**
18:4, 25:2,
25:11, 32:20,
33:4, 33:21,
48:7, 54:1,
71:8, 73:23,
78:5, 80:5,
85:17, 88:17,
89:8, 97:13,
98:23
**belief**
67:3
**believe**
6:12, 7:1,
29:16, 31:10,
54:8, 65:20,
66:10, 66:12,
74:18, 79:12,
89:5, 95:2
**below**
83:18
**benefits**
98:23
**between**
44:8, 46:19,
55:14, 69:3,
72:6
**beyond**
9:22, 27:14,
27:15, 33:21,
63:19, 64:13,
85:14, 88:12,
93:18
**bi-weekly**
28:11
**bids**
8:5
**binder**
42:7
**bit**
58:12

**blank**
23:16
**block**
18:20
**blunt**
16:12
**bodies**
78:10
**body**
36:14, 36:15
**bolded**
80:1
**bolton**
1:4, 17:8,
24:2, 28:22,
31:1, 31:13,
32:23, 33:3,
33:15, 33:19,
34:9, 34:22,
35:9, 36:3,
36:6, 36:8,
39:23, 40:4,
41:7, 42:12,
45:18, 49:7,
49:12, 49:19,
50:8, 50:11,
50:20, 51:12,
51:20, 52:4,
52:11, 55:15,
56:13, 57:3,
57:24, 58:2,
63:3, 63:22,
66:19, 67:4,
67:13, 68:2,
70:4, 75:13,
76:16, 80:7,
80:24, 92:20,
93:12, 95:23,
97:24, 98:13,
98:18, 98:22,
99:6, 99:12,
99:24, 100:3
**bolton's**
99:10
**both**
8:13, 8:15
**bottom**
42:2, 45:3,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

30

91:21
**boulevard**
2:12
**box**
47:24, 48:3
**boxer**
13:11
**boxes**
44:4, 45:5,
45:21, 46:16,
49:1
**brackets**
72:8
**break**
5:1, 5:3, 5:4
**brief**
18:20
**briefly**
16:24
**broken**
13:8
**building**
30:8, 30:9
**bunch**
44:3
**business**
78:10

**C**

**c-i-u-k-a-j**
4:8
**call**
32:8, 32:16,
32:19, 33:9,
33:14, 35:21
**called**
31:17, 32:2,
32:20, 33:4,
101:6
**calls**
56:18, 61:8,
81:20
**came**
21:11, 21:17,
64:24, 65:23
**camera**
34:23, 35:23,
36:11, 36:14,

36:15, 36:16,
36:18, 66:20,
67:8
**campus**
10:11
**can't**
25:1, 25:13,
27:18, 27:19,
28:9, 29:17,
51:6, 54:24,
55:13, 59:2,
59:13, 66:11,
95:14
**canes**
29:15
**cannot**
56:9
**capacity**
1:9, 1:11, 9:1,
33:9
**captured**
55:15
**case**
6:20, 17:6,
24:2, 43:23,
44:16, 52:22,
62:9, 69:21,
87:11, 98:3,
98:6, 98:19,
100:4
**categories**
12:8, 13:9,
14:16, 47:16
**category**
12:17, 13:7,
14:12, 16:8
**cause**
13:10, 13:24,
14:2, 98:18
**caused**
99:6
**cell**
32:23, 70:11,
70:17, 70:18,
71:4, 71:12,
71:13, 71:17,
72:7, 74:21,
75:6, 75:12,

75:13, 76:6,
76:8, 76:15,
77:17, 77:18,
80:24
**cells**
71:8, 73:23,
77:4, 77:7,
77:11, 77:14
**center**
2:20
**cermak**
71:19, 74:5,
76:12
**certain**
11:3, 54:18,
71:12
**certified**
1:30, 101:2
**certify**
101:4, 101:14
**chain**
9:4, 73:19,
73:20, 82:16,
83:7, 83:13
**change**
9:16, 35:22
**changed**
29:18
**changes**
27:19, 78:5
**characterization**
25:20
**characterized**
14:1, 14:13
**charge**
9:8
**check**
45:21, 47:23,
50:21, 51:13,
54:7, 54:17
**checked**
42:24, 44:5,
45:5, 45:15,
45:16, 46:14,
46:15, 46:16,
46:22, 47:3,
47:17, 47:22,
48:3, 48:11,

49:1, 53:14
**checking**
44:3, 50:13
**chicago**
1:36, 2:5,
2:13, 2:21
**chief**
83:24
**christopher**
1:17
**circle**
10:11
**circumstance**
92:15, 93:21
**circumstances**
25:1, 89:15,
93:9
**ciukaj**
1:14, 1:29,
3:3, 4:1, 4:8,
101:6, 101:10
**civil**
1:32
**cleaned**
75:7
**clear**
15:13, 22:14,
50:10, 51:9,
52:10, 61:14,
94:10, 98:11
**cleared**
74:22, 98:4
**clearly**
56:12
**client**
60:2, 99:14
**closed**
16:10, 47:12,
47:15, 47:23,
48:3, 48:11,
50:12, 50:13,
50:22, 50:23,
51:12, 51:14
**cmdr**
61:23, 65:3,
70:2, 72:23,
73:13, 73:16,
82:1, 85:9,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

31

85:14, 85:16,
95:22
**cody**
1:16
**college**
10:9, 10:10,
10:22, 10:24,
11:2, 11:4
**com**
2:7, 2:15
**come**
33:10, 44:1,
65:6, 65:23,
77:24, 90:12,
93:4
**command**
9:4, 12:11,
64:24, 73:20,
82:17, 83:7,
83:13
**commander**
26:10, 26:12,
40:15, 40:18,
40:22, 44:21,
55:20, 55:23,
61:19, 61:21,
63:7, 63:23,
64:8, 64:22,
65:1, 68:24,
72:21, 81:14,
81:18, 83:12,
83:15, 83:18,
83:21, 85:5,
85:7, 85:11,
85:13, 95:10,
95:16
**commander's**
81:8
**commands**
12:22, 15:8
**communicable**
70:22
**compare**
45:20
**complainant**
74:8
**complete**
48:7, 101:15

**completed**
26:9, 46:7
**completeness**
42:24
**completing**
96:13
**comply**
12:15
**compound**
30:9
**computer**
23:23, 24:14
**computer-aided**
101:9
**computerized**
78:1, 78:2
**concluded**
100:21
**conclusion**
57:22
**conduct**
92:14, 93:8
**conducted**
74:14
**conducting**
93:20
**consideration**
54:16, 54:19
**considered**
84:19
**consist**
11:12, 11:21,
18:21
**consists**
11:13, 94:11
**constant**
77:23
**constantly**
77:23
**contact**
32:22, 33:2,
90:16, 91:2,
98:13
**contain**
19:16
**contained**
19:15
**contains**
19:5

**control**
13:3, 44:7,
46:18
**conversation**
38:1, 38:19,
39:21, 40:2,
40:21, 72:6,
75:18
**conversations**
40:12, 41:8,
41:17, 66:12
**cook**
1:7, 1:9, 1:12,
1:18, 1:22,
1:25, 2:18,
4:17, 4:20,
5:22, 6:6, 6:11,
7:3, 7:6, 7:10,
8:4, 8:9, 8:24,
17:14, 17:20,
18:24, 28:6,
62:7, 74:2,
82:5, 86:16,
90:5, 91:22,
98:17, 98:22,
99:4, 101:3,
101:19
**cooperating**
13:16, 15:7
**cooperative**
12:4, 12:9,
12:10, 15:10,
15:12, 15:14
**corner**
21:1, 21:12,
91:21
**correctional**
1:14, 6:2, 6:9,
6:10
**corrections**
1:13, 7:6,
7:10, 8:4, 8:8,
8:13, 8:23, 9:9,
20:12, 20:22,
21:1, 21:3,
22:2, 23:19,
26:5, 27:23,
28:15, 35:10,

35:16, 35:17,
57:20, 65:12,
74:1, 75:3,
76:5, 82:18,
82:23, 84:4,
84:21, 86:17,
89:17, 90:1,
96:22
**correctly**
38:15, 51:3,
51:11
**cos**
9:9
**could**
13:4, 32:12,
41:23, 70:3,
70:19, 70:20,
71:12, 74:20,
75:5, 75:13,
75:23, 76:7,
95:13
**couldn't**
55:7, 87:7
**counseled**
82:12, 82:13
**counseling**
84:10, 84:11
**counselor**
59:19
**county**
1:7, 1:9, 1:13,
1:18, 1:23,
1:25, 2:18,
4:17, 4:21,
5:22, 6:6, 6:11,
7:3, 7:6, 7:11,
8:4, 8:9, 8:24,
17:14, 17:20,
19:1, 28:7,
62:8, 74:2,
82:5, 86:16,
86:23, 90:6,
91:22, 98:17,
98:22, 99:4,
101:3, 101:19
**couple**
4:15, 4:23,
6:20, 50:5,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

32

52:23, 59:13,
62:4, 79:9, 89:3
court
1:1, 1:33, 4:2,
5:10, 5:13, 5:18
coverup
99:19
coyne
2:10, 2:11,
3:5, 56:17,
91:16, 97:14,
97:16, 100:6
cpr
11:14
cr
43:2
create
44:7, 60:18
created
39:16, 48:17,
68:15, 68:17,
69:8, 73:13,
81:17
creates
46:18
credit
11:2
credits
10:22, 10:24,
11:4, 11:6
crestwood
7:19, 7:20,
8:14
csr
101:24
cuffs
15:16
current
18:5
currently
5:22, 24:10,
71:24
cv
1:6

___ D ___

daley
2:20

dates
43:2
david
1:30, 101:2,
101:23
day
8:16, 23:9,
23:12, 23:13,
31:2, 31:22,
36:17, 58:18,
61:22, 101:4,
101:19
days
8:1, 8:2, 8:6,
8:11, 8:15,
8:18, 8:22
deadly
13:14
deadweight
12:23
dealt
74:3, 76:5,
76:11
decided
95:15, 95:22
decision
41:12, 64:20,
65:18, 65:21
defendants
1:27, 2:16,
2:24
defense
101:6
degree
11:4
delay
98:18, 99:7,
99:23, 100:3
delivered
49:7, 50:8
demeanor
13:11
demski
1:30, 101:2,
101:23
department
1:13, 4:19,
7:3, 7:12, 7:13,

7:21, 17:21,
19:1, 87:1,
98:18, 98:23,
99:5
department's
17:15, 18:8
depend
54:12
depending
8:5, 9:16, 54:1
depends
9:18, 15:23
deposed
4:9, 4:11, 4:22
deposition
1:29, 6:20,
16:23, 58:11,
60:14, 92:7,
96:22, 101:5
depositions
1:34
deputy
62:22, 62:23,
63:11
describe
9:23, 12:7,
42:21, 56:6
described
14:17, 33:10,
44:4
describes
19:17
description
15:17, 29:24,
30:4, 30:5,
45:21, 48:1,
48:2, 49:6,
49:11, 50:7,
56:14, 58:2
designed
30:12
detail
27:3, 27:8
details
26:23, 66:12
detainee
35:15, 35:20,
61:2, 61:4,

72:5, 72:7,
74:21, 75:6,
80:24, 89:17,
95:8
detainees
74:19, 75:2,
76:7, 90:5
determine
53:22, 65:12
determining
54:16, 54:19,
82:17
diaz
1:20, 74:15
difference
69:3
different
7:2, 7:11,
14:23, 19:12,
21:9, 37:7,
53:4, 58:12,
60:24, 77:9
diffuse
44:17, 45:14,
47:3, 47:17
direct
16:13, 99:15,
99:18
direction
65:5
directly
9:7, 9:13,
32:22
director
1:12, 83:17,
83:19, 83:22,
83:23, 83:24
disciplinary
86:6, 86:14,
87:11, 95:11
discipline
64:19, 64:21,
64:23, 87:13,
87:21, 94:4,
94:22, 94:24,
95:7, 95:15,
95:19, 95:23,
98:2

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

33

| | | | |
|---|---|---|---|
| **disciplined** 94:4, 94:21 | 13:8, 20:7, 31:18, 31:19, | **88:23** | **end** 23:4, 23:7, |
| **discovery** 1:35 | 33:4, 33:10, 33:11, 44:5, | **eastern** 1:3 | 24:12, 24:20, 25:19, 37:2 |
| **discuss** 26:19, 96:16 | 44:17 **dr** | **educational** 9:19 | **enter** 32:23, 33:3 |
| **discussed** 13:22 | 1:9 **ds** | **efficiently** 5:1 | **error** 48:8, 81:12 |
| **disease** 70:22 | 62:19, 62:20 **due** | **effort** 100:2 | **escort** 12:24, 16:1 |
| **disinfected** 72:9, 81:2 | 25:2 **duly** | **efforts** 98:16, 99:22 | **escorting** 15:10 |
| **district** 1:1, 1:2 | 4:2, 101:11 **during** | **eight** 8:2, 28:24 | **esther** 1:21 |
| **division** 1:3, 28:24, | 8:7, 8:12, 18:11, 19:22, | **eight-hour** 8:6 | **estimate** 32:11, 88:1 |
| 31:8 **document** | 24:18, 30:16, 36:6, 71:1, | **either** 12:10, 14:21, | **eval** 98:1, 98:9 |
| 42:19, 62:6, 62:11, 62:12, | 89:11 **duties** | 31:11, 76:5 **electronic** | **evaluation** 97:23 |
| 62:24, 66:21, 68:4, 72:17, | 25:10, 25:14, 31:6, 83:3, | 24:8, 24:10 **electronically** | **even** 78:2 |
| 79:5, 79:14, 79:17 | 91:23, 96:5, 96:13 | 68:5 **ellis** | **evening** 61:18, 63:7, |
| **documented** 80:23, 81:12, | **duty** 31:5, 96:11 | 78:22, 79:18 **else** | 70:2 **ever** |
| 81:15 **documents** | **dynamics** 22:7 | 27:17, 64:12, 66:18, 70:23, | 55:18, 67:12, 70:17, 84:22, |
| 16:22, 17:1, 17:11, 42:22, | | 88:13, 98:8, 100:18 | 90:14, 91:9, 91:10 |
| 77:3, 77:7, 77:10 | **E** | **elsewhere** 38:23 | **every** 27:18, 36:23, |
| **doing** 6:19, 12:12, | **e-mail** 2:7, 2:15, | **emergency** 44:18, 45:15, | 86:15 **everybody** |
| 12:13, 12:14, 35:18, 54:7 | 2:23, 18:6 **each** | 47:4, 47:18 **employed** | 78:8, 83:15 **everything** |
| **done** 20:16, 23:4, | 12:7, 13:24, 14:23, 15:20, | 5:22, 6:5, 98:17, 98:22, | 5:18, 9:21, 22:8, 26:7, |
| 23:8, 23:12, 23:22, 24:21, | 26:19, 42:14, 44:14, 46:2, | 99:4 **employee** | 44:18 **everything's** |
| 25:2, 42:2, 46:1, 47:3, | 52:15, 87:15, 96:24, 97:6 | 64:19, 64:23, 86:5, 87:15, | 23:22, 86:3 **evolving** |
| 62:12, 69:14 **dormitory** | **earlier** 25:23, 53:12, | 87:18, 94:4 **employee's** | 77:23, 78:6 **exact** |
| 29:13 **double** | 72:16, 75:17, 96:21 | 96:18 **employees** | 87:12 **exactly** |
| 44:3, 54:7 **down** | **early** 82:6, 82:18, | 1:18, 1:22, 1:23, 64:21 | 5:7, 29:17, 31:11, 95:6 |
| 5:13, 5:19, | 82:24, 84:4, 84:22, 88:17, | **encountering** 11:23, 12:2 | |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

34

| | | | |
|---|---|---|---|
| examination<br>3:4, 3:5, 4:4,<br>97:15<br>examined<br>4:3, 101:12<br>example<br>20:20, 24:19,<br>45:12, 94:14<br>excessive<br>91:4<br>exchange<br>98:24<br>executive<br>1:12, 83:17,<br>83:19, 83:23,<br>83:24<br>exhibit<br>41:22, 91:16,<br>91:17, 97:19,<br>97:20<br>expected<br>12:11<br>explain<br>5:9, 90:8,<br>95:4, 95:5<br>extenuating<br>25:1<br>      **F**<br>face<br>47:12<br>factor<br>55:5, 55:11<br>factors<br>44:10, 53:14,<br>53:17, 53:23,<br>54:15, 54:18,<br>54:20<br>facts<br>57:19, 57:20,<br>57:22, 58:13,<br>58:17, 59:3<br>factual<br>58:9<br>failure<br>95:2<br>fair<br>15:17, 25:14, | 25:20, 33:7,<br>37:24, 38:17,<br>39:11, 42:10,<br>48:2, 48:6,<br>49:10, 55:1,<br>80:9, 82:22,<br>83:6<br>fall<br>47:16, 47:20,<br>83:18<br>falls<br>9:4<br>familiar<br>73:24, 92:3<br>far<br>74:4<br>fast<br>22:7<br>feel<br>66:18<br>felt<br>91:3<br>female<br>30:2<br>females<br>29:8<br>field<br>2:3, 3:4, 3:6,<br>4:5, 56:23,<br>57:13, 60:1,<br>60:7, 60:11,<br>61:12, 76:20,<br>81:23, 91:17,<br>91:18, 94:9,<br>97:8, 97:11,<br>100:8, 100:13,<br>100:18<br>fifth<br>29:8, 30:2<br>fifty<br>86:12, 87:9,<br>88:2<br>fighting<br>13:10, 14:5<br>figure<br>69:10<br>file<br>86:5, 87:15, | 87:18<br>filed<br>98:19<br>filing<br>98:18, 98:24,<br>99:7, 100:4<br>fill<br>19:6, 19:14,<br>19:18, 20:13,<br>23:20, 24:4,<br>24:11, 24:20,<br>25:14, 25:17,<br>26:1, 26:5,<br>26:17, 26:18,<br>28:7, 81:19,<br>96:23<br>filled<br>22:21, 24:18,<br>25:24, 27:8,<br>42:11, 43:19,<br>43:20, 44:24,<br>57:24, 65:14,<br>68:4, 69:2,<br>69:6, 69:22,<br>72:23, 73:2,<br>82:3<br>filling<br>18:17, 19:2,<br>23:2, 27:3,<br>27:7, 45:6,<br>54:2, 65:21,<br>97:5<br>fills<br>61:2<br>finally<br>91:15<br>fine<br>9:23, 60:1<br>finish<br>5:15<br>finished<br>5:17<br>firearms<br>11:15<br>first<br>4:2, 21:13,<br>22:2, 30:8,<br>33:7, 33:8, | 34:9, 35:12,<br>35:13, 35:16,<br>35:17, 35:21,<br>36:2, 36:3,<br>49:1, 52:10,<br>53:12, 62:7,<br>62:16, 79:4,<br>79:13, 83:22,<br>95:12, 100:9,<br>101:11<br>fist<br>16:10, 47:12,<br>47:16, 50:12,<br>51:12<br>five<br>6:22, 6:23, 8:6<br>flailing<br>21:22, 22:3<br>flex<br>36:13<br>flight<br>13:5<br>flip<br>79:8<br>floor<br>29:8, 29:10,<br>29:12, 29:16,<br>29:20, 29:22,<br>30:1, 30:2,<br>30:15, 31:4,<br>31:18, 31:20,<br>31:21, 31:24,<br>32:4, 32:8,<br>32:21, 33:3,<br>33:5, 33:11,<br>33:19, 34:6,<br>34:10, 93:4<br>floors<br>31:2, 31:5,<br>31:12<br>focus<br>24:1<br>focused<br>27:15<br>follow<br>88:16, 100:11<br>follow-up<br>100:8 |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

35

following
96:11
follows
4:3
food
73:20
foregoing
101:14
form
18:13, 19:18,
21:9, 24:5,
24:11, 25:14,
25:17, 26:17,
43:10, 44:15,
44:24, 45:14,
46:6, 46:10,
48:17, 48:20,
49:21, 50:4,
50:14, 51:13,
52:22, 52:24,
53:6, 53:13,
65:14, 65:22,
76:18, 94:5
forms
23:16, 23:20,
26:18, 52:9,
52:14, 52:18,
53:22, 54:2,
69:23
found
45:21, 94:3
four
31:5
fourth
29:9, 31:4,
74:18
free
66:18
fresh
35:22
front
33:24, 34:4,
43:1, 43:8, 44:1
full
4:7, 6:14,
6:17, 7:10, 13:5
fully
72:19

further
100:6, 101:14

G

games
59:23
gave
10:12, 10:20,
29:24, 61:13,
85:8
gender
44:11, 53:17,
55:10
general
10:17, 29:7,
29:17, 30:6,
30:10, 60:21,
72:9, 81:2
generally
20:1, 22:19,
32:15, 35:14,
69:1, 73:21,
76:4, 89:14,
89:18
generated
69:11
getting
14:20, 21:2
give
5:10, 15:16,
20:20, 54:24,
64:20, 95:22
given
60:9, 60:15,
64:19, 74:10,
83:16, 84:9,
85:4, 94:22,
95:1, 95:6, 98:2
gives
94:17
giving
53:15, 85:14
go
4:23, 9:19,
9:22, 10:1,
10:10, 12:20,
12:24, 15:11,
15:20, 20:7,

20:8, 21:23,
22:5, 22:10,
23:19, 25:4,
25:11, 43:17,
48:15, 50:3,
51:7, 53:8,
57:11, 70:20,
71:21, 97:8,
98:4, 100:9,
100:10
goes
32:17, 60:18,
74:5
going
5:5, 9:3,
10:22, 13:13,
14:19, 14:21,
15:15, 26:4,
27:11, 41:21,
41:22, 43:1,
43:2, 43:12,
43:18, 43:21,
43:22, 43:24,
44:1, 44:3,
50:19, 52:22,
56:20, 57:8,
58:8, 58:16,
58:17, 60:20,
80:24, 82:15,
88:5, 91:19,
100:20
gone
21:12, 64:13,
69:5
gov
2:23
grabbed
21:18
graduated
10:4
ground
4:24, 20:23,
20:24, 21:2,
21:13, 21:22,
22:4
group
41:21, 91:17,
97:20

guess
28:18, 30:1,
30:19, 53:4,
69:2, 78:13
guessing
87:24
guzman
1:8

H

hallway
33:20, 33:21,
34:3, 34:19,
35:2
hand
47:23, 48:4,
48:11, 50:13,
50:22, 50:24,
51:14
handbook
90:11
handcuff
15:15, 20:23,
21:23
handcuffed
21:2, 34:5
handcuffing
15:10, 15:14,
20:24, 21:5,
21:14, 44:18,
45:16, 47:4,
47:19
handicuffs
21:19
hands
12:15, 14:18,
15:16, 20:7,
20:8, 20:10
happen
64:16
happened
20:17, 58:19,
58:22, 58:23
harassment
11:16
harm
13:10, 13:24,
14:1, 14:6,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

36

14:7, 14:10,
14:14, 14:17
**head**
5:12, 16:13,
47:12
**health**
29:9, 29:10,
30:13
**heard**
32:8
**helped**
21:19
**here**
4:20, 5:19,
7:1, 20:2,
31:10, 32:6,
33:22, 36:1,
37:12, 38:1,
38:7, 39:2,
39:13, 39:20,
40:1, 40:20,
41:7, 41:17,
42:2, 48:2,
49:17, 51:5,
51:6, 52:23,
53:5, 53:10,
55:3, 55:8,
56:7, 58:10,
59:7, 63:1,
63:5, 63:16,
64:6, 66:16,
67:2, 70:3,
70:7, 71:6,
72:12, 72:22,
75:9, 75:24,
76:10, 76:14,
76:22, 77:1,
79:21, 80:1,
80:10, 81:6,
81:10, 81:24,
83:9, 84:2,
84:16, 88:1,
91:6, 91:9,
92:19, 93:8,
93:16, 93:18,
94:10, 94:13,
95:21, 97:3,
97:13, 99:20

**hereby**
101:4
**hereinabove**
101:17
**hierarchy**
84:3
**high**
9:21, 10:1,
10:3, 10:8
**higher**
73:20
**highest**
83:13, 83:16
**history**
57:20
**holds**
16:1
**home**
99:10
**hon**
1:7, 1:10
**honest**
27:20
**honestly**
18:22, 27:20
**hour**
88:11
**hours**
7:23, 8:2, 8:3,
8:4, 8:19, 11:2
**house**
74:20, 75:5
**housed**
29:19, 29:20,
30:15, 74:19,
75:2, 76:6,
77:14
**housing**
29:5
**however**
9:20
**hundred**
87:6
**hurt**
14:20
**hypothetical**
57:1, 58:21,
59:3, 59:9,

60:18
**I**
**idea**
63:17
**identified**
12:5, 99:14
**identify**
19:8, 20:5
**identifying**
11:22, 12:1
**ifs**
58:18
**illinois**
1:2, 1:33,
1:37, 2:5, 2:13,
2:21, 10:11,
10:14, 91:22,
101:4, 101:19
**illness**
70:22, 71:14
**immanent**
46:23
**immediate**
9:5, 47:21,
66:1, 66:3,
66:5, 96:17
**immediately**
25:2, 25:18
**imminent**
44:9
**impact**
16:12
**important**
26:23, 27:2
**impose**
11:14
**in-service**
27:19
**inappropriate**
89:16, 89:20
**incident**
17:6, 17:8,
20:3, 20:18,
22:22, 24:1,
24:22, 26:16,
26:20, 28:22,
28:23, 29:21,

30:18, 30:19,
30:24, 31:12,
31:16, 33:9,
33:15, 34:22,
37:10, 37:18,
38:22, 39:4,
39:9, 39:16,
39:22, 40:3,
40:13, 41:2,
41:9, 41:14,
41:18, 42:12,
45:10, 46:3,
48:12, 52:11,
55:14, 56:7,
60:19, 60:23,
61:15, 63:2,
63:7, 63:14,
63:15, 63:21,
64:11, 66:4,
66:8, 66:20,
67:23, 68:1,
69:4, 69:7,
69:8, 69:11,
69:13, 69:14,
69:16, 69:18,
69:19, 69:21,
70:2, 71:3,
71:11, 71:21,
72:4, 73:3,
73:4, 73:9,
75:11, 75:21,
80:7, 81:9,
82:2, 86:15,
87:17, 87:22,
89:7, 90:24,
91:11, 92:12,
92:14, 92:19,
92:20, 94:13,
96:10, 96:16,
97:17, 99:1,
99:20, 99:23,
100:14
**incidents**
82:11, 84:9,
84:18, 86:5,
87:6, 88:2,
89:11
**include**
28:1, 28:3,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

38

50:1, 52:6,
56:16, 57:6,
58:5, 61:7
**james**
1:14, 1:29,
3:3, 4:1, 4:8,
101:6, 101:10
**january**
28:22, 42:12,
98:14, 100:15
**jcc@johncoynelaw**
2:15
**jobs**
8:15
**john**
2:10, 2:11,
100:19
**joint**
16:2
**jones**
1:10
**jr**
1:29, 3:3, 4:1,
4:8, 101:6,
101:10
**judge**
1:7, 1:10
**julian**
1:20
**july**
101:20
**justification**
92:16, 93:10,
93:22

**K**

**keeping**
78:10
**kept**
23:16
**kick**
16:15
**kicking**
16:13
**kind**
5:12, 15:24,
22:24, 24:22,
26:14, 60:5,

65:22, 84:10,
90:7
**kinds**
23:6
**know**
4:22, 5:2, 5:9,
11:6, 16:14,
17:18, 18:1,
19:13, 22:23,
27:14, 28:11,
29:7, 31:2,
33:20, 34:3,
38:16, 38:24,
40:14, 40:15,
49:13, 49:15,
50:16, 51:6,
52:15, 52:22,
54:15, 55:7,
55:13, 56:21,
57:10, 58:21,
58:23, 66:23,
67:18, 69:3,
69:6, 70:24,
74:5, 76:22,
79:4, 82:20,
82:21, 86:7,
87:7, 87:18,
87:24, 90:11,
90:12, 90:19,
91:2, 94:16,
95:14, 98:5,
100:2
**knowing**
61:5
**knowledge**
59:5, 60:22,
61:11, 71:5,
71:7, 71:9,
71:15, 76:15,
77:1, 77:6,
81:6, 81:24,
84:2, 84:16,
89:8, 89:9,
90:5, 90:10,
97:24, 99:15,
99:18

**L**

**last**
4:14, 16:24,

47:13, 62:20,
63:10, 89:5,
90:20
**later**
66:17
**law**
1:35, 2:10
**lawsuit**
98:19, 98:24,
99:7, 100:4
**least**
4:13
**leave**
77:24
**leeway**
25:5
**left**
21:18
**less**
28:17, 28:18
**let's**
9:19, 10:1,
53:11, 59:23,
95:5, 97:8
**letter**
92:10, 96:9
**lettiere**
1:16, 38:13,
38:19, 40:8
**level**
13:14, 14:1,
47:24
**lieutenant**
9:6, 9:15,
83:20, 83:21,
89:18, 90:3,
90:10
**lieutenants**
28:3
**likelihood**
14:21
**likely**
39:11, 87:8
**line**
47:13, 62:16,
80:16
**lineup**
99:13, 99:16

**list**
9:21, 66:7,
87:15, 90:7
**litroy**
1:4
**little**
58:11
**loevy**
1:36, 2:2
**long**
6:3, 6:10, 7:8,
23:11, 26:8,
32:7, 32:11,
57:20, 58:18,
88:10
**look**
18:2, 19:19,
41:21, 42:4,
42:5, 43:2,
43:21, 43:22,
44:3, 44:10,
46:5, 47:6,
53:11, 61:24,
62:3, 67:20,
74:6, 78:11,
79:24, 80:13,
91:14, 94:20,
96:3, 97:17
**looked**
16:24, 42:9,
44:13, 87:19
**looking**
42:24, 43:7,
43:8, 44:22,
46:14, 49:5,
50:6
**looks**
26:8
**lot**
55:1
**low**
47:24
**low-level**
13:9, 14:4,
47:20

**M**

**made**
18:3, 30:19,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

39

| | | | |
|---|---|---|---|
| 30:24, 31:12, 31:15, 33:8, 63:14, 67:1, 67:7, 72:20, 72:21, 78:5, 85:17, 92:23, 98:7, 98:21, 99:19, 99:22, 100:2, 101:16 | 28:12, 30:19, 37:6, 37:19, 50:16, 50:18, 60:24, 82:14, 88:11 | memory 34:1, 38:6, 53:6, 56:8, 57:18, 93:19 | mostly 69:2 move 12:22, 13:4, 59:11, 59:18, 60:6, 60:8 |
| mag 1:10 | mcgrath 2:19, 56:18, 57:7, 59:20, 60:3, 61:8, 76:18, 81:20, 93:24, 100:10, 100:19 | mental 29:9, 29:10, 30:13 | moved 44:7 |
| make 5:7, 5:19, 20:21, 22:14, 43:5, 43:16, 43:18, 44:19, 45:22, 65:17, 79:10, 86:2 | | mentioned 13:23, 18:15, 25:22, 35:1, 53:12, 84:1 | movement 78:4 moves 46:17 moving 13:2, 44:6 |
| making 99:5 | mean 9:24, 10:21, 12:2, 15:14, 17:5, 20:1, 22:6, 22:13, 22:22, 23:8, 25:7, 27:15, 28:12, 31:20, 48:24, 59:3, 59:22, 94:10 | met 88:10 | much 10:13, 15:12, 27:3, 27:8, 29:18, 42:4, 50:19, 62:3 |
| males 29:9 | | midlevel 13:12 | |
| mandated 11:14 | | midnights 8:11 | must 92:12, 96:11, 96:14 |
| mandatory 11:10, 11:18, 41:13 | | miguel 1:15, 46:7 | myself 72:20 |
| manipulation 16:2 | meaning 46:17, 47:17, 70:19 | mind 57:15 | N |
| many 4:11, 10:24, 11:6, 28:6, 54:22, 82:11, 84:8, 86:4, 88:2 | meant 14:9, 16:21 | minute 6:19, 41:24, 42:4, 79:8 | name 4:7, 38:14, 62:20 |
| march 1:37, 101:5 | mechanical 16:13 | minutes 50:5 | narrative 43:24, 45:22, 47:7, 49:2, 49:6, 49:20, 49:24, 50:7, 51:21, 51:23, 52:5, 56:15, 61:3, 74:18 |
| maria 1:11 | medical 25:4, 29:13, 41:10, 41:15 | missing 74:23 | |
| marked 44:10 | meeting 88:10, 88:14, 88:16, 88:20, 89:12 | misstates 93:24 | |
| match 45:23 | | model 15:22 | necessarily 25:13, 37:19, 81:19 |
| matched 44:19, 48:24 | megan 2:19 | monitoring 67:18 | need 5:1, 15:11, 42:4, 59:12, 59:17, 62:3, 82:14 |
| matter 98:9 | meganmcgrath@coo-kcountyil 2:23 | monitors 67:18 | |
| maybe 6:20, 25:3, | member 20:12 | montanez 1:21 | |
| | members 18:3, 70:20, 84:3 | months 29:19 | needed 31:17, 32:3 |
| | memoralized 51:8 | montinez 74:15 | neither 59:16 |
| | | more 28:16, 28:20, 66:17, 70:18, 86:8, 86:10, 86:12, 87:5, 87:9, 94:11 | |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

40

never
14:5, 16:7,
51:11, 79:6,
82:23, 87:19,
87:20
new
18:1, 18:4,
23:23
newer
69:12
newest
30:9
next
13:7, 37:5
night
53:3, 55:19,
56:10, 61:15,
64:19
nneka
1:9
nodding
5:11
nondisciplinary
82:13, 84:13,
86:2
none
3:8
normally
23:4
north
1:36, 2:4
northern
1:2
notary
1:31, 101:18
notes
62:9
nothing
100:18, 101:12
notice
82:14, 85:4,
85:8, 85:15
notifications
91:24, 96:5
notified
92:11, 92:24,
93:2, 93:6,
95:9, 95:12,

95:24
notify
90:4, 95:2
number
11:3, 28:5,
28:10, 43:3,
54:24, 63:15,
84:17, 87:12,
91:20, 92:13,
96:8, 96:12,
97:3
number's
43:2
numbered
42:1

O

oath
4:3
objected
59:19
objection
56:18, 57:7,
61:8, 76:18,
81:20, 93:24
objection's
59:20
obligation
51:13
observe
70:3
obtain
11:3, 11:4,
13:3
obtained
11:1
obviously
25:10, 66:17,
75:21, 94:6
oc
16:3, 16:4
occur
28:23
occurred
8:21, 29:21,
30:18, 30:20,
31:16, 33:15,
52:12, 90:18,

90:21
occurring
78:4
occurs
20:11, 69:13
offered
3:8
office
1:24, 1:26,
23:17, 23:20,
62:8, 74:7,
79:1, 79:22,
80:6, 91:11
officer's
21:15, 43:19,
45:4, 45:7,
46:1, 92:16,
93:11, 93:22
officers
1:15, 9:8,
9:10, 24:15,
25:7, 26:15,
27:23, 35:11,
35:16, 35:17,
36:2, 37:9,
37:17, 38:21,
39:3, 39:8,
44:8, 52:16,
52:19, 54:1,
54:5, 54:12,
56:22, 64:18,
66:10, 66:13,
82:2, 93:16,
94:4, 94:20,
95:1, 96:16,
96:22, 97:5
offices
1:35, 2:10
official
1:8, 1:11,
101:18
officially
84:10
often
8:21, 77:21,
90:18
oh
99:11

okay
12:20, 13:8,
20:20, 32:15,
34:12, 42:7,
42:9, 44:18,
51:18, 58:24,
60:17, 62:5,
62:23, 74:24,
80:14, 80:21,
85:14, 86:3,
86:21, 96:7,
97:21
old
57:12, 69:12
on-camera
35:18, 41:6
on-the-ground
21:5
once
28:12, 32:8,
60:7, 73:16
one
8:22, 9:22,
10:15, 11:13,
12:21, 14:1,
14:6, 23:20,
36:22, 37:6,
37:7, 44:11,
52:15, 54:20,
56:21, 59:14,
59:15, 66:9,
67:7, 70:15,
70:18, 72:19,
76:1, 76:15,
76:22, 78:21,
81:12, 83:2,
88:20, 92:13,
93:17, 94:18,
95:18, 97:19,
97:20, 97:24,
100:8
one-quarter
72:4
ongoing
11:8
only
20:18, 21:3,
21:6, 31:4,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017                    41

44:15, 45:5,
51:7, 51:23,
59:13, 60:16,
64:16, 88:22,
94:14
**opened**
30:8
**operate**
67:9
**opr**
62:13, 64:15,
90:16, 91:2,
100:14
**oral**
5:11, 101:12
**order**
19:4, 19:5,
20:23, 91:22
**ortiz**
1:15, 17:9,
24:2, 34:22,
37:22, 38:2,
38:5, 39:21,
46:7, 46:14,
46:22, 47:7,
47:17, 48:2,
48:10, 49:8,
49:18, 50:8,
50:20, 51:19,
52:4, 53:2,
55:14, 56:13,
57:2, 57:24,
58:2, 64:17,
65:6, 65:18,
68:2, 70:4,
76:16, 78:19,
79:3, 80:7,
91:11, 92:20,
94:6, 98:8,
99:14
**ortiz's**
47:2, 49:12,
52:22, 53:10
**other**
8:24, 9:12,
16:11, 17:11,
23:6, 25:10,
26:19, 27:13,

31:21, 41:8,
41:16, 45:9,
58:13, 59:15,
63:21, 63:22,
64:11, 66:9,
69:17, 71:13,
71:17, 76:2,
76:7, 76:23,
85:16, 93:17,
93:19, 94:16,
96:15, 96:17,
96:24, 97:6,
97:12, 98:1
**out**
17:24, 18:17,
19:2, 19:6,
19:14, 19:18,
20:13, 22:21,
23:3, 23:21,
24:4, 24:11,
24:18, 24:20,
25:14, 25:17,
25:24, 26:1,
26:5, 26:17,
26:18, 27:3,
27:7, 27:8,
28:7, 36:17,
36:23, 37:6,
42:7, 42:11,
43:19, 43:20,
44:24, 45:6,
51:13, 54:2,
57:24, 61:2,
65:15, 65:21,
68:4, 69:2,
69:6, 69:10,
69:22, 72:23,
73:2, 81:19,
82:3, 94:5,
96:23, 97:5
**outranks**
73:19
**over**
4:23, 6:22,
6:23, 26:8,
26:9, 26:11,
29:8, 32:2,
32:8, 32:17,

32:20, 37:14,
42:9, 57:12,
62:4, 63:23,
83:15, 86:1
**overflow**
29:16
**overheard**
72:5
**own**
18:2, 44:15,
50:14

P

**packet**
23:18, 62:1,
65:15, 65:17,
67:21, 74:7,
78:12, 91:14
**page**
3:2, 41:22,
41:23, 43:1,
43:6, 43:8,
43:11, 43:12,
43:17, 43:23,
44:2, 44:22,
45:3, 45:22,
46:5, 46:14,
47:6, 47:7,
48:15, 49:1,
49:2, 49:5,
50:3, 50:6,
53:9, 53:11,
61:24, 67:20,
67:21, 71:21,
71:24, 74:6,
74:18, 78:11,
78:12, 78:13,
78:14, 78:15,
78:17, 78:21,
79:11, 79:17,
79:24, 80:13,
80:15, 91:20,
91:21, 92:10,
96:3, 96:8,
96:9, 96:12,
97:4
**pan**
61:23, 65:3,

70:2, 72:23,
73:13, 73:16,
82:1, 95:22
**paper**
24:5, 51:8
**paragraph**
74:11, 74:17
**part**
11:17, 13:2,
15:3, 18:7,
18:19, 94:6
**part-time**
7:17, 7:23,
8:13
**participated**
99:13
**participation**
20:6, 20:15,
99:9
**particular**
20:2, 44:11,
45:6, 51:24,
52:15, 77:17,
89:7
**particularly**
94:10
**pending**
5:4
**people**
77:24
**pepper**
16:4
**percent**
19:20, 28:20
**perform**
96:11
**period**
6:16, 7:9, 8:7,
8:12, 30:16,
71:1, 71:10,
86:18
**person**
9:17, 12:11,
14:2, 14:5,
15:10, 15:12,
15:15, 19:9,
21:19, 32:19,
54:6, 54:21,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

42

```
100:3                86:4, 99:13          24:24, 26:2,         32:20, 33:4,
person's             pointless            27:3, 27:9,          72:7, 94:1
15:23, 20:5          60:5                  69:17, 75:23,        previously
persons              points               76:3, 80:9,          48:22, 81:1,
96:15                16:2                  87:5, 87:10,         96:4
pertain              police               88:4                 prior
71:19                4:19, 7:2,           possibly             35:10
pertaining           7:12, 7:13,          13:10, 95:13         privileged
1:34                 7:20, 43:4, 87:1     potential            59:15
phrased              policies             14:7, 14:9,          probably
14:8                 17:15, 17:21,        14:13, 14:17         4:19, 19:11,
physical             17:22, 18:1,         potentially          22:11, 22:13,
44:7, 44:11,         18:8, 18:11,         93:15                28:18, 51:2,
44:12, 53:18,        57:6, 58:5,          practicable          86:13
53:19, 54:6,         59:6, 71:16          23:8                 problems
54:17, 55:6,         policy               practical            12:16
55:10                12:6, 18:4,          23:5                 procedure
physically           19:1, 19:15,         practice             1:32
16:15                19:16, 19:19,        22:20, 23:2,         procedures
pick                 19:21, 19:24,        24:17, 24:19,        11:22, 17:15,
57:15                22:15, 22:20,        24:23, 32:16,        17:21, 91:24,
place                22:22, 23:2,         32:17, 35:15,        96:6
76:16, 84:3,         23:11, 24:17,        37:16, 39:7,         process
99:16, 101:17        24:23, 27:6,         39:12, 40:17,        42:21
placed               49:10, 50:1,         41:2                 professional
70:11, 71:8,         52:6, 56:16,         preparation          1:24, 62:8,
71:12, 76:8,         61:7, 71:7,          16:22, 17:2,         74:7, 79:2,
82:18, 82:23,        86:1, 89:24,         17:12, 17:16         79:22, 80:6,
84:22, 85:3,         92:3, 92:6,          presence             91:12
85:17, 88:17,        92:8, 96:4           12:10, 15:9,         program
88:23, 89:8          population           90:9                 82:6, 82:9,
placing              29:8, 29:17,         present              82:19, 82:24,
71:17                30:6, 30:10,         86:17, 86:22,        84:5, 84:8,
plaintiff            72:10, 81:2          87:2, 88:6,          84:19, 84:23,
1:5, 2:8             portion              99:15                85:3, 85:18,
play                 45:3, 63:15,         pressure             88:18, 88:24,
58:18, 59:23         72:22, 73:1,         16:2, 44:17,         89:8
playback             73:3, 73:5, 73:7     45:14, 47:3,         promises
55:21                portrays             47:18                98:21
please               56:7                 pressures            prompted
4:6, 5:6, 5:8        position             16:1                 90:15, 90:24
point                6:1, 6:3, 6:8,       pretty               properly
32:14, 34:21,        7:16, 9:12           15:12                19:6, 19:14,
38:22, 41:1,         positions            prevent              43:19, 43:21,
43:22, 50:17,        84:1                 100:3                67:9
59:23, 61:15,        possible             prevented            protester
64:3, 66:10,         5:1, 23:12,          95:13                13:1
67:7, 85:20,         24:12, 24:21,        previous             provide
                                          4:14, 6:5,           26:24, 27:3,
```

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

43

54:13, 59:17
**provided**
48:2, 75:24,
97:23, 98:23
**providing**
96:13
**provisions**
1:32
**psych**
29:12, 98:1,
98:9
**psychiatric**
29:12, 98:4
**psychological**
97:23
**public**
1:31, 101:18
**pull**
13:1, 46:17
**pulled**
43:13, 44:6
**punch**
16:10, 16:15,
47:23, 48:4,
48:11, 50:14,
50:22, 50:24,
51:14
**punches**
49:7, 49:12
**punching**
22:3, 50:20,
51:19, 52:4
**pure**
32:13
**purpose**
1:35, 20:3,
99:6
**pursuant**
1:31
**put**
12:14, 14:18,
15:16, 21:16,
28:5, 35:23,
44:5, 44:16,
51:4, 64:17,
71:4, 75:13,
80:24, 82:13

**Q**

**qualification**
11:15

**quarantine**
32:24, 70:12,
70:18, 71:4,
71:8, 72:8,
76:17, 76:21,
77:4
**quarantined**
73:23, 81:1
**question**
5:4, 5:6, 5:15,
5:17, 18:23,
19:12, 19:13,
29:21, 40:6,
40:8, 51:3,
51:10, 52:2,
53:5, 59:1,
59:6, 59:12,
59:14, 60:8,
60:12, 60:17,
60:20, 60:21,
77:8, 77:9,
77:10, 77:22,
80:20, 91:19,
96:21, 97:1,
100:8
**questions**
5:5, 9:3,
28:21, 36:5,
36:9, 42:6,
58:12, 62:4,
79:9, 97:12,
98:11, 100:19,
101:15
**quickly**
4:24, 9:19
**quote**
99:19

**R**

**radio**
31:17, 32:3,
32:9, 32:17,
32:21
**ramos**
1:16, 38:9,
40:3, 48:17,
49:5, 49:15,
50:19, 52:3,

68:8, 68:18,
69:6, 72:6,
73:2, 74:11,
74:12, 74:19,
74:20, 75:1,
75:5, 75:10,
75:19, 98:8
**rather**
5:11
**reach**
46:19
**reaching**
44:8
**read**
43:24, 97:3
**reads**
92:13
**ready**
72:9, 79:12,
81:2
**really**
28:9, 28:10,
28:11, 28:20,
29:17, 59:21
**reason**
33:4, 58:14,
59:2, 67:8,
70:19
**reasons**
59:13, 60:16
**recall**
17:13, 30:23,
31:24, 32:2,
33:18, 34:5,
34:8, 36:1,
36:5, 36:8,
37:12, 37:22,
37:24, 38:17,
38:18, 38:21,
39:13, 39:20,
40:2, 40:11,
40:21, 41:8,
41:16, 52:21,
52:24, 53:5,
55:3, 55:9,
61:21, 66:11,
70:2, 71:3,
71:11, 80:5,

80:11, 88:13,
90:24, 91:6,
93:17
**receive**
32:22, 90:6
**received**
87:21
**recollection**
32:7, 33:22,
39:3, 63:1,
70:8, 75:10,
75:15, 75:18,
76:1, 91:10
**recommendation**
95:10
**record**
4:7, 15:13,
29:2, 36:11,
59:21, 66:21,
86:6, 86:14,
87:6, 87:11,
87:14, 97:8,
97:10, 97:11,
101:15
**recorded**
35:2, 35:4,
67:9
**records**
30:14
**reduced**
101:8
**reexamination**
3:6, 100:12
**refer**
45:16
**reference**
43:1, 97:22
**referred**
98:1, 98:9,
101:17
**referring**
23:24, 66:23,
72:14, 73:22,
81:7, 91:10
**refers**
12:8, 63:17
**refresh**
62:24

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

44

| | | | |
|---|---|---|---|
| **refresher** 27:16 **refuse** 60:17 **regarding** 99:19 **regards** 18:23, 20:16, 40:15, 43:4, 44:9, 57:10, 59:8, 82:21, 87:13, 94:8, 98:3 **regulations** 90:8 **relate** 45:5 **related** 7:2, 17:5, 46:2, 60:23, 63:2, 68:1, 70:21, 75:21 **relates** 62:12 **relation** 4:16, 20:2, 24:23, 27:6, 39:22, 40:3, 40:12, 41:9, 41:18, 42:11, 45:17, 64:10, 66:8, 71:7, 71:16, 80:6, 80:20, 82:2, 87:21, 88:17 **relevant** 63:14 **relieve** 25:2 **relieved** 25:16 **remain** 96:14, 97:5 **remedial** 64:18, 65:6, 65:13, 65:19, 94:5 **remember** 4:18, 18:22, | 27:18, 29:17, 34:7, 34:11, 34:12, 35:12, 35:13, 37:15, 37:23, 38:4, 38:20, 53:14, 66:16, 70:5, 82:4, 89:13, 91:13, 96:24 **repeat** 78:20 **rephrase** 5:9, 70:13 **report** 9:12, 9:15, 19:7, 19:14, 20:4, 20:13, 20:19, 21:3, 21:15, 21:24, 22:5, 22:10, 22:16, 22:17, 23:3, 25:23, 26:6, 26:24, 27:4, 28:8, 31:18, 31:19, 32:3, 32:19, 32:21, 33:11, 45:7, 49:2, 50:14, 50:21, 55:4, 55:9, 55:12, 56:14, 57:4, 57:11, 58:1, 58:3, 58:4, 61:3, 61:5, 61:7, 67:23, 68:13, 68:14, 69:2, 69:4, 69:7, 69:8, 69:10, 69:14, 69:16, 69:23, 71:22, 73:1, 73:4, 73:9, 73:17, 85:5, 90:15, 97:5, 97:18, 98:3 **reportable** 69:14, 69:18 | **reported** 85:21, 85:23, 87:4, 101:7 **reporter** 1:31, 4:2, 5:10, 5:13, 5:18, 101:3 **reporting** 9:17, 11:22, 47:10, 47:11, 62:17, 68:7, 91:24, 96:6 **reports** 9:7, 17:3, 17:4, 17:5, 18:17, 19:2, 22:20, 23:15, 24:21, 26:4, 27:7, 27:10, 39:15, 42:11, 46:2, 54:23, 56:1, 63:20, 63:24, 68:21, 69:5, 69:11, 72:18, 93:13, 96:23 **represent** 41:1 **representative** 96:19 **request** 64:17, 64:18, 65:14, 65:22, 90:9, 96:1 **requested** 95:23 **requests** 90:2, 98:7 **require** 22:16, 27:7 **required** 18:10, 20:13, 26:17, 50:21, 63:20, 96:23 **requirement** 11:9, 17:18, 17:20, 17:22, 24:11, 25:23, | 26:14, 26:18, 41:13, 50:13, 73:17 **requirements** 27:13, 27:14 **requires** 65:13 **residential** 29:3, 29:4, 30:4, 30:7, 30:12 **resistance** 15:11, 43:9, 44:24, 45:13, 46:6, 48:16, 49:20, 50:4, 91:23, 92:12, 92:15, 93:10, 93:22, 96:5 **resister** 12:19, 12:20, 12:21, 13:2, 13:3, 13:19, 14:12, 15:19, 16:8, 16:9, 16:17, 44:6 **resisters** 13:6 **resistive** 12:4, 12:18 **respond** 28:19, 32:17, 57:18 **responded** 92:24 **responding** 47:8 **responds** 92:13 **response** 11:24, 15:1, 15:6, 15:20, 15:24, 16:11, 16:16, 16:18, 19:9, 36:9, 43:9, 44:23, 45:4, 45:7, 45:9, 45:13, |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

45

46:6, 47:2,
47:16, 48:12,
48:16, 49:20,
50:3, 51:16,
91:23, 92:11,
92:15, 93:10,
93:21, 96:4
**responses**
15:9, 16:7,
44:14, 44:16
**responsibility**
18:2, 82:21
**responsible**
65:17, 67:15,
82:16
**result**
39:16, 98:24
**review**
1:25, 16:22,
17:1, 17:14,
17:20, 18:8,
18:11, 41:24,
52:9, 52:14,
52:18, 53:21,
55:18, 61:16,
62:9, 62:24,
63:12, 67:12,
68:22, 73:6,
73:18, 74:7,
79:2, 79:22,
80:6, 80:19,
85:5, 85:15,
85:21, 87:5,
88:9, 89:10,
89:12, 91:12,
93:12
**reviewed**
17:11, 19:22,
42:19, 46:9,
46:10, 48:20,
48:21, 52:21,
54:23, 55:4,
55:9, 55:19,
55:22, 55:24,
56:3, 61:18,
62:7, 63:2,
63:6, 63:24,
64:7, 68:23,

70:1, 72:17,
73:4, 73:9,
90:14, 92:7
**reviewing**
17:22, 42:22,
52:19, 52:20,
52:24, 53:6,
65:17, 67:15
**richard**
2:20, 78:22,
79:18
**right**
14:11, 21:5,
22:9, 32:18,
34:17, 34:18,
35:23, 42:2,
43:18, 49:14,
51:8, 74:24,
78:11, 94:2
**right-hand**
91:21
**risk**
14:19, 44:10,
53:13, 53:17,
53:22, 54:20,
55:5, 55:11
**rita**
10:3, 10:4
**ro**
47:8
**rodrigo**
1:15
**role**
77:2, 85:16
**ronald**
1:8
**rtu**
28:24, 29:1,
30:21, 30:22,
30:23
**rules**
1:32, 1:33,
4:24
**runs**
78:14

**S**

**said**
4:22, 14:6,

22:13, 30:1,
34:11, 36:8,
38:5, 42:3,
60:13, 71:2,
72:5, 84:9,
84:13, 86:1,
88:8, 88:13,
101:10, 101:16
**sake**
5:10, 59:1
**same**
5:16, 6:16,
8:16, 9:17,
23:8, 23:12,
23:13, 25:23,
37:6, 38:9,
38:11, 40:6,
40:8, 43:6,
43:14, 43:17,
45:10, 46:1,
46:10, 46:16,
48:21, 52:2,
57:7, 60:21,
61:24, 63:6,
67:20, 68:1,
74:6, 79:11,
96:3
**saved**
16:19
**saw**
49:14, 49:16,
51:7, 56:22
**say**
5:19, 8:21,
10:20, 12:1,
12:18, 15:14,
17:4, 23:7,
23:24, 28:12,
31:19, 33:7,
34:9, 34:14,
37:24, 38:17,
39:11, 42:10,
48:3, 48:6,
49:10, 55:1,
66:18, 80:9,
81:14, 82:12,
82:22, 83:6
**saying**
5:12, 34:12,

38:14, 58:20,
58:21, 60:4
**says**
43:9, 45:4,
62:16, 62:19,
63:11, 68:7,
72:8, 75:1,
79:24, 92:10,
93:8, 96:12
**scene**
34:17, 35:7,
35:11, 37:10,
37:18, 37:19,
37:21, 38:2,
38:6, 38:13,
38:19, 38:23,
39:5, 41:5,
41:9, 41:19,
50:20, 52:11,
54:12, 92:13,
93:1, 93:3, 93:5
**school**
9:21, 10:1,
10:3, 10:8
**second**
12:17, 13:2,
21:3, 21:6,
21:11, 21:14,
29:16, 29:20,
29:22, 30:15,
31:3, 31:18,
31:20, 32:3,
32:8, 32:21,
33:5, 33:11,
33:19, 34:6,
34:10, 47:13,
49:2, 63:10,
74:17, 91:14,
97:9
**see**
12:13, 20:17,
22:7, 28:21,
44:4, 47:6,
47:13, 50:16,
51:5, 68:8,
70:5, 72:10,
74:22, 75:1,
75:7, 78:15,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

46

78:22, 79:17,
79:19, 80:3,
80:17, 81:3,
92:1, 92:17,
96:19
**seek**
25:4
**seen**
41:14, 56:9,
79:5, 79:6,
79:14
**sees**
21:2
**segregation**
98:5
**self**
46:19
**semester**
10:15
**sense**
5:7, 5:19
**sensitive**
16:1
**sent**
41:10, 65:15,
94:5
**sentence**
63:11, 72:5,
74:19, 80:19
**separate**
35:3, 96:24,
97:6
**separated**
96:15
**separately**
26:19
**september**
99:10
**sergeant**
4:6, 6:2, 6:11,
6:17, 7:17,
7:24, 8:14, 9:4,
9:7, 9:13, 11:8,
26:7, 26:11,
28:6, 28:16,
28:19, 32:16,
36:22, 39:17,
41:11, 42:17,

42:18, 54:11,
54:22, 57:21,
59:4, 61:4,
61:10, 62:22,
62:23, 63:11,
63:20, 65:11,
65:23, 68:21,
71:3, 71:11,
73:18, 74:1,
76:6, 77:2,
80:2, 82:22,
83:3, 83:7,
84:22, 86:19,
89:18, 90:2,
90:9, 90:14,
94:13, 95:18,
97:12, 97:14,
100:7
**sergeants**
28:1, 31:5,
31:7
**served**
6:17, 8:8, 8:24
**setting**
29:13
**several**
47:12
**sexual**
11:15
**sgt**
1:14, 1:29,
3:3, 4:1, 101:6,
101:10
**shaded**
15:24
**sheet**
77:17
**sheets**
77:12, 77:13,
77:21
**sheriff**
1:7, 17:15,
17:20, 83:14
**sheriff's**
1:26, 19:1,
43:4, 62:8,
91:22, 98:17,
98:23, 99:5

**shift**
8:7, 23:5,
23:7, 24:12,
24:18, 24:20,
25:8, 25:11,
25:20, 26:1,
36:23, 37:2,
37:5
**shifts**
8:6, 8:10
**shorthand**
1:30, 101:2
**should**
19:17, 22:1,
22:9, 23:12,
24:18, 24:21,
30:17, 42:3,
48:3, 48:10,
49:11, 49:19,
67:3, 81:14,
95:12
**should've**
22:12, 22:14
**show**
85:15
**showed**
56:11, 88:9
**sick**
71:13, 71:18,
74:20, 75:2,
75:12, 76:7
**sign**
18:10, 36:22,
37:5, 42:17,
42:23, 44:20
**signature**
42:14, 101:18
**signature-ftuyc**
101:21
**signatures**
78:17, 78:21
**signed**
36:17, 44:19,
48:6, 53:1,
55:24, 56:15,
57:4, 58:3,
64:3, 64:7,
79:18

**signing**
42:18, 58:4,
61:6, 63:19
**signs**
26:8, 61:5
**similar**
52:2, 68:20
**simple**
13:4
**since**
6:4, 30:8,
56:9, 59:4,
59:16, 71:2
**sir**
7:13, 60:10
**sit**
7:1, 31:10,
32:6, 33:22,
36:1, 37:12,
38:1, 38:7,
39:2, 39:13,
39:20, 40:1,
40:20, 41:7,
41:17, 49:17,
52:23, 53:5,
55:3, 55:8,
56:7, 63:1,
63:5, 63:16,
64:6, 66:16,
67:2, 70:3,
70:7, 71:6,
72:12, 75:9,
75:24, 76:10,
76:14, 76:22,
77:1, 80:10,
81:5, 81:10,
81:24, 83:9,
84:2, 84:16,
91:6, 91:9,
93:16, 93:18,
95:21
**situation**
20:6, 21:17
**sixty**
11:7
**slash**
62:16
**slightly**
19:12

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017                                    47

| | | | |
|---|---|---|---|
| so-called<br>82:12<br>some<br>9:3, 10:9,<br>16:19, 24:22,<br>25:5, 27:12,<br>28:21, 29:14,<br>38:22, 41:1,<br>42:5, 57:19,<br>58:13, 59:2,<br>64:3, 66:10,<br>70:21, 78:17,<br>84:9, 84:10,<br>85:20, 94:16,<br>97:14, 99:13<br>somebody<br>13:10, 14:20,<br>16:15, 20:17,<br>31:17, 83:6<br>somebody's<br>41:14<br>someone<br>95:6<br>something<br>8:19, 12:12,<br>14:19, 19:22,<br>20:17, 34:13,<br>34:15, 38:5,<br>66:18, 66:21,<br>68:20, 70:23,<br>73:24, 74:2,<br>76:5, 76:11<br>sometime<br>39:1, 63:12<br>sometimes<br>22:7<br>somewhere<br>74:23<br>soon<br>22:23, 24:21,<br>24:24, 35:7,<br>78:4<br>sorry<br>14:8, 20:9,<br>38:14, 42:3,<br>43:5, 43:8,<br>57:10, 66:7,<br>74:24, 77:9, | 78:13, 78:20,<br>83:23, 86:24,<br>89:6, 97:19<br>sort<br>5:11, 9:21,<br>14:1, 21:21,<br>25:23, 29:14,<br>69:4, 70:22,<br>79:24, 83:13,<br>94:17<br>space<br>44:7, 46:18<br>speak<br>37:9, 40:17,<br>52:18, 90:2<br>speaking<br>20:2, 22:19,<br>32:15, 35:10,<br>35:14, 37:13,<br>69:1, 73:21,<br>76:4, 89:14,<br>89:19, 93:15<br>specific<br>34:1, 36:21,<br>60:19, 60:22,<br>73:21, 90:23<br>specifically<br>33:23, 37:15,<br>39:4, 40:16<br>specifics<br>89:13<br>speculate<br>51:7, 59:23<br>speculating<br>34:2<br>speculation<br>32:14, 49:13,<br>49:15, 50:17,<br>56:17, 56:19,<br>57:9, 61:9,<br>81:21<br>spell<br>4:6<br>spend<br>10:13<br>spent<br>59:4<br>split<br>31:6 | spoke<br>36:1, 40:14,<br>41:1, 82:1<br>spray<br>16:3, 16:4<br>st<br>10:3, 10:4,<br>101:4<br>staff<br>18:3, 20:12,<br>41:15, 70:20,<br>83:24<br>stance<br>13:11, 14:5<br>stand<br>29:1, 47:8,<br>62:20<br>stands<br>63:13, 63:15,<br>75:3<br>stapled<br>23:18<br>stare<br>13:12<br>start<br>5:15, 10:2,<br>12:8, 95:5<br>started<br>30:11, 86:16<br>starting<br>41:22, 78:14,<br>80:16<br>starts<br>72:5, 78:12,<br>78:13, 91:20<br>state<br>1:33, 4:6,<br>101:3<br>state's<br>2:18<br>stated<br>59:21, 63:13,<br>74:19, 74:20,<br>75:2, 75:5<br>statement<br>21:7, 74:8,<br>74:10<br>statements<br>99:5 | states<br>1:1<br>status<br>18:5, 29:9,<br>29:10<br>stenographically<br>101:7<br>step<br>25:13, 82:14<br>steps<br>53:21, 64:12,<br>94:12<br>stick<br>45:12, 54:17<br>stiff<br>12:23<br>still<br>24:11, 58:6<br>stop<br>12:13, 43:22<br>story<br>35:22<br>street<br>1:36, 2:4<br>strike<br>23:6, 44:17,<br>45:14, 47:18,<br>47:23, 48:4,<br>48:11, 49:18,<br>50:11, 50:13,<br>50:22, 50:24,<br>51:14, 77:8<br>strikes<br>47:3, 50:7<br>striking<br>47:15, 56:13,<br>57:2, 57:24,<br>58:2, 61:1, 70:4<br>struck<br>47:11, 51:11,<br>61:4<br>studying<br>10:16<br>stuff<br>8:6, 28:20,<br>59:8, 59:24<br>stun<br>44:17, 45:14, |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

48

47:18
**subcategories**
13:17, 13:20,
13:22, 15:21
**subject**
13:4, 14:22,
44:6, 44:12,
44:13, 46:17,
53:18, 53:19,
54:18, 55:6,
55:11
**subject's**
43:20, 46:15
**subjects**
11:23, 11:24,
12:2, 12:5
**submit**
26:6, 44:20,
68:24
**submitted**
67:17
**sufficient**
96:14
**superintendent**
83:21
**supervisor**
9:5, 66:2,
66:3, 66:5,
92:11, 92:21,
95:3, 95:9,
95:24, 96:17
**supervisors**
40:10
**supplement**
69:15
**supposed**
22:21, 45:8,
45:19, 64:15,
90:1, 94:8,
94:18
**supreme**
1:33
**sure**
5:7, 19:20,
20:21, 22:6,
22:14, 25:7,
28:5, 28:20,
28:21, 29:5,

31:3, 37:11,
43:6, 43:16,
43:18, 44:19,
45:22, 51:9,
52:8, 53:4,
53:8, 56:24,
57:14, 59:10,
59:21, 59:22,
62:2, 70:14,
71:23, 76:3,
78:21, 79:10,
81:22, 82:20,
83:9, 83:11,
85:4, 86:2,
86:9, 86:11,
88:7, 94:15,
98:2
**surrounding**
92:15, 93:9,
93:21
**sworn**
4:2, 101:11
**synopsis**
78:15, 78:18
**system**
23:23, 24:4,
24:10, 69:12,
69:13, 78:6

---
**T**
---

**take**
5:2, 5:4,
20:22, 41:23,
42:3, 42:7,
44:17, 53:21,
62:3, 64:11,
79:8, 82:14,
94:12
**takedown**
45:15, 47:4,
47:18
**taken**
1:30, 54:15,
54:19, 95:11,
98:16, 101:7
**taking**
1:34, 14:5
**talk**
35:17, 35:19,

37:17, 39:8,
66:9
**talked**
6:19, 27:11,
27:14, 35:12,
35:13, 37:20,
38:24, 39:12,
41:5, 53:13,
66:13, 92:6,
93:11
**talking**
17:19, 18:16,
19:15, 35:16,
37:15, 38:21,
39:3
**tapes**
63:12
**tapia**
1:10
**taser**
16:3, 36:13,
36:19, 36:21,
37:3, 37:6,
66:20
**tate**
85:9, 85:14,
85:16
**tell**
15:14, 27:20,
54:5, 55:7,
55:13, 72:13,
87:7, 101:11
**telling**
54:8, 59:1,
60:2, 60:3
**ten**
86:8
**terminals**
24:14
**terms**
14:17, 24:17,
25:24, 32:15,
41:4, 42:22,
46:15, 47:2,
56:7, 64:12,
83:13, 84:17,
85:16, 93:20,
94:11

**testified**
4:3, 88:8,
88:12, 99:20
**testimony**
5:14, 24:7,
35:6, 35:24,
45:4, 45:20,
49:17, 51:18,
53:15, 63:5,
64:6, 66:11,
73:12, 75:17,
76:10, 79:13,
81:10, 83:2,
84:14, 87:8,
87:20, 89:2,
94:1
**th**
28:22, 98:14,
100:15, 101:19
**thank**
70:1, 89:6,
97:12, 100:7,
100:20
**thereafter**
25:18, 63:12,
101:8
**thereof**
1:34
**they'd**
54:8
**thing**
5:12, 5:16,
6:16, 22:24,
43:14, 46:1,
64:16
**things**
29:15, 45:23,
58:7, 59:16,
66:8, 66:9,
93:18, 94:16
**think**
11:2, 26:21,
27:17, 29:11,
40:24, 51:10,
61:13, 63:10,
66:18, 71:2,
89:2
**third**
13:14, 29:12,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017 49

| | | | |
|---|---|---|---|
| 30:1, 31:4, 80:1, 80:15<br>**thirteen**<br>6:12<br>**thirty-four**<br>67:22<br>**thorough**<br>92:14, 93:9, 93:20<br>**thought**<br>54:6<br>**thousand-yard**<br>13:12<br>**threat**<br>44:9, 46:23, 47:21, 54:6<br>**threatening**<br>13:11<br>**three**<br>8:1, 8:10, 12:5, 13:8, 26:15, 26:16, 64:18, 93:18, 96:8, 96:12, 97:4<br>**through**<br>4:24, 9:19, 12:5, 15:20, 41:23, 42:5, 46:11, 48:22, 50:5, 53:13, 64:13, 66:7, 69:5, 78:14, 79:9, 90:12, 101:9<br>**throughout**<br>29:18<br>**tier**<br>33:24, 34:4, 74:19, 75:2, 77:12, 77:13, 77:21<br>**time**<br>4:14, 5:2, 6:14, 6:16, 6:17, 7:5, 7:9, 7:10, 8:8, 8:12, 10:13, 14:18, | 20:11, 24:4, 25:17, 29:6, 30:10, 30:16, 30:21, 33:7, 33:8, 33:19, 34:21, 39:22, 40:2, 41:13, 42:4, 53:1, 62:3, 70:17, 71:1, 71:10, 73:6, 78:2, 79:4, 79:14, 83:16, 85:7, 86:4, 86:16, 86:18, 86:20, 86:21, 87:16, 88:22, 89:23, 90:20, 90:23, 97:13, 99:15, 101:16<br>**times**<br>4:11, 4:23, 28:6, 47:12<br>**title**<br>80:1, 85:12<br>**today**<br>4:14, 5:19, 7:1, 16:23, 17:12, 17:16, 31:10, 32:6, 33:22, 36:1, 37:12, 38:1, 38:7, 39:2, 39:13, 39:20, 40:1, 40:20, 41:7, 41:17, 49:17, 52:23, 53:5, 55:3, 55:8, 56:8, 63:1, 63:5, 63:16, 64:6, 66:16, 67:2, 70:3, 70:7, 71:6, 72:12, 75:9, 76:1, 76:10, 76:14, 76:22, 77:2, 80:10, 81:6, | 81:10, 82:1, 83:9, 84:2, 84:17, 91:6, 91:9, 93:16, 93:18, 95:21, 99:20<br>**told**<br>12:11, 64:22<br>**took**<br>32:7, 32:11, 41:9, 41:17, 45:17, 93:20, 99:16<br>**top**<br>68:8, 72:5, 73:3, 73:7, 74:11, 80:15<br>**track**<br>78:8, 78:10<br>**trained**<br>14:24<br>**training**<br>11:9, 11:10, 11:11, 11:13, 11:14, 11:18, 11:20, 15:4, 17:19, 18:7, 18:12, 18:16, 18:17, 18:20, 18:21, 19:23, 27:11, 27:12, 27:13, 27:16, 27:22, 64:17, 64:18, 65:6, 65:13, 65:19, 65:22, 90:7, 94:5<br>**transcription**<br>101:9<br>**transitioned**<br>29:7<br>**transitioning**<br>30:11<br>**treatment**<br>29:3, 29:4, 30:5, 30:8, 30:12<br>**triggered**<br>89:7 | **true**<br>57:19, 59:17, 72:19, 101:14<br>**truth**<br>54:8, 101:11, 101:12<br>**truthful**<br>54:2<br>**try**<br>5:9, 26:1<br>**trying**<br>4:18, 21:23, 29:11, 57:15, 69:10, 70:14, 70:15<br>**tuesday**<br>1:37<br>**turn**<br>12:14, 26:11, 37:2, 63:23, 92:10<br>**turned**<br>26:7, 26:9, 30:7, 39:17<br>**twenty**<br>86:10<br>**twice**<br>4:13<br>**two**<br>8:1, 8:22, 13:5, 31:2, 31:4, 31:7, 31:11, 37:14, 57:12, 60:16, 66:17<br>**type**<br>11:23, 12:1, 12:16, 14:3, 15:1, 16:18, 16:19, 29:6, 69:2, 69:13, 84:9<br>**types**<br>13:23, 14:23, 16:7, 16:11, 24:20, 30:15<br>**typewriting**<br>101:8 |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

50

**typical**
31:7

**U**

**uh-huh**
5:12
**under**
18:5, 32:24,
45:22, 50:12,
51:12, 65:13,
67:2, 70:11,
70:18, 71:4,
71:8, 72:3,
72:22, 76:17,
76:21, 77:4,
87:14, 96:9
**underneath**
19:3, 47:20
**understand**
5:5, 20:21,
51:18, 57:17,
58:11, 60:22,
66:15, 77:22,
83:14, 94:19,
99:12
**understanding**
33:14, 82:8,
82:10, 84:7,
95:21
**understood**
65:16
**uniform**
12:13
**unit**
29:3, 29:4,
30:5, 67:18,
85:6, 85:16,
85:21, 85:24,
87:5, 88:9,
89:12
**united**
1:1
**university**
10:11, 10:14
**unknown**
1:17, 1:22,
1:23
**unquote**
99:19

**until**
5:17, 6:13,
93:3
**updated**
77:21
**using**
94:13, 95:3
**usually**
13:15, 23:17,
24:19

**V**

**vague**
56:18
**vaguely**
19:12
**valdez**
1:11
**varied**
8:1
**varies**
8:5, 8:11,
15:22
**verbal**
5:11, 12:11,
12:22, 15:8
**video**
35:2, 35:4,
36:12, 55:15,
55:18, 55:22,
56:3, 56:6,
56:8, 56:11,
61:16, 61:18,
63:2, 63:6,
64:8, 66:19,
66:20, 66:22,
67:3, 67:8,
67:9, 67:12,
67:16, 67:17,
70:4, 70:6, 70:8
**village**
7:19, 7:20,
8:14
**vince@loevy**
2:7
**vincenzo**
2:3
**violation**
50:1, 52:6,

56:16, 57:5,
58:4, 61:7
**visit**
99:10

**W**

**wait**
24:19, 25:19
**walks**
21:1
**want**
9:20, 9:22,
9:24, 15:21,
19:13, 20:21,
22:14, 35:21,
43:16, 60:18,
61:14, 79:10,
86:2, 100:9
**wanted**
76:16, 94:19
**wanting**
32:23, 33:3
**watch**
26:9, 26:12,
40:14, 40:18,
40:21, 44:21,
55:20, 55:23,
61:19, 61:21,
63:7, 63:23,
64:8, 64:24,
65:3, 68:24,
72:21, 72:23,
73:13, 81:8,
81:14, 81:18,
82:1, 83:12,
83:15, 83:18,
85:10, 95:10,
95:16, 95:22
**way**
11:1, 16:7,
18:24, 35:21,
46:10, 47:9,
48:21, 52:15,
60:24, 61:1,
70:16, 72:4,
76:1, 76:15,
76:23, 86:17,
93:17, 97:24,

100:16
**we'll**
54:17
**we're**
19:15, 43:6,
43:16, 43:17,
44:22, 58:9,
59:7, 78:9,
79:10
**we've**
64:13, 69:5
**weapon**
13:15
**week**
8:2, 8:6, 8:22,
11:13, 16:24,
28:13
**weekly**
28:10, 28:12
**went**
10:3, 46:11,
48:22, 50:5,
53:12, 66:7,
86:1
**west**
2:12
**whatever**
10:12, 10:20,
20:12, 21:18,
21:19, 22:22,
31:21, 35:20,
67:8, 70:19,
71:14
**whatsoever**
100:3
**wheelchairs**
29:15
**whereas**
12:22
**whether**
12:4, 29:14,
36:1, 38:18,
38:22, 39:4,
40:11, 53:22,
54:16, 54:20,
57:21, 65:12,
65:18, 70:3,
70:21, 76:15,

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

51

| | | | |
|---|---|---|---|
| 77:3, 77:4, 82:1, 82:17, 93:17, 96:10, 96:22, 99:4 | work 4:16, 4:18, 7:2 | .2 91:22 | 43:11, 48:15 |
| whoever 66:1 | worked 7:10, 7:11, 8:12, 8:19 | **0** | **2011** 6:4, 6:13, 7:15, 59:4, 71:2 |
| whole 23:23, 86:20, 86:21, 101:11 | working 57:16 | 00 1:37 | **2014** 28:22, 42:12, 98:14, 99:10, 100:15 |
| wide 28:19 | works 60:14 | 0020 42:3 | **2017** 1:37, 101:5, 101:20 |
| willing 60:13 | would've 41:5, 41:10 | 004386 101:24 | **204** 91:20 |
| wing 29:13 | wouldn't 16:9, 71:19, 82:12, 87:13 | 084 101:24 | **208** 96:9 |
| within 9:4, 13:17, 28:23, 30:20, 30:23 | write 20:19 | **1** | **209** 96:3, 96:12, 97:4 |
| without 12:15, 15:11 | writing 21:6 | 100 3:6, 19:20, 28:20 | **21** 1:37, 48:15, 49:5, 101:4 |
| witness 3:2, 21:7, 25:22, 51:19, 56:20, 57:8, 60:9, 61:10, 74:8, 76:19, 81:22, 94:2, 96:15, 101:5, 101:10, 101:16, 101:18 | written 19:1 | 11 53:2 | **210** 92:10 |
| | wrong 14:20, 87:17 | 11.2 91:22 | **23** 46:5, 46:14 |
| | wrote 44:1, 44:4, 47:7, 51:8, 64:23 | 13 6:13, 101:19 | **24** 46:5, 47:6, 47:7 |
| | **Y** | 135 74:6 | **243** 2:6 |
| | yeah 16:9, 34:14, 42:2, 57:8, 91:17, 95:5 | 143 61:24 | **26** 43:12, 43:17, 44:2, 44:22, 45:3, 50:3, 53:11 |
| | year 10:6, 10:18, 27:19, 85:2, 89:3, 89:5 | 15 100:21 | **27** 43:23, 44:22, 45:22, 50:3, 50:6, 53:12 |
| witnessed 21:4, 21:21, 22:2, 22:6, 22:9, 22:11, 22:18, 49:18, 49:21, 49:23, 51:24, 52:4, 52:7, 52:8, 52:16, 56:12, 57:2, 57:23, 61:1, 61:6 | yearly 11:10, 11:18 | 16 1:6, 8:19 | **28** 41:23, 42:5 |
| | years 4:15, 6:12, 6:13, 6:20, 6:22, 6:23, 37:14, 52:23, 57:12, 66:17, 89:3 | 17 28:22, 42:12, 98:14, 100:15 | **2a** 74:19, 75:2 |
| | | 1989 10:7 | **3** |
| | | 1993 7:15, 86:22 | 3 100:21 |
| witnesses 22:15 | yourself 62:12, 83:7 | 1998 6:13, 86:23, 86:24, 87:2, 88:5 | 311 1:36, 2:4 |
| wondering 69:3 | **.** | **2** | |
| words 69:17 | .0 91:22 | 2 1:37 | |
| | | 20 41:22, 42:5, | |

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017
52

**312**
2:6, 2:14, 2:22
**34**
67:21, 71:21,
97:17
**4**
**46**
11:2
**49**
53:2
**4th**
99:10
**5**
**500**
2:20
**5012**
1:6
**53**
2:12
**583**
2:14
**5900**
2:6
**5967**
2:22
**6**
**603**
2:22
**60601**
2:21
**60604**
2:13
**60607**
2:5
**8**
**87**
78:13, 78:15
**88**
78:12
**89**
10:19, 78:11,
80:13
**9**
**91**
79:24

**93**
78:17, 78:21,
79:17, 86:24
**94**
78:14
**9500**
2:14
**97**
3:5