1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
LITROY BOLTON,              )
4                           )
          Plaintiff,        )
5                           )
     -vs-                   )  No. 16 cv 5012
6                           )
MIGUEL ORTIZ, et al.,       )
7                           )
          Defendants,       )
8                           )
     _____)
9
10          The deposition of LITROY BOLTON, called for
11   examination pursuant to the Rules of Civil Procedure
12   for the United States District Courts pertaining to
13   the taking of depositions, taken before Pamela L.
14   Cosentino, Certified Shorthand Reporter for the State
15   of Illinois, at Cook County Jail, 2700 South
16   California, Illinois, on the 7th day of March, 2017,
17   at the hour of 1:30 p.m.
18
19
20
21
22
23
     Reported by:  Pamela L. Cosentino, CSR
24   License No.:  084-003601

1

APPEARANCES:
1
2    LOEVY & LOEVY, By
       MR. VINCENZO FIELD
3      311 North Aberdeen Street, 3rd Floor
       Chicago, Illinois  60607
4      (312) 243-8900
       Email:  vince@loevy.com
5
          On behalf of the Plaintiff;
6
7    HON. KIMBERLY M. FOXX,
     State's Attorney of Cook County, By
8    MS. ALLYSON WEST
     Richard J. Daley Center
9    50 West Washington
     Chicago, Illinois  60602
10   (312) 603-6299
     Email:  Allyson.west@cookcountyil.gov
11
       -AND-
12
     JOHN C. COYNE LAW OFFICE, By
13   MR. JOHN C. COYNE
     53 West Jackson Boulevard, Suite 1750
14   Chicago, Illinois  60604
     (312) 583-9500
15   Email:  jcc@johncoynelaw.com
16        On behalf of the Defendants;
17              *    *    *
18
19
20
21
22
23
24

2

1                     INDEX
2    WITNESS              DX    CX    RDX    RCX
3    LITROY BOLTON
4      By Mr. Coyne       4
       By Ms. West               87
5      By Mr. Field             88
6
7                   EXHIBITS
8    EXHIBIT NUMBER          MARKED FOR ID
9    Bolton Deposition
10     Exhibit No. 3              43
11
12
13
14
15
16
17
18
19
20
21
22
23
24

3

1              (Witness duly sworn.)
2         MR. COYNE:  Let the record reflect this is
3    the deposition of plaintiff Litroy Bolton taken
4    pursuant to notice to all parties and in compliance
5    with all applicable rules of the Federal Rules of
6    Civil Procedure.
7              DIRECT EXAMINATION
8    BY MR. COYNE:
9         Q.   Mr. Bolton, my name is John Coyne.  I
10   represent the defendants Miguel Ortiz, et al.  I
11   appreciate you making yourself available for the
12   deposition today.
13             During the deposition, how would you like me
14   to address you?  Mr. Bolton?  Litroy?
15        A.   Doesn't matter.
16        Q.   During the course of the deposition, I am
17   going to try to ask you questions that you easily
18   understand.  And if I fail to do that, just let me
19   know.
20             And I will repeat the question or rephrase
21   it, whichever you prefer.  Is that fair enough?
22        A.   Yes, sir.
23        Q.   Can we agree that if you begin to answer the
24   question, that that will mean, number one, you



EXHIBIT
B

1  understood it, and, number two, you are giving the
2  most complete and truthful answer you're capable of?
3      A.   Yes, sir.
4      Q.   Can you start with your full name including
5  middle initial, spelling it, please?
6      A.   My full name is Litroy, middle name start
7  with an M, Marcelle, last name Bolton.
8      Q.   What is your date of birth?
9      A.   11-15-86.
10     Q.   What is your current residence address?
11     A.   My current residence.
12     Q.   Other than this?
13     A.   1858 South Avers.
14     Q.   Is that in Chicago?
15     A.   Illinois.
16     Q.   Who do you reside there with?
17     A.   My grandmother, Mattie Woods, M-a-t-t-i-e.
18     Q.   So today you're how old?
19     A.   I am 30.
20     Q.   Can you give me a background of your formal
21  education, sir?
22     A.   I graduated from William Penn Elementary.
23  Went to Westinghouse Career Academy, Homewood,
24  Franklin.

5

1      Q.   I'm sorry, what was the last thing you said?
2      A.   Westinghouse career vocational high school,
3  Homewood, Franklin.  Westinghouse high school.  It's a
4  vocational high school.
5      Q.   What year did you graduate from there?
6      A.   I never graduated.  I got dropped out because
7  of my attendance my junior year.
8      Q.   Do you have a GED?
9      A.   No, sir.
10     Q.   Are you married or single?
11     A.   I am single, sir.
12     Q.   Have you ever been married?
13     A.   No, sir.
14     Q.   Do you have any children?
15     A.   Yes, sir.
16     Q.   How many?
17     A.   I got one, a junior.
18     Q.   Your name but junior?
19     A.   Yes, sir.
20     Q.   How old is he?
21     A.   He's 15 months.
22     Q.   Who does he live with?
23     A.   Right now he stays with his mother I believe,
24  with his mother.

6

1      Q.   What's his mother's name?
2      A.   Shyera Gaston.
3      Q.   Do you know how to spell the first name?
4      A.   S-h-y-e-r-a, Gaston, G-a-s-t-o-n.
5      Q.   Mr. Bolton, what's your Social Security
6  number?
7      A.   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.
8      Q.   You're presently in custody in the Cook
9  County Jail, Division 11; is that fair?
10     A.   Yes, sir.
11     Q.   What's the charge that has you here?
12     A.   Allegations of I believe home invasion.
13     Q.   Are you represented by private criminal
14  defense counsel or the public defender?
15     A.   Public defender, sir.
16     Q.   What public defender is representing you?
17     A.   Armando Sandoval.
18     Q.   Sandoval?
19     A.   Yes.
20     Q.   Do you have a trial date in that matter or is
21  it just pending?
22     A.   Still pending.
23     Q.   Have you ever lived in any other states
24  besides Illinois?

7

1      A.   No, sir.
2      Q.   Do you have any siblings?
3      A.   Yes.
4      Q.   How many?
5      A.   Three -- there is three of us.  I got two
6  sisters and one brother.
7      Q.   And do your parents reside in the Chicago
8  area?
9      A.   Yes, they deceased.
10     Q.   Mr. Bolton, the lawsuit that has been filed
11  on your behalf alleges an incident that took place on
12  or about January 17, 2014.
13          Do you understand that?
14     A.   Yes, sir.
15     Q.   And a lot of the questions I am going to ask
16  you today pertain to that particular incident.
17          Do you have a specific recollection of that
18  incident, of an incident occurring on or about that
19  date?
20     A.   Yes, sir.
21     Q.   Are you presently under any prescription
22  medications?
23     A.   No, sir.
24     Q.   Are you taking anything that would affect

8

**Page 9**

```
 1   your memory or your ability to testify truthfully and
 2   accurately in this deposition?
 3       A.   No, sir.
 4       Q.   At the time of the incident that we're here
 5   today to discuss, were you an inmate in the Cook
 6   County Jail?
 7       A.   Yes, sir.
 8       Q.   Do you know -- do you recall what division
 9   you were in?
10       A.   I was in Division VI, but they were
11   transferring me from Division VI to Division VIII.
12       Q.   Do you know what purpose you were being
13   transferred for?
14       A.   Not at all.
15       Q.   Do you know how long you had been in Cook
16   County Jail custody as of January 17, 2014?
17       A.   How long I was incarcerated that whole time?
18       Q.   Up to that date.
19            So as of January 17, 2014, do you know how
20   long you had been in Cook County Jail?
21       A.   I don't know.  Maybe a couple days.
22       Q.   And the arrest that put you in jail at that
23   time, was that for possession of cannabis?
24       A.   Yes, sir.
```

**Page 10**

```
 1       Q.   Do you know if that was straight possession
 2   or whether it was possession with intent to deliver,
 3   if you know?
 4       A.   I don't remember.  It could have been
 5   possession with intent, just a possession.  I don't
 6   know.  I don't even remember.
 7       Q.   Understood.  Did you have any co-defendants
 8   in that case?
 9       A.   No, sir.
10       Q.   What was the eventual disposition in that
11   case?  What ended up happening?
12       A.   In my preliminary hearing, the case got
13   dismissed.
14       Q.   Do you know did the officer testify at your
15   preliminary hearing?
16       A.   Yes, he did.
17       Q.   Do you know if it was dismissed because of a
18   finding of no probable cause or for some other reason?
19       A.   The finding of no probable cause.  I believe
20   the judge didn't believe the officer that was
21   testifying.
22       Q.   As I understand it, the incident that
23   occurred that gave rise to your complaint had to do
24   with a conflict or an altercation between you and
```

**Page 11**

```
 1   corrections officer, Miguel Ortiz; is that fair?
 2       A.   Yes.
 3       Q.   Do you recall approximately what time that
 4   incident occurred?
 5       A.   It was later on, maybe 10, 10:00 o'clock that
 6   night.
 7       Q.   As I understand it, you were being
 8   transferred from Division VI to Division VIII?
 9       A.   Yes, sir.
10       Q.   I don't know if you testified to this
11   already, but what's your understanding for the reason
12   for the transfer?
13       A.   I don't know.  They just called my name and
14   told me to pack it up and be on --
15       Q.   In the course of being transferred from
16   Division VI to Division VIII, were you handcuffed at
17   any time?
18       A.   I probably was hand- -- I don't remember if I
19   was handcuffed.
20       Q.   At the time of the subject incident, were you
21   handcuffed?
22       A.   No.
23       Q.   And if I use the phrase "the subject
24   incident," can we agree that I am referring to the
```

**Page 12**

```
 1   incident where you had an altercation with Defendant
 2   Ortiz?
 3       A.   Yes.
 4            MR. FIELD:  Just object to the term
 5   "altercation" being vague.
 6            But you can answer.
 7   BY MR. COYNE:
 8       Q.   At the time of your in-custody status, on or
 9   about January 17, 2014, were you under any medications
10   at that time?
11       A.   No, sir.
12       Q.   Did you have any physical ailments as of the
13   time that you were admitted in custody to Cook County
14   Jail?
15       A.   Excuse me, I don't understand that.
16       Q.   I will rephrase.
17            Did you have any physical problems?  Were you
18   in pain of any sort when you were admitted prior to
19   January 17th?
20       A.   No, sir.
21       Q.   Did you have any mental health diagnosis
22   prior to January 17, 2014, that you are aware of?
23       A.   No, none that I don't -- I do not recall.
24       Q.   As of the time you were being transported to
```

```
 1   Division -- from Division VI to Division VIII, how
 2   many members or employees of the jail, so far as you
 3   can recall, were in the process of helping you move or
 4   transporting you?
 5       A.   It was one transporting officer until I got
 6   to the place where they actually wanted me to be.
 7       Q.   Do you know the name of that officer, by
 8   chance?
 9       A.   Correctional Officer Ivory.
10       Q.   Where did you first encounter corrections
11   officer, Ivory?  Was it while you were in the cell?
12       A.   No, I believe he was the officer that
13   actually came and got me from Division VI to do the
14   whole transfer, I believe.
15       Q.   Were you given any instructions or any
16   information from Officer Ivory or anyone else prior to
17   being moved from Division VI to Division VIII?
18       A.   No.
19       Q.   I understand that at the time of the
20   incident, you were holding certain personal items, at
21   the time the incident occurred?
22       A.   Yeah, I had the bed roll, the stuff that they
23   give you in order to fix your bed.
24       Q.   Anything else you were holding at that time?
```
                                                          13

```
 1       A.   Just the bed roll.
 2       Q.   To the best of your recollection, is it fair
 3   to say that you were dressed pretty much similar to
 4   the way you're dressed now?
 5       A.   Correct.
 6       Q.   The clothes you were wearing were issued to
 7   you by the Cook County Jail?
 8       A.   Yes.
 9       Q.   Had you ever seen Officer Miguel Ortiz at any
10   time prior to January 17, 2014?
11       A.   Never.
12       Q.   Had you ever seen Officer Ivory at any time
13   prior to that date?
14       A.   Never.
15       Q.   As of January 17, 2014, how many prior times
16   had you been in custody in the Cook County Jail?
17       A.   I have been in custody in Cook County Jail a
18   few times.
19       Q.   Do you know how many times prior to
20   January 17?
21       A.   I don't know exactly how many, but I have
22   been in custody a few times before.
23       Q.   Were there any incidents or anything, so far
24   as you understand the word "incident," anything that
```
                                                          14

```
 1   occurred prior to your in-custody stays at Cook County
 2   Jail?
 3       A.   Never.
 4       Q.   Now, in preparation for your deposition,
 5   Mr. Bolton, other than speaking to your counsel, and I
 6   don't want to know anything you said to him or he said
 7   to you, but in preparation to your deposition, did you
 8   do anything in particular to prepare?  Did you review
 9   any documents?
10       A.   Did I review any documents?  I looked at a
11   couple pieces of paperwork.
12       Q.   Do you know what the paperwork was that you
13   had reviewed?
14       A.   I can't say exactly.
15       Q.   Were they documents generated by the Cook
16   County Jail as far as you know?
17       A.   Yes.
18       Q.   Were there any documents you reviewed that
19   you yourself signed?
20       A.   Me myself signed?
21       Q.   Yeah, that you signed, any documents.
22       A.   Yeah.
23       Q.   Was there more than one or was there just one
24   that you signed?
```
                                                          15

```
 1       A.   Maybe a few.
 2       Q.   Do you know what they were?
 3       A.   Just the grievance.
 4       Q.   Anything else that you did other than
 5   reviewing documents in order to prepare for your
 6   deposition here today?
 7       A.   No, nothing.
 8       Q.   Have you ever -- have you spoken to
 9   corrections officer, Miguel Ortiz, at any time after
10   January 17, 2014?
11       A.   No, sir.
12       Q.   How about corrections officer, Ivory?
13       A.   No, sir.
14       Q.   Had you had a personal conversation with any
15   of the individuals who were present at the time of
16   your incident after it occurred?
17       A.   I may have seen one since I have been here.
18       Q.   Do you know who that was?
19       A.   Officer Ramos.
20       Q.   Did you any conversation with Officer Ramos?
21       A.   No, he tried to conversate with me because he
22   knew who I was.
23       Q.   What, if anything, did he say to you?
24       A.   He just asked me what happened as far as with
```
                                                          16

1    my situation.
2    Q.   When you say your situation, do you mean why
3    you're presently in Cook County Jail?
4    A.   When I recently been incarcerated, he asked
5    me as far as like what was the results as far as what
6    happened or whatever.
7    Q.   When you say "what happened," are you
8    referring to the incident on January 17?
9    A.   Yes.
10    Q.   What did you tell him?
11    A.   I told him nothing.
12    Q.   Did you respond in any way to him when he
13    asked?
14    A.   I didn't tell him nothing.
15    Q.   Other than Officer Ramos, in the limited way
16    you've described, have you had any other conversations
17    since January 17, 2014, with employees of the Cook
18    County Jail regarding that accident?
19    A.   No.
20    Q.   When was the first time that you saw Miguel
21    Ortiz prior to the incident occurring?
22    A.   When was the first time that I seen Miguel
23    Ortiz?
24    Q.   Right, prior to the incident on January 17,

17

1    2014, happened?
2    A.   It was my first time seeing him when I got
3    transferred.
4    Q.   I understand that you were going to be
5    transported to a particular cell originally; is that
6    fair?
7    A.   Yes.
8    Q.   At some point, you overheard a conversation
9    regarding the condition of that cell; is that true?
10    A.   Yes.
11    Q.   Can you tell me about that, what you
12    overheard?
13    A.   At the time that they was trying to place me
14    into the assigned cell, Correctional Officer Ramos,
15    came and told Officer Ortiz that I could not be placed
16    inside of the cell because it was a quarantine.
17    Q.   At the time that statement was made, it was
18    made by Ramos to Ortiz?
19    A.   Exactly.
20    Q.   Besides you, was there anyone else present?
21    A.   Correctional Officer Ivory.
22    Q.   Anyone else present besides them?
23    A.   Just us.
24    Q.   Did that conversation take place in the

18

1    general vicinity of where the incident occurred?
2    A.   Exactly.
3    Q.   Ramos was speaking to Ortiz directly at that
4    time?
5    A.   Yes.
6    Q.   What, if anything, did Ortiz say in response?
7    A.   He didn't say nothing right away, but after a
8    certain amount of time, he told him that they assigned
9    me to that cell, "We are going to put him in the cell
10    anyway."
11    Q.   Had you seen that cell at that point?
12    A.   I never saw the cell.
13    Q.   Did Officer Ramos say anything in response to
14    Officer Ortiz saying that they were going to put you
15    in that cell anyway?
16    A.   No.
17    MR. FIELD:  Just one second.
18    (Off the record.)
19    BY MR. COYNE:
20    Q.   Did Officer Ivory say anything in response to
21    anything Ortiz or Ramos had said?
22    A.   No.
23    Q.   At some point, did you say something?
24    A.   Yes.  I asked to speak to a sergeant or a

19

1    lieutenant, someone in charge.
2    Q.   Was that because you didn't want to go in the
3    cell?
4    A.   Yes, sir.
5    Q.   Why was that?
6    A.   Because the cell was quarantine.  Officer
7    Ramos told Ortiz that the cell was actually in a
8    quarantine.
9    Q.   By "quarantine, "what did you take that to
10    mean?
11    A.   Contagious.  Something that I can catch, like
12    a disease.  A way you can get sick, anything.
13    Q.   As of the time that Officer Ramos told
14    Officer Ortiz that it was quarantined, did you have
15    any other knowledge about the state of that cell other
16    than what Ramos had told Ortiz?
17    A.   I just knew that officer -- see, Officer
18    Ortiz was by the desk.  He had the computer, like this
19    computer right here (indicating).  So I guess his job
20    was to just log in the computer what cell that you go
21    into.
22    But Officer Ramos was the guy officer that
23    actually was on the wings that actually knew about the
24    wings, so I guess he informed Ortiz about the cell at

20

1 the time.
2    Q.   At that point, you had yet to be in the cell.
3 In fact, you were never in the cell?
4    A.   I never went in the cell.
5    Q.   As to the state of the cell whether it was,
6 in fact, contagious or not, that was something you had
7 no direct information about; is that fair?
8    A.   Yes.
9    Q.   Other than what Officer Ramos had said to
10 Ortiz, did you ever have any other information about
11 the state of that cell that you were supposed to go
12 to?
13    A.   No.  Just what Officer Ramos informed Ortiz.
14    Q.   So you asked to speak to a sergeant or
15 lieutenant because you had concerns about being sick
16 if you were placed in a cell that was contagious?
17    A.   Exactly.
18    Q.   Did you ever speak to a sergeant or a
19 lieutenant?
20    A.   Yes, I did.
21    Q.   Any time before the confrontation before you
22 and Ortiz?
23    A.   It was way after the incident.
24    Q.   When I say -- I have use the word "subject

21

1 incident, incident," and "confrontation."  So to be
2 fair to you, do you understand that when I say
3 "subject incident" or "confrontation" or "incident," I
4 am referring to the physical confrontation between you
5 and Ortiz; is that fair?
6    A.   Yes.
7    Q.   Did you have any other conversation -- strike
8 that.
9        Did Ramos say anything else to Ortiz other
10 than what you've testified to prior to the
11 confrontation with you and Ortiz?
12    A.   No.
13    Q.   So if I understood your testimony correctly,
14 Ortiz said he was going to put you in that cell
15 anyway?
16    A.   Exactly.
17    Q.   Did he make any statement about -- that is
18 did Ortiz make any statement about the condition of
19 the cell?
20    A.   No.  He just said basically he didn't care,
21 they assigned me to that cell, he going to put me in
22 that cell anyway.
23    Q.   Do you know what the cell number was?
24    A.   I think it was 2-A.

22

1    Q.   Do you know if anyone had -- strike that.
2        Do you know when the last time was that
3 anyone was in that cell prior to you?
4    A.   I don't know.
5    Q.   Now, when you said Officer Ortiz was at his
6 computer, do you mean he was in his room off the
7 hallway?
8    A.   He was like right across maybe from where I
9 was standing at.  I would say it was like in a booth.
10    Q.   Was that booth in a room that was off the
11 hallway?
12    A.   I can't say it was a room because there was
13 no closed door.  So it was just like a little booth.
14    Q.   To get to the booth, you would walk
15 through -- you would walk to that booth through the
16 hallway?
17    A.   To get to the booth?
18    Q.   Yes.
19    A.   The booth -- it's like a hallway separating
20 the booth and the side that I was at.
21    Q.   Did you review the video that was generated
22 from this incident?
23    A.   Yes, sir.
24    Q.   Did you review that within the past 48 hours?

23

1    A.   No, sir.
2    Q.   You have seen it at some point?
3    A.   Yes, sir.
4    Q.   As far as you're concerned -- we may watch
5 the video here, but as far as you are concerned, did
6 that video capture the incident that led to your
7 filing the complaint against Officer Ortiz?
8    A.   Yes, sir.
9    Q.   Were there any aspects of the incident that
10 you believe were not accurately captured on that
11 video?
12    A.   Was there any aspect?
13    Q.   Sure.  I'll ask it in a different way.
14        Was there anything that happened that you
15 remember that was not captured on the video?
16    A.   The video showed everything clearly what
17 happened.
18    Q.   Did the video that you watched, did it
19 contain any audio at all?
20    A.   No audio.
21    Q.   Have you ever heard any recording of the
22 conversation between you and Officer Ortiz that took
23 place prior to the confrontation?
24    A.   Never.

24

1    Q.   To the best of your recollection, was Officer
2  Ivory depicted in the video at some point?
3    A.   Yes, he was in the video.
4    Q.   What about Officer Ramos?
5    A.   Yes, he was in the video.
6    Q.   After Officer Ortiz told you that you were
7  going to go in the cell anyway, despite your protest,
8  what, if anything, did you say?
9    A.   All I asked was for a sergeant or white
10 shirt.
11       And I told him also that, "If I was you and
12 you was me, would you want me to go in a cell that's
13 quarantined?" That's what I did say.
14       I told him I didn't want to go in a cell
15 that's quarantined. I didn't want to get sick.
16   Q.   Did he say anything in response to that?
17   A.   He said, "If you don't get in the cell, we
18 are going to put you in the cell anyway," but he said
19 that as he was walking towards me, as he was
20 approaching me.
21   Q.   And are you referring to the moments just
22 before the confrontation occurred?
23   A.   Yes, like when he was right directly in front
24 of my face.

25

1    A.   I tried to get on the ground.
2    Q.   You tried to get on the ground.
3        So you tried to get on the ground as he was
4  approaching you, and were you still holding the bed
5  roll at that time?
6    A.   No.
7    Q.   You had let it go?
8    A.   Yes.
9    Q.   Was it your intent -- why was it your intent
10 to get on the ground?
11   A.   Because I was nervous. I was frightened,
12 because I saw Officer Ortiz trying to do something
13 with me indulged in his hands.
14   Q.   Was it your intent to get facedown or on your
15 back?
16   A.   It was my intent to turn around and get
17 helped -- held loose, like on the ground, for me to
18 roll around on my stomach or lay down flat and just
19 turn around and give them my hands, that was my
20 objective.
21   Q.   Why was that your objective at that point?
22   A.   Because I was scared, I was nervous. After
23 he tried to reach -- after he came up into my face and
24 got to talk to me, after he actually reached for me

27

1    Q.   Other than what you've testified to, as far
2  as did Officer Ivory say anything to you at that
3  point?
4    A.   No.
5    Q.   What about Officer Ramos?
6    A.   No.
7    Q.   So the bulk of the conversation immediately
8  prior to the incident was between you and Officer
9  Ortiz?
10   A.   Exactly.
11   Q.   After Officer Ortiz started to approach you
12 in the manner you've described, what happened next?
13   A.   He tried to -- I saw that he was trying to
14 put his hands on me like he was going to reach for me,
15 so I got nervous.
16       So I tried to get away from him because I
17 seen that he was actually trying to do something to me
18 with his hands. So I stepped back away if him, but I
19 guess I fell. But I tried to get on the ground and
20 turn around and just get on the ground.
21   Q.   At that point, you were not cuffed, correct?
22   A.   No, sir.
23   Q.   At the time he approached you, you said you
24 tried to walk away ---

26

1  and actually tried to touch me, I just tried to get on
2  the ground.
3    Q.   What is your height and weight today?
4    A.   I'm about 5-8, maybe 155, 160.
5    Q.   Were you substantially the same weight on
6  January 17, 2014?
7    A.   Probably so, yes.
8    Q.   What happened next?
9    A.   What happened next as far as?
10   Q.   In the incident.
11       You got on the ground?
12   A.   I got on the ground. I felt someone hitting
13 me, the officer is going to hit me. At least -- I was
14 just being hit.
15       After I was being hit, I felt a knee like,
16 you know, in my body. Just a knee like moving me
17 around a little bit, but then I was getting
18 handcuffed.
19   Q.   Who was striking you? Who was hitting you?
20   A.   I believe officer Ortiz.
21   Q.   Did you have a direct and unobstructed view
22 to Officer Ortiz at the time you were being hit?
23   A.   I could not see directly.
24   Q.   To the best of your knowledge, did anyone --

28

1  well, let me back up.
2        What's your -- what are your reasons for
3  believing it was Officer Ortiz that hit you?
4      A.  What was my reasons?
5      Q.  Yeah, why did you believe that?
6      A.  Probably because I didn't do what he said as
7  far as like -- he came towards me.  I believe he was
8  maybe upset at me.
9      Q.  As far as your belief that it was Ortiz that
10 was striking you, is it your belief that he was the
11 only one who hit you at that time?
12     A.  Yes.
13     Q.  Were you able to see him hitting you or do
14 you just believe that for other reasons?
15     A.  I maybe seen him maybe the first swing or so,
16 but after that I was trying to move my face.  But I
17 knew he was the one that was actually hitting me.
18     Q.  Did anyone other than Ortiz hit you at any
19 time?
20     A.  No.
21     Q.  Were you -- at the time you were being hit,
22 were you resisting arrest as far as you know?
23     A.  No.
24     Q.  Were you resisting at any point between the
                                                    29

1  time Ortiz walked up to you and the time you were
2  placed in handcuffs?
3      A.  No.  All I did was get on the ground.  I
4  don't recall me resisting.
5      Q.  Were you ever instructed by Ortiz or anyone
6  else to get on the ground?
7      A.  He told me prior to him trying to reach for
8  me -- prior to him trying to grab me to get on the
9  ground, he did tell me to get on the ground, but he
10 did as in his motion trying to reach for me too.
11       When I actually seen him trying to touch me,
12 because he told me he was going to put me in the cell
13 anyway, I got on the ground.
14     Q.  Was that the last thing he said to you before
15 you got on the ground, that he was going to put you in
16 the cell anyway?
17     A.  No, that wasn't the last thing he said to me.
18     Q.  What was the last thing he said to you before
19 you started to get on the ground?
20     A.  "Get on the ground," as he was moving in
21 motion.
22     Q.  So he told you to get on the ground, and then
23 you were starting to get on the ground?
24     A.  He said it all in one motion.  As he was
                                                    30

1  saying, "Get on the ground," he was reaching on me
2  too.
3        Once I seen him reaching with his hands to
4  try to touch me, I backed up and jumped away from him
5  and then tried to get on the ground.
6      Q.  Did he threaten you in any way prior to your
7  getting on the ground?
8      A.  He never threatened me.  He just was trying
9  to force me inside the quarantined cell.
10     Q.  Do you know how far the quarantined cell was
11 from the location where the incident occurred?
12     A.  No.
13     Q.  Do you know whether it was on the same floor
14 or the same level?
15     A.  I believe it's on the same level, but I don't
16 know exactly where.
17     Q.  At some point, you were placed in handcuffs?
18     A.  Yes.
19     Q.  Other than the hitting that you received that
20 you've already testified to, and the knee that you
21 received into the body, is there any other physical
22 contact?
23     A.  No.
24     Q.  If you know, do you know how many times you
                                                    31

1  were hit prior to being handcuffed?
2      A.  Maybe eight, nine times, punched.
3      Q.  After you were handcuffed, were you struck at
4  any time by anyone?
5      A.  As I was getting handcuffed, I believe he was
6  still swinging.
7      Q.  After the point where you were successfully
8  handcuffed, were you hit by anyone?
9      A.  I wasn't hit by anyone.
10     Q.  After you were handcuffed, you were not hit?
11     A.  After I was handcuffed, he still hit me maybe
12 a few times, but it was -- he was doing it -- while
13 the other officer was handcuffing me, he was punching
14 me.
15     Q.  At the point where both cuffs were placed on
16 your wrist, were you struck at any time?
17     A.  Maybe a couple more times.  I felt like
18 somebody grab my DOC and, like, I believe it was Ortiz
19 and, like, lift on me and then my head kind of hit the
20 ground a little.
21     Q.  So as far as the physical contact between you
22 and Ortiz, it consisted of him hitting you, to the
23 best of your recollection, eight to nine times, and
24 then you were also kneed at some point.  Is that fair?
                                                    32

1    A.    I can't say "knee."  His knee was just -- you
2   know how police officer -- well, they got someone on
3   the ground, how they have their knee inside the body.
4    Q.    Other than that contact and the eight to nine
5   times being hit, was there any other physical contact
6   between Ortiz and you?
7    A.    Only -- I believe he grabbed my shirt, lifted
8   my body up a little and let my head fall on the
9   concrete ground.
10   Q.    When you say he let your head fall on the
11  concrete ground, just tell me specifically what you
12  mean by that?
13   A.    Like he grabbed me and lifted my body up a
14  little while I was cuffed and then my head hit the
15  ground.
16   Q.    I understand you're cuffed, so that limits
17  your ability to demonstrate.
18       But, for the record, the witness was -- had
19  his hands together and was lifting upwards from his
20  waist upwards.
21  BY MR. COYNE:
22   Q.    How many times did that happen?
23   A.    Once.
24   Q.    After you were handcuffed, what happened

33

1   next?
2    A.    I got up, I scooted against the wall and I
3   waited to talk to a sergeant or lieutenant.
4    Q.    Did Officer Ortiz say anything to you after
5   you were handcuffed?
6    A.    No.
7    Q.    Did Ramos say anything to you after you were
8   handcuffed?
9    A.    No.
10   Q.    Did Ivory say anything to you after you were
11  handcuffed?
12   A.    No.
13   Q.    Did there come a time when the sergeant or
14  lieutenant arrived?
15   A.    Yes.
16   Q.    Do you know the name of that officer?
17   A.    I don't know the name of the sergeant.
18   Q.    Was it a white shirt?
19   A.    Yes, sir.
20   Q.    How much time elapsed between the time you
21  were handcuffed and the time the white shirt arrived?
22   A.    Maybe 10 to 15 minutes.
23   Q.    Besides Ramos, Ivory and Ortiz and yourself,
24  prior to the white shirt arriving, was there anyone

34

1   else who was at that scene?
2    A.    I did not -- after they -- after I got up, I
3   believe there was another officer that maybe walked up
4   and gathered around and was talking to them, maybe one
5   more officer.
6    Q.    What physical injuries did you sustain from
7   this confrontation?
8    A.    I had a couple of knots in the back of my
9   head.  I had a swollen eye, face was swollen.
10       I had a few migraines, migraines, sharp pains
11  in the head throughout the incarceration.  Every so
12  often, just a sharp pain in the back of my head.
13   Q.    Anything else?
14   A.    No.
15   Q.    Which eye was swollen?
16   A.    I don't remember exactly which one as of now.
17  It's been a long time now, but...
18   Q.    Was your vision affected in any way as a
19  result of this incident?
20   A.    For maybe a week while my eye was swollen,
21  yeah, I mean -- I had a swollen eye, so, I mean, my
22  eye was messed up maybe until it got healed or until
23  the swelling went down.
24   Q.    Are you -- you closed your left eye.  Is it

35

1   your --
2    A.    I am just describing -- I don't know exactly
3   which eye.
4    Q.    The migraines that you sustained -- you
5   called them "migraines" -- had you suffered migraine
6   headaches any time before January 17, 2014?
7    A.    Throughout my whole life?
8    Q.    Any time before January 17.
9    A.    Yes, I got migraines before, but it was a
10  sharp pain from the incident of him banging my head
11  against the ground.
12   Q.    Let me pause for one moment.
13       Unless somebody objects, I am going to shut
14  the door.
15            (Whereupon, the record was
16             read as requested.)
17  BY MR. COYNE:
18   Q.    When you said that he banged your head
19  against the ground, earlier I wrote down that he
20  lifted you up and let your head fall to the concrete.
21       Are you referring to a separate encounter or
22  separate attack on you or is this the same one?
23   A.    That's the same one.
24   Q.    Based on your recollection, is it more

36

1  accurate to describe it that he let your head hit the
2  ground or that he actually physically forced your head
3  into the concrete?
4      A.   He wanted my head to hit the concrete so he
5  made sure my head hit the concrete.
6      Q.   As to whether he let it fall or whether he
7  slammed it, are you able to say specifically --
8      A.   I can't say specifically.  It sound like the
9  same thing.
10     Q.   You had a couple of knots on the back of your
11 head.  Was it immediately in the rear of your skull or
12 on the left side or the right side?
13     A.   I had one knot right here, on the right of my
14 head, and maybe on the left side.
15     Q.   First one you indicated, for the record, was
16 above the color in the middle of the back of the
17 skull.
18          The second one appeared to be to the left,
19 above your left ear, correct?
20     A.   Yes.
21     Q.   To the rear and above your left ear.
22          Were these two -- how long before these knots
23 resolved or went away?
24     A.   Maybe a couple of months.

37

1      Q.   The sharp pains in the back of your head --
2  did you say it was in the back of your head?
3      A.   Yes.
4      Q.   Were they the same as where you were
5  indicating where the knots were, is that where the
6  sharp pains were?
7      A.   Yes.
8      Q.   Had you ever taken any medication,
9  over-the-counter or otherwise, for headaches prior to
10 January 17, 2014?
11     A.   Yes.
12     Q.   Was it over-the-counter or prescription
13 medication?
14     A.   Just prescription medication.
15     Q.   Do you recall who the physician was who
16 prescribed those medications to you?
17     A.   I believe the medication that I took was
18 really pain medication that was here.  So I don't know
19 if you mean that I was prescribed.  I mean, it was
20 just the medication that I would receive when I was
21 here.
22     Q.   Did you have a primary care physician outside
23 of Cook County that treated you prior to January 17th?
24     A.   No.  I just took regular pain medication.  If

39

1      Q.   Did you bleed in any way as a result of the
2  confrontation?
3      A.   No.  Just had a swollen face.
4      Q.   When you say you had a swollen face, was the
5  swelling restricted to one side of your face or the
6  other or was it on both sides?
7      A.   I believe this was -- it was to one side of
8  the face.
9      Q.   Do you know, was that -- you indicated to the
10 right.  Do you recall which --
11     A.   I don't know exactly which side of the face
12 it was, but I know whatever side of the face it was,
13 it was one-half of the face that was swollen.
14     Q.   Understood.
15          Was the swelling above the nose or below the
16 nose as well?
17     A.   Nose, the eye, it was all together, on one
18 side of the face.
19     Q.   To the best of your recollection, did the
20 swelling extend down below your nose line, in other
21 words, down to your jaw area?
22     A.   No.  It was just the eye and maybe the nose
23 and maybe the part of my face, like the jaw,
24 everything, things like this (indicating).

38

1  my head hurt -- was hurting, I just took maybe an
2  Advil or Tylenol.
3      Q.   Had you ever been hospitalized overnight
4  prior to January 17, 2014?
5      A.   No.
6      Q.   Had you ever been in a car accident before
7  January 17, 2014?
8      A.   No.
9      Q.   Any physical altercation prior to that date
10 that resulted in you receiving medical treatment for
11 any reason?
12     A.   No.
13     Q.   The knots on the back of your head, I believe
14 you said they resolved within a couple of months?
15     A.   Yes.
16     Q.   The swelling in your face, how long before
17 that resolved?
18     A.   Maybe by the time I went home, within three
19 weeks it was down.
20     Q.   Do you remember when you went home after
21 January 17, 2014?
22     A.   I believe it was February 3rd.
23     Q.   The migraines, how long did they continue?
24     A.   I just, like, maybe had, like, maybe sharp

40

**Page 41**

1    pains throughout, like, every now and then I guess,
2    like, if I was stressed or something like that, I'd
3    get like a sharp pain from where I landed on my head.
4         Q.   Did you receive any medical opinion that the
5    migraines that you experienced after the date of the
6    altercation were attributable to the altercation?
7         A.   No, sir.
8         Q.   Did you injure any part of your body below
9    your neck as a result of the altercation?
10        A.   No, sir.
11        Q.   Is it fair to say that within roughly one
12   month after the altercation, the physical injuries you
13   sustained had basically gone away?
14        A.   Yes, sir.  A month or two.
15        Q.   I'm sorry?
16        A.   A month or maybe two months.
17        Q.   Did there come a time when you had filed a
18   grievance against Officer Ortiz?
19        A.   Yes.
20        Q.   Was that as a result of the incident?
21        A.   Yes.
22        Q.   What specifically caused you to file a
23   grievance?
24        A.   It was the protocol -- or maybe the action

**Page 42**

1    that I had to do to maybe get something done about
2    what the officer had did to me.
3         Q.   Clearly, you feel and felt that what Officer
4    Ortiz did to you was inappropriate, true?
5         A.   Yes, sir.
6         Q.   What specifically do you believe he did to
7    you that was inappropriate?
8         A.   Hit me when I was on the ground, just putting
9    his hands on me as a correctional officer.  It was
10   very inappropriate.
11        Q.   Do you believe at the time he approached you
12   immediately prior to your going to the ground, do you
13   believe at that time he was within his rights as a
14   corrections officer, if you know?
15        A.   Yes.
16        Q.   It was at the point where he was attempting
17   to put his hands on you that he crossed the line, so
18   to speak?
19        A.   Just him actually hitting me, like he was
20   hitting me and him grabbing me and banging my head
21   against the ground.
22        Q.   As far as you're going on -- going to the
23   ground, was that something that was a result of your
24   decision or do you think he assisted you or caused you

**Page 43**

1    to fall to the ground?
2         A.   I didn't want him to actually touch me as
3    physically, like, because I know that some
4    correctional officers will beat you, like, put their
5    hands on you.
6              So as I seen him actually trying to put his
7    hands on me, I made myself to get helpless on the
8    ground so I wouldn't get touched.
9         Q.   At that time, Officer Ortiz was pretty much
10   right in front of you, at the time you were going to
11   the ground?
12        A.   He was in front of me.  He's putting his
13   hands in my face.
14        Q.   At that time, where was Ivory and Ramos?  Do
15   you know if they were to the right, to the left, if
16   you know?
17        A.   I believe one officer was maybe to the left
18   and both of them was on one side I believe, to my
19   left.
20                  (Whereupon, Bolton Deposition
21                   Exhibit No. 3 was marked for
22                   identification.)
23   BY MR. COYNE:
24        Q.   Mr. Bolton, I am going to show you -- first

**Page 44**

1    show your counsel, what's been marked as Bolton
2    Exhibit 3.  And this has already been marked.  I am
3    going to show your counsel.
4              I am just going to ask you to take a look at
5    this.  It's what I understand to be the Sheriff's
6    Office of Cook County Internal Affairs/Inspector
7    General Complaint Register.
8              For the record, it's Bates stamped P56, -57,
9    and -58.  I understand that to be three pages long.
10             Is this a document that you have seen before, sir?
11        A.   Yes.
12        Q.   Is one of the documents you reviewed in
13   preparation for your deposition?
14        A.   Yes.
15        Q.   Could you kindly take a look at that?  I want
16   to give you a chance to read it.  If you've read it
17   recently enough, you can just let me know.
18             It is three pages long, so I am going to ask
19   you a few questions about the entire document.
20        MR. FIELD:  The third page is not a part of
21   the actual Cook County Jail grievance.  That's a
22   separate document.
23        MR. COYNE:  Okay.

BY MR. COYNE:

Q.   Let's make a correction for the record.

The complaint register based on plaintiff's counsel's representation is actually two pages long. So it should be P-56 and P-57; is that fair?

MR. FIELD:  Yes.

BY MR. COYNE:

Q.   So P-58 appears to be a separate document. It actually says, "Detainee complaint notification." So just directing your attention to the first two pages of Exhibit 3, Mr. Bolton, is it fair to say that that's a document that you wrote yourself?

A.   Yes.

Q.   Where were you when you wrote that, if you remember?

A.   I believe I was at home.

Q.   It indicates the date of incident as January 17, 2014.  To the best of your recollection, is that the date in fact when the incident occurred at the Cook County Jail?

A.   Yes, sir.

Q.   Does your signature appear on the second page that is P-57?

A.   Yes, sir.

45

Q.   It indicates a date of March 16, 2015.

To the best of your recollection, is that the date you both created and signed this document?

A.   Yes.

Q.   Who else was present when you wrote this up?

A.   When I wrote the Page 1.

Q.   Right.  When you wrote it and signed it?

A.   It was some sheriff deputies.

Q.   Do you remember how many were present?

A.   There was two.

Q.   Do you remember their names?

A.   No.

Q.   Was this at your home?

A.   Yes.

Q.   Had they traveled to your home with your approval and your allowing them to enter your home?

A.   Yes.

Q.   And to the best of your knowledge, were they at your home in response to the grievance you filed against Officer Ortiz?

A.   Yes.

Q.   Were there any documents that you created and signed prior to this document regarding the incident?

A.   Was there any document?  The only thing that

46

I signed was this paper right here (indicating).

Q.   To the best of your knowledge, was there anything else that you signed other than this document pertaining to your complaint against Officer Ortiz?

A.   Not that I know of, sir.

Q.   Is that fair?

Was this at the home address that you gave earlier that this was created?

A.   Yes, sir, 1858 South Avers.

Q.   Okay.

The location of incident is listed as Division VIII, 2-A.

Is that your -- do you believe that's an accurate description of where with the incident occurred?

A.   Yes, sir.

Q.   What does "2-A" refer to, to the best of your knowledge?

A.   I have no clue.

Q.   Did you write that in or was it written in for you?

A.   Did I write what in?

Q.   Division VIII, 2-A, under "Location of incident."

47

Q.   I am just asking you, did you write that or did somebody write that for you?

A.   I believe I wrote that.

Q.   How did you know it was 2-A where the incident occurred?

A.   Because I had a copy of my grievance.

Q.   The time of the incident said 3 to 11.

Is that the shift during which the incident occurred?

A.   Yes, sir.

Q.   Did you write that in?

A.   Yes.

Q.   As far as Page 1, is there any writing on this document that was the result of anyone else but you?

A.   Excuse me.

Q.   Did anyone else other than you write anything on Page 1 of this complaint?

A.   I did, just me.

Q.   Same question as to Page 2, other than the notary public.

A.   Just me.

Q.   Were you instructed to write any of the text on Page 1 or 2, or was it an entirely a result of your

48

| | |
|---|---|
| **49** | **51** |
| 1 own decision? | 1 result of the incident? |
| 2    A. Run that by me one more time. | 2    A. Yes. |
| 3    Q. Did anyone tell you to write this or did you | 3    Q. Other than the physical problems that you |
| 4 write it because you believe it's a true and accurate | 4 have described earlier, were there any other injuries |
| 5 description of what occurred? | 5 that you believe that you sustained that caused you to |
| 6    A. I believe the sheriffs told me to write this | 6 request physical attention or medical attention? |
| 7 down. | 7    A. No. |
| 8    Q. When you say told you to write, are you | 8    Q. How long were you in -- well, let me ask you, |
| 9 saying that they told you to write what happened or | 9 where did you go to receive the medical attention? |
| 10 they told you to write these particular words? | 10    A. Cermak. |
| 11    A. In order to go through with the proceedings. | 11    Q. And how long after the incident were you |
| 12 If I wanted to pursue everything, I believe they told | 12 transported there? |
| 13 me to write this down. | 13    A. How long after. |
| 14    Q. The text that appears under the narrative | 14    Q. Yeah. I mean, how long did it take for them |
| 15 section on Page 1, do you believe that that's a true, | 15 to get you over there? |
| 16 accurate and complete description of what occurred at | 16    A. Maybe three hours, maybe three hours. |
| 17 the time of the incident with Officer Ortiz? | 17    Q. Where were you detained or where were you in |
| 18    A. Yes. | 18 between the time of the incident and the time you were |
| 19    Q. In the middle that paragraph, it says Officer | 19 transported to Cermak? |
| 20 Ortiz asked to you get on the ground. | 20    A. I was sitting in -- are you saying where was |
| 21       At what point did he ask you to get on the | 21 I before I went there? |
| 22 ground? | 22    Q. Yes. |
| 23    A. As he was reaching, "Get on the ground," and | 23    A. Sitting inside of a bullpen. |
| 24 he was reaching. So he did that as he was trying to | 24    Q. When you were sitting inside the bullpen when |

| | |
|---|---|
| **50** | **52** |
| 1 touch me. | 1 you were sitting there, were you handcuffed? |
| 2    Q. Now, the last sentence it says, "I told | 2    A. No. |
| 3 sergeant when he approached me, but he just wrote it | 3    Q. How long did you have the cuffs on after the |
| 4 up as I fell on the ground on my own." | 4 incident before they were removed? |
| 5       Are you referring to what Officer Ortiz wrote | 5    A. I believe -- once they placed me in the |
| 6 up or what the sergeant wrote up? | 6 bullpen, I believe they took them off, but I don't |
| 7    A. What the sergeant wrote up. | 7 know if they took them off or if I kept them off. |
| 8    Q. How did you come to know that that's what the | 8    Q. Who was in your presence while you were in |
| 9 sergeant wrote up? | 9 the bullpen, if you remember? |
| 10    A. Because I believe when I got a copy of the | 10    A. I don't know. The shift changed. I don't |
| 11 grievance or some paperwork, that I seen the | 11 remember what officer really moved me over there, put |
| 12 sergeant's response, and he said that I had fell on | 12 me over there. |
| 13 the ground on my own. | 13    Q. Did you have any other conversation after the |
| 14    Q. At the time you signed this document on | 14 incident -- strike that. |
| 15 March 16, 2015, did you believe it was a true, | 15       Did you have any conversation after the |
| 16 accurate, and complete description of what occurred at | 16 incident with Officer Ortiz at all? |
| 17 the time of the incident? | 17    A. No. |
| 18    A. Yes, sir. | 18    Q. Did you have any conversation after the |
| 19    Q. Do you continue to hold that opinion? | 19 incident with Officer Ramos? |
| 20    A. Yes, sir. | 20    A. No. |
| 21    Q. After the incident, did there come a time | 21    Q. How about Officer Ivory? |
| 22 when you went to the medical dispensary? | 22    A. No. |
| 23    A. Yes. | 23    Q. You did talk to the white shirt about what |
| 24    Q. And did you request medical attention as a | 24 happened? |

1  A.  Yes.
2  Q.  Was there anyone else you talked to after the
3  incident other than the white shirt before you were
4  transported to Cermak?
5  A.  No.
6  Q.  Did you ever threaten Officer Ortiz?
7  A.  No.
8  Q.  As far as you know, did you have any visible
9  injury after the incident, if you know?  In other
10  words, an injury that somebody could see?
11  A.  Yes.
12  Q.  Was that basically what you described
13  earlier, the swollen face?
14  A.  My face was swollen, I didn't...
15  Q.  It looks as if the medical -- or strike that.
16  It looks as if the hospital evaluation
17  occurred on or about January 18, 2014, at
18  approximately 2:14 a.m.
19  Does that sound accurate, if you know?
20  A.  I believe so, yes.
21  Q.  Do you know whether you were ever transferred
22  to special housing segregation after the incident
23  before you were discharged from Cook County Jail?
24  A.  No, I was never transferred to segregation,

53

1  never transferred to seg.
2  Q.  You never were you said?
3  A.  Never were.
4  Q.  Prior to your discharge from county jail, at
5  any point did you threaten Officer Ortiz?
6  A.  No.
7  Q.  Were you ever evaluated, to the best of your
8  recollection, by the chief psychiatrist at Cermak?
9  A.  Chief psychiatrist.  Which is?
10  Q.  Just at Cermak.
11  A.  There's probably been a time that I have been
12  right there before.  I don't know if during that time
13  that I was incarcerated, if I was there then or not.
14  I don't remember, but yes, I have been there before.
15  Q.  Separate and apart from the physical injuries
16  that you sustained from the incident, were there any
17  other types of injuries that you sustained?
18  A.  Any type of injuries?
19  Q.  Any other types of injuries.  For example,
20  emotionally, psychological.
21  A.  I was stressed out because I felt like how
22  can I get beat up by a correctional officer when they
23  supposed to be here to help us.  It's stuff that I
24  thought about.

54

1  When my hands were handcuffed behind my back,
2  I felt like he could have did anything to me.  My
3  hands cuffed behind my back.  So there is times where
4  I thought about mostly, like, why would this even
5  happen.
6  Or if I was in the midst of trying to do
7  anything to him, you know what they would have did to
8  me?  I would have been broken up, like totally broke
9  up, somewhat, because they all would have did
10  something to me.  So yeah, I thought about it
11  emotionally, yes, it hurt.  Then I locked down, locked
12  up.  It's very stressful.
13  On top of that, me just thinking about what
14  happened to me, I have no one to talk to, like my mom
15  is deceased and my dad is deceased, yeah, it was
16  emotionally, yes, stressful.  It's just a stressful
17  situation.
18  Q.  The stress that you just described and the
19  emotional distress that you described, did there come
20  a time when that resolved, went away?
21  A.  It's like it will always be something that I
22  think about.  It's like if you have, like, a friend,
23  when you forgive them for something but you never
24  forget what they did, it's always going to be in the

55

1  back of my mind that I never forgot what happened to
2  me.  But I can let it go past, but it's still going to
3  always be there that this is what happened to me.
4  Q.  The feelings of stress that you described,
5  and I'm obviously talking about after the incident,
6  did they persist after you were discharged to Cook
7  County Jail.
8  A.  It's been a couple times that I thought
9  about, man, yeah, this guy did this to me.  I mean,
10  yes, I thought about it.  But, you know, when you're
11  outside and you're living, life is going on, it's just
12  going to be something that come across you that you
13  just won't think about.  You know, your life still
14  goes on.
15  Q.  Well, you were discharged from Cook County
16  Jail on or about February 3, 2014; is that fair?
17  A.  Yes.
18  Q.  After your discharge, how frequently would
19  you be troubled by these thoughts?  Daily?  Weekly?
20  Monthly?
21  A.  Maybe once a month.  Maybe when I am just
22  feeling or thinking about, like, my mom and my dad, or
23  something that just comes to pass, come through as a
24  thought.

56

1   Q.   Are you still plagued by these thoughts?
2   A.   It still happened to me.  I mean, I am never
3   going to forget it.  Like I just said, it happened.
4        Now, the only thing I can think about is what
5   if I tried to defend myself or anything like that.
6   Stuff like that come to me, and I think about that
7   type of stuff, too, what would have happened to me if
8   I would have tried to defend myself or tried to help
9   myself from getting touched or anything like that.
10        So yeah, I mean, it's always going to be
11   something I think about.  Now that I got a son, when
12   he gets a little bit older, I am going to let him
13   know, I'm going to try to tell him.
14        You know, so it's always going to be there in
15   my head.  You know, you know, it's going to be there.  But it's
16   just maybe something that I know that happened to me,
17   so it's going to be there.
18   Q.   We have discussed the physical injuries that
19   you sustained and now you've described the emotional
20   and, as you put it, the stress that you experienced as
21   a result of the incident.
22        In order to fully understand what happened to
23   you as a result of this incident, is there anything
24   else you think you need to testify to?  Anything else

                                                    57

1   you'd want to add in addition to what you've testified
2   to thus far as far as the injuries you sustained in
3   this incident?
4   A.   Anything else that I want to add?
5   Q.   What I'm saying is in order to appreciate --
6   you testified to your physical injuries, you testified
7   to the stress.
8        My question is, in order to fully appreciate
9   the injuries and bad things that you experienced as a
10   result of this incident, is there anything else that
11   you would need to add to make that description
12   complete?
13   A.   I just wish that stuff that happened to me
14   wouldn't happen to the people just at all, like,
15   because you never know what anybody is going through.
16   You never know what one person's life is like as far
17   as just being inside this little thing.  That's how
18   they are.  I never want anybody to go through what I
19   went through.
20        It's been going on a lot.  It goes on a lot
21   of times and all the time, you know.
22        I am surprised that something even happened,
23   you know, as far as someone to see or appreciate what
24   happened to me.  Because this common, you know, this

                                                    58

1   is something that go on all the time.  So I'm just --
2   I am really appreciated that something is actually
3   happened behind it, you know.
4        But I just wish it wouldn't happen to nobody
5   because you never know how the next person will be
6   able to take it.  You know, you never know.  You know
7   what I'm saying?
8        It's just people get beat up and just go on
9   with it.  Ain't nothing going to happen to them or
10   nothing like that, it's just you in jail, you are
11   going to beat up.  This is what we do to you.  That's
12   all.
13        Surprised my grievance even got turned in,
14   because there is a lot of times when you write
15   grievances, they rip up the grievances, people don't
16   even see them.  You got to give it to the right hands
17   in order for it to go through the proper chains of
18   command.  So I am just blessed that my stuff actually
19   went through, that stuff actually came to light.
20   Q.   Had you filed a grievance at any time prior
21   to this one?
22        MR. FIELD:  What do you mean by "this one"?
23        THE WITNESS:  You mean before?
24   BY MR. COYNE:

                                                    59

1   Q.   You've identified Exhibit 3, you have
2   identified the complaint that you filed.
3        When you say "a grievance," is that what you
4   mean?  Are you referring to the complaint you filed
5   against Officer Ortiz?
6   A.   Yes.
7   Q.   Have you ever filed a complaint against any
8   other officer prior to January -- prior to this
9   incident?
10   A.   I don't remember.
11   Q.   Have you filed a complaint against anybody
12   other than this one?
13   A.   If something went on that I didn't like, I am
14   pretty sure I probably filed a grievance.
15   Q.   Do you have any specific recollection of a
16   grievance where you actually signed a document to
17   support a complaint that you were making?
18   A.   No.
19   Q.   Other than this one?
20   A.   No, I don't remember.
21   Q.   Do you believe that anyone employed by
22   Cook County Sheriff's Department took any steps to
23   prevent you from filing your lawsuit in this case at
24   any time?

                                                    60

1    A.    Do I believe?  No.
2    Q.    I understand you had a civil case that was
3 filed where you sued a company or a person named
4 Heatherington; is that true?
5    A.    Which one?  My father?  Is that what you are
6 recalling -- what you are saying?
7    Q.    In discovery, there was identification of a
8 civil lawsuit that was filed by you or at your -- on
9 your behalf.
10    A.    My father had passed away, fell down some
11 stairs -- if that's what you're saying.  I am trying
12 to help see -- that's the only thing that I know of.
13          It would have been my dad who filed it also,
14 but he was brain dead at the time and he passed away
15 at Kindred Hospital.
16    Q.    At Kindred?
17    A.    Yes, Montrose and Rockwell.
18    Q.    Do you know was that a wrongful death suit?
19    A.    Yes.
20    Q.    Were you appointed the special
21 representative?
22    A.    Yes, I am my daddy's only child.  So he was
23 brain dead, he couldn't talk and couldn't do nothing,
24 so it was left to me.

61

1    Q.    Did you testify at a deposition at any point
2 in that case?
3    A.    No.
4    Q.    Do you know if there were any depositions
5 that took place as a result of that lawsuit being
6 filed?
7    A.    If it was, I believe it was with my sister.
8    Q.    Your sister was not the biological daughter
9 of your father?
10    A.    No.
11    Q.    Did you sign any documents in the course of
12 the investigation of that lawsuit that you know of?
13    A.    I don't remember.
14    Q.    Do you know who the attorney was that
15 represented your father's estate?
16    A.    Yes.
17    Q.    Who was that?
18    A.    Frank Santilli.
19    Q.    Frank Santilli?
20    A.    Yes.
21    Q.    Prior to your becoming in custody at Cook
22 County Jail this time, were you employed?
23    A.    Was I employed?  No.
24    Q.    When is the last time you were employed?

62

1    A.    I haven't been employed in maybe a few years
2 because I had my grandmother -- grandmother and my
3 uncle, like familywise, they have, like, a barbershop.
4 So I actually help around the barber shop.  If I need
5 something like that, my grandmother is able to help
6 provide me.
7          My grandmother is getting old.  And so I
8 basically try to stick around her house, and she has a
9 few houses, try to help her -- my grandmother.
10    Q.    So you help your grandmother around the
11 house?
12    A.    She got a couple -- well, she owns a couple
13 apartments and I help her around all the apartments.
14 I mow the grass.
15    Q.    I'm sorry, I didn't hear you.
16    A.    Mow grass, shovel snow, clean up the barber
17 shop.  When people getting through cutting their hair,
18 I help them.  If they fixing up the barber shop, I do
19 stuff like that.
20          I have tried to go to do labor work.  I was
21 at a company called Accurate, but it's been a couple
22 times where background showed up where they didn't let
23 me work no more.
24    Q.    You have two felony convictions?

63

1    A.    Yes.
2    Q.    One is for domestic battery?
3    A.    Yes.
4    Q.    What's the other one for?
5    A.    A drug case, 2005.
6    Q.    Is that cannabis?
7    A.    No.
8    Q.    What was the drug involved?
9    A.    Ecstasy pill.
10    Q.    Was that possession or possession with intent
11 or delivery?
12    A.    It was a possession with intent.
13    Q.    Were there any co-defendants in that case, if
14 you recall?
15    A.    No.
16    Q.    That was in Cook County, right?
17    A.    Yes.
18    Q.    Have you ever served a period of time of
19 incarceration in the Illinois Department of
20 Corrections?
21    A.    Yes.  I have been in boot camp, and I had --
22 yes, and I had a year.
23    Q.    When you say you had a year, was that at
24 Stateville?  Do you know where you served?

64

1    A.    I had majority of my time in -- I stayed in
2  Stateville for like a month.
3    Q.    In all how many felony convictions do you
4  have altogether?
5    A.    Three.
6    Q.    Have you ever violated your probation?
7    A.    I had probation once before and they
8  terminated me unsatisfactory, that's why I got boot
9  camp.
10    Q.    Did you testify at any probation violation
11  hearings?
12    A.    No.
13    Q.    Have you ever been found to be a parole
14  violator?
15    A.    Yes.
16    Q.    Did you testify at any parole violation
17  hearings approximately?
18    A.    No.
19    Q.    Other than your testimony here today, have
20  you ever testified under oath before today for any
21  reason at all?
22    A.    Yes.
23    Q.    When was that?
24    A.    When I had got my drug case, I testified

65

1  under oath.
2    Q.    Was that a bench trial or a jury trial?
3    A.    It was a bench trial.
4    Q.    There was a finding of guilty or not guilty?
5    A.    Guilty.
6    Q.    Besides that testimony -- let me back up.
7          What year was that that you gave that
8  testimony?
9    A.    2005.
10    Q.    Was that at 26th and California?
11    A.    Yes.
12    Q.    Any other testimony that you've provided
13  under oath other than today and then?
14    A.    No.
15    Q.    Have you ever testified at a deposition
16  before for any reason?
17    A.    No.
18    Q.    Were you aware of, as of January 18, 2014,
19  that there was a timeline that governed your ability
20  to file a lawsuit in Cook County?
21    A.    No, sir.
22    Q.    I don't want to know anything that was said
23  by you to your attorneys or your attorneys to you, but
24  when was the first time that you contacted an attorney

66

1  regarding this incident?
2    A.    The first time was actually when the IA, the
3  sheriffs, they came to my house maybe the end of 2015
4  and they told me that they had a video and they wanted
5  to ask me if I wanted to go through with everything
6  still.
7          And I told them yes, I want to go through
8  with everything still.
9          Just like the officers that came to my house
10  the previous time, which was what?  That was March 16,
11  2015.  I told them I wanted to go through with
12  everything.  Just as well.  The other officer, they
13  asked when they came to my house, did I want to go
14  through with everything.
15          They told me that they wanted me to come to
16  the County and give them my side of the story or
17  whatever the case may be.  And that's when I -- I
18  didn't want to go to the County by myself, so I
19  contacted an attorney then.
20    Q.    I'd like you to appreciate that I don't want
21  to know anything you said to the attorney.  I don't
22  want to know anything the attorney said to you.
23    A.    Okay.
24    Q.    But to the best of your knowledge, first of

67

1  all, it was a civil attorney, correct, not a criminal
2  attorney?
3    A.    Yes, sir.
4    Q.    What was the date of that first contact with
5  the attorney?
6    A.    I believe it was in January -- I am not for
7  sure, though, 2016, that they wanted me to come and
8  tell them something about my side of the story.
9    Q.    When you say "they," are you referring to
10  employees with Cook County Sheriff's Department?
11    A.    Yes, sir.
12    Q.    As of January 17, 2014, you understood
13  there's a difference between a criminal case and a
14  civil case, correct?
15    A.    Do I understand?
16    Q.    As of January 17, 2014, at that time, you
17  understood there's a difference between a civil case
18  and a criminal case, correct?
19    A.    I am pretty sure the difference is two
20  different things, one's civil and one's criminal, yes.
21    Q.    At that time, you had already filed, or there
22  had been a lawsuit filed on your behalf, the wrongful
23  death case resulting from your father's problem?
24    A.    Yes.

68

1    Q.   Is it fair to say that you understood that
2  the Cook County Sheriff's Department employees were
3  not contacting you regarding any civil suit that you
4  might have; is that fair?
5    A.   No, I didn't know exactly what was going on.
6  I just knew that when they told me that they
7  basically -- when they came to my house, by them
8  asking me if I wanted to go through with everything, I
9  thought it was like a whole process all together,
10  like, that they had -- that they had going on as far
11  as the civil lawsuit.
12    Q.   Is that belief, is that something that
13  resulted from something they told you or is it just
14  something you believed?
15    A.   They told me that I didn't have to worry
16  about nothing, that they was going to take care of
17  everything.  So I had beliefs that maybe something
18  civil was coming out just dealing with the sheriffs.
19    Q.   Well, you understood they weren't -- first of
20  all, did you believe they were attorneys --
21    A.   No.
22    Q.   Diaz and Montanez?
23    A.   I know they was not attorneys, but I thought
24  they were going to help me get attorneys or help me as

69

1  far as in the process when they first came to my
2  house.  By them telling me don't worry about anything,
3  I don't have to say nothing or nothing, they were
4  going to get in contact with me, stuff like that, and
5  I thought they were going to help me do that.
6    Q.   When you say "they," are you referring to
7  Officers Diaz and Montanez?
8    A.   Diaz, Montanez, and the other two officers
9  that asked me did I want to go through -- they came to
10  my house at first, too.
11        By them telling me, "Don't worry about
12  nothing," I don't have to worry about nothing, they
13  are going to take care of everything, I thought that
14  was like a process as far as with civil, that they
15  were going to help me with.
16    Q.   Well, the first contact you had at your home
17  with employees or representatives of the Cook County
18  Sheriff's Department, that would have been March 16th,
19  2015, true?
20    A.   Yes.
21    Q.   Was that the first time that you had contact
22  outside the jail with employees of the sheriff's
23  department?
24    A.   Yes.

70

1    Q.   And the two people that saw you on that date,
2  who were they?
3    A.   I don't know.
4    Q.   Did you understand that they were
5  investigators or corrections officers?
6    A.   They told me that they were investigators,
7  IA, that was looking into my stuff.  They asked me if
8  I wanted to go through with the -- with my complaint.
9        And I told them yes.
10    Q.   When you said your complaint, that was the
11  complaint that you filled out, correct?
12    A.   The grievance -- the grievance.  Everything
13  that I said about what had happened to me.
14    Q.   That was the document that you saw here
15  today, correct?  Exhibit 3?
16    A.   No, it was -- I had another grievance that I
17  wrote from the jail.  There was another -- there was
18  something else that I wrote, a summary that you showed
19  me today.
20    Q.   Let me make sure I understand.  So you are
21  saying you had filled out two separate grievances?
22    A.   Yes, I had a grievance that I filled out from
23  when I got -- when I was incarcerated already that I
24  filled out, that was the first grievance that I wrote.

71

1    Q.   Was that grievance -- was there anything in
2  that grievance that was not contained in the grievance
3  that you saw here today?
4    A.   No.  Maybe that's probably was a better
5  grievance because it was the one I wrote the day after
6  the incident, like the time -- the other paperwork was
7  what I had -- what date?  March 15, '3, that was what
8  I wrote then.
9    Q.   Well, the March 16, 20 -- strike that.  Let
10  me back up a little bit.
11        As of any time between January 17 and the
12  time you were discharged on February 3, 2014, did
13  anyone tell you, anyone, that they were acting on your
14  behalf as far as filing a complaint against Ortiz?
15    A.   No.
16    Q.   Any time between February 3, 2015, and
17  March 16, 2015, did anybody tell you they were acting
18  on your behalf in terms of filing a complaint against
19  Ortiz?
20    A.   You say as of February 3 until when?
21    Q.   So from the time you were discharged from
22  Cook County Jail on February 3rd, 2014, and March 16,
23  2015 when you met with the two employees --
24    A.   Yes.

72

1    Q.   -- of the sheriff's department in your home,
2 in that time period, did anybody tell you they were
3 acting on your behalf to file a complaint against
4 Ortiz?
5    A.   Just the IA people that actually talked to me
6 on that day.
7    Q.   Do you recall how those two individuals were
8 addressed?
9    A.   They had on sheriff uniforms with a
10 bullet-proof vest that had "Sheriff's" on the back.
11   Q.   Was there two men or a man and woman?
12   A.   I don't remember.
13        I know it was one man that -- the first time
14 they came, I don't know if it was two males the first
15 time.  I don't know about the first time.
16   Q.   The first time, just so we are on the same
17 page, you are talking about March 16, 2015.
18   A.   Yes, sir.
19   Q.   Was your grandmother present during that
20 meeting?
21   A.   Yes.
22   Q.   Was your grandmother writing anything down
23 during that meeting?
24   A.   No.

73

1    Q.   Was she recording anything during that
2 meeting?
3    A.   No.
4    Q.   Were you recording anything during that
5 meeting?
6    A.   No.
7    Q.   Were you writing anything down?
8    A.   No.
9    Q.   Was there anyone else present besides you,
10 your grandmother and the two officers?
11   A.   No.
12   Q.   Did they leave behind business cards when
13 they visited, do you recall?
14   A.   No, they just told me that they will get in
15 contact with me, that they'll keep in touch with me
16 and they will be in contact with me.
17   Q.   Did they leave with the grievance that you
18 had filled out and signed?
19   A.   They asked me did I have a grievance, and I
20 believe I had provided it for them.
21   Q.   One of them you filled out that day, correct,
22 March 16th?
23   A.   That was the one I filled out that day.  It
24 probably was with Montanez and the other, Diaz, when I

74

1 actually found the copy of my grievance.
2    Q.   So the officers that visited you on
3 March 16th, 2015, if I understand your testimony
4 correctly, you don't recall their names, true?
5    A.   Yes.
6    Q.   Now, Montanez, Diaz visited you on a separate
7 day, correct?
8    A.   Yes.
9    Q.   Was that at your house as well?
10   A.   Yes.
11   Q.   What was the date of that visit if you
12 recall?
13   A.   I don't remember the date.
14   Q.   Was it in 2015?
15   A.   I don't know if it was 2015 or if it was --
16 yes, I believe it was the end of September -- was it?
17 I don't know exactly.  I don't know exactly.
18   Q.   At any time, did there -- in the conversation
19 with the officers that visited you on March 16, 2015,
20 did the subject of the civil lawsuit as a result of
21 the incident ever come up?
22   A.   No.  They just told me I didn't have to worry
23 about nothing, that they was going to take care of
24 everything.  So I believed that they were going to

75

1 help me as far as with the civil lawsuit.
2    Q.   When they said they were going to help you
3 with everything, was that a word that they used, they
4 were going to help you with everything?
5    A.   They told me that I didn't have to worry
6 about nothing, that they were going to get in contact
7 with me.  I didn't have to do nothing.
8    Q.   Did you ask them what that word "everything"
9 meant?
10   A.   No, I never asked them what "everything"
11 meant.
12        They just told me that they was investigating
13 what was going on and that was it.
14   Q.   When did you first, you individually, first
15 decide that you wanted to file a civil lawsuit as a
16 result of the incident?
17   A.   When they asked me to come to the county to
18 give them my side of the story.
19   Q.   When was that?
20   A.   I believe that was January 2016, I believe.
21   Q.   When you said they asked you to come to the
22 county, who was it that asked you to come to the
23 county?
24   A.   Diaz and Montanez, they called me and asked

76

1  me to come up there and give them my side of the
2  story.
3      Q.   Had you met with Diaz and Montanez at your
4  home at any time prior to that date?
5      A.   Yes, they came to my home prior to that.
6      Q.   How long were they at your house the first
7  time they came to your home?
8      A.   Maybe 15 minutes to 20 minutes.
9      Q.   As to that meeting, was your grandmother
10 present?
11     A.   Yes.
12     Q.   Did she take any notes?
13     A.   No.
14     Q.   Did she record anything?
15     A.   No.
16     Q.   Did you take any notes?
17     A.   No.
18     Q.   Did you record anything?
19     A.   No.
20     Q.   Was anyone else present besides you, the two
21 officers and your grandmother?
22     A.   No.
23     Q.   Where in your home did that take place, the
24 living room, dining room, kitchen, basement?

77

1      A.   Maybe the living room.
2      Q.   So January 2016, if I understood your
3  testimony correctly, was the first time that you had
4  decided that you might want to pursue a civil lawsuit
5  as a result of the incident; is that fair?
6      A.   Yes, when they asked me to come to the county
7  to give my side of the story.
8      Q.   Did their request to you to come to the
9  county, did that have any bearing on your decision to
10 file a civil lawsuit?
11     A.   I didn't want to go in there -- I didn't want
12 to go by myself to give them any type of testimony
13 about what happened to me alone by myself. I
14 didn't -- I didn't want to do that.
15         Then I thought that they was going to provide
16 me with some civil help by them knowing exactly what
17 happened to me, so I told myself that I am going to
18 get an attorney so I want won't be in there, you know,
19 handicap. I didn't want to be there by myself alone.
20 That's when I got my attorney.
21     Q.   Did you, in fact, go with your attorney to
22 the Cook County Jail?
23     A.   Yes.
24     Q.   What attorney was that?

78

1      A.   Vince.
2      Q.   Was that in January of '16?
3      A.   Yes.
4      Q.   Do you recall the date in January of 2016?
5      A.   I don't know exactly what date.
6      Q.   You had -- previously as a result of your
7  father's death, you contacted an attorney to file a
8  lawsuit, correct?
9      A.   Excuse me.
10     Q.   As a result of your father's death?
11     A.   As a result of my father's death?
12     Q.   Maybe I misunderstood you.
13         I understood that as a result of your father
14 falling down the stairs, there was a lawsuit that was
15 filed.
16     A.   Yes.
17     Q.   Was that lawsuit instigated by you?
18     A.   No, it was my daddy -- that was my first time
19 -- I am surprised it even happened like that.
20         I haven't seen my daddy in maybe three or
21 four years. The incident happened at my sister's
22 house and she was, at the time, on Section 8, but the
23 way just the houses were, but that was instigated --
24 or the thought about the lawsuit happened by my

79

1  daddy's side of the family.
2          Because we didn't want them to think it was
3  anything was up on us as something that we did to my
4  father, so they were all talking about filing the
5  lawsuit.
6          I was just my daddy's only child; I was my
7  daddy's beneficiary, so it was left upon me to make a
8  decision.
9      Q.   When you say "make a decision," you agreed to
10 be the personal representative and you agreed for a
11 lawsuit to be filed?
12     A.   I didn't want to go in there -- I didn't have no choice. Everyone -- you
13 know, it's a family thing. We all sat back and
14 talked. Basically, I didn't have no choice.
15     Q.   When you say you didn't have a choice, tell
16 me what you mean.
17     A.   Didn't have no choice. I mean, they all
18 wanted to file a lawsuit, but they made me be part of
19 it because of where I was left at as far as my
20 father's life.
21     Q.   After you are discharged from Cook County
22 Jail on February 3rd, 2014, we've talked about the
23 visit on March 16, 2015, and then we have also talked
24 about the visit by Diaz and Montanez to your home?

80

1      Between February 3, 2014, and the date where
2  you visited at your home with Montanez and Diaz, did
3  you have any other contact with any employees or
4  representatives of the Cook County Sheriff's
5  Department?
6      A.   No.
7      Q.   January '16 -- or January 2016, you were
8  accompanied by your counsel when you went to the Cook
9  County Jail?
10     A.   Yes.
11     Q.   That was for the purpose of meeting with
12 representatives of the jail?
13     A.   Yes.
14     Q.   During that meeting you had counsel present,
15 correct?
16     A.   Yes.
17     Q.   What was the outcome of that meeting, what
18 took place?
19     A.   The outcome was they were supposed to let me
20 give them my side of the story.
21     I believe it was state's attorney got there.
22 His name was Andrew Nastoff.  He was supposed to bring
23 charges against Miguel Ortiz by me giving my
24 information.

                                                    81

1      Q.   When you say "bring charges," were you
2  talking about civil charges or are you talking about
3  criminal charges?
4      A.   Criminal charges against Miguel Ortiz for
5  what he had did to me.
6      Q.   To the best of your knowledge, were criminal
7  charges ever brought against Miguel Ortiz for what he
8  did to you?
9      A.   Not by that particular -- not by Andrew
10 Nastoff, no.
11     Q.   To the best of your knowledge, were criminal
12 charges ever filed against Ortiz as a result of the
13 incident?
14     A.   Yes.
15     Q.   What's the nature -- what's the current
16 status of those charges, if you know?
17     A.   I do not know.
18     Q.   Did you ever testify in any proceeding
19 regarding those civil criminal charges?
20     A.   Yes.
21     Q.   Where did you testify at?
22     A.   At Cook County.
23     Q.   Was that a preliminary hearing?
24     A.   It was like a preliminary hearing, but it was

                                                    82

1  a grand jury that I testified in front of.
2      Q.   Was the grand jury -- did that grand jury --
3  was that at 26th and Cal?
4      A.   Yes.
5      MR. COYNE:  Off the record.
6          (whereupon, a discussion was had
7           off the record.)
8          (whereupon, the record was
9           read as requested.)
10 BY MR. COYNE:
11     Q.   When you went to Cook County Jail in January
12 of 2016, did you view a lineup?
13     A.   Not in January.  I believe it was in April.
14     Q.   So in January of 2016, as a result of the
15 meeting that you had at the Cook County Jail, did you
16 have any belief that anyone who was employed by
17 Cook County was going to represent you in a civil
18 lawsuit?
19     A.   No, not at that time, no.
20     Q.   Did there ever come a time when you believed
21 that anyone who was employed by Cook County was going
22 to represent you for the purpose of filing a civil
23 lawsuit as a result of the incident?
24     A.   Yes, in the beginning.  When the first couple

                                                    83

1  of officers came to my house in March 16, 2015, I
2  thought that they was going to help me as far as doing
3  the civil lawsuit.
4      Q.   You understood that those two officers were
5  not attorneys, correct?
6      A.   Yes.  After a certain period of time, I found
7  it out.
8      Q.   Did you ever specifically ask them:  "Are you
9  people" -- or "will you people" --
10     A.   No, I never did that.
11     Q.   Let me just get the question out.
12     Did you ever specifically ask them, "Are you
13 or will you retain a civil attorney for me to file a
14 civil lawsuit against Ortiz?"
15     A.   No.
16     Q.   Did you ever ask anyone who was employed at
17 Cook County at the time to do that for you?
18     A.   No.
19     Q.   When you identified Ortiz, that was at a
20 lineup in April of 2016; is that fair?
21     A.   Yes.
22     Q.   Was that the first time you had seen him
23 since the incident?
24     A.   Yes.

                                                    84

1  Q.  How many individuals were present in that
2  lineup, do you recall?
3  A.  Six.
4  Q.  Were you able to immediately identify him?
5  A.  Yes.
6  Q.  To the best of your knowledge, is there
7  anything that prevented you from filing a civil
8  lawsuit against Ortiz at sometime before January 17th
9  of 2016?
10  A.  Like I said, like I thought that the county
11  sheriffs, like the IA was going to help me get into
12  the civil.
13      It wasn't until after I contacted my attorney
14  to go to the County that I found out that I was going
15  to have to do this stuff on my own.
16  Q.  That was in January of 2016?
17  A.  Correct.
18  Q.  You said you thought that they were going to
19  do something to help you.
20      Did you ever ask them --
21  A.  No.
22  Q.  -- to do something to help you?
23  A.  No, I never asked them.  I thought it was
24  their job or like a procedure, that after they got

85

1  through investigating, after the investigation, that
2  they was going to help me to get an attorney to file a
3  civil lawsuit.
4  Q.  What information did you have or what
5  experience did you have that led you to believe that?
6  A.  I just -- it was just hearsay with other
7  people -- myself, like other regular people, that I
8  thought that it was going to happen like that.  It was
9  just other people.
10  Q.  When you say "other people," are you saying
11  that somebody told you that the Cook County would
12  actually get you a civil attorney to file a civil
13  lawsuit?
14  A.  Yes, other regular people.  Just other people
15  that's been incarcerated and regular civilians.
16  Q.  So that was basically something you assumed
17  was going to happen?
18  A.  Exactly.
19  Q.  Did you ever test that assumption in order to
20  determine if it was accurate --
21  A.  No, I never --
22  Q.  Let me just finish.
23      -- by asking anyone who was employed by
24  Cook County?

86

1  A.  No.
2  Q.  Mr. Bolton, have you ever filed personal
3  bankruptcy?
4  A.  No.
5  Q.  Have you ever been sued as a defendant in a
6  civil case?
7  A.  No.
8  Q.  Other than the case filed as a result of your
9  father's --
10  A.  Death.
11  Q.  -- death and this particular case, have you
12  ever been a plaintiff in any other lawsuit?
13  A.  No.
14  MR. COYNE:  I am going to pass for you guys
15  to go over whatever questions you have as I go through
16  my notes.  I thank you for your time and attention.
17  THE WITNESS:  Thank you.
18  MR. FIELD:  You said you only have a couple.
19  MS. WEST:  I only have a couple.
20  MR. FIELD:  Why don't you go through yours
21  and then I'll do mine.
22  CROSS-EXAMINATION
23  BY MS. WEST:
24  Q.  My name is Allyson West.  I represent several

87

1  other officers, including Ramos and Ivory that you
2  briefly spoke about.
3      I wanted to ask you a couple questions about
4  your interaction with Officer Ivory and Officer Ramos.
5  A.  Okay.
6  Q.  You previously testified on the date of the
7  incident, that Officer Ramos and Ivory were present
8  during your physical altercation with Officer Ortiz;
9  is that correct?
10  A.  Yes, ma'am.
11  Q.  I apologize if this was already asked, but
12  when you say you received the physical blows, were you
13  laying on your stomach or were you on your back?
14  A.  I was on my stomach -- I was on my stomach.
15  Q.  At any point when you felt these physical
16  blows, did you ever see Officer Ivory?
17  A.  I couldn't see him because my face was
18  towards the ground.
19  Q.  At any point during the physical blows that
20  you received, did you ever see Officer Ramos?
21  A.  No.  I never seen them, I just felt them on
22  me.
23  Q.  While this physical altercation is taking
24  place, do you recall hearing any conversation from any

88

**Page 89**

1 of the three officers involved?

2     A.   I don't remember. I just was getting hit. I

3 don't remember.

4     Q.   Did you yourself say anything during this

5 physical altercation?

6     A.   Did I say -- no.

7     Q.   Do you recall who handcuffed you?

8     A.   I believe it was Ivory and Ramos.

9     Q.   Now, other than the one conversation that you

10 previously testified to that you had with Officer

11 Ramos after the incident, have you had any other

12 conversations with Officer Ramos?

13     A.   No.

14     Q.   Do you recall the name of the officer that

15 took you to the holding cell after the incident?

16     A.   I don't know.

17     MS. WEST:   That's all I have.

18              CROSS-EXAMINATION

19 BY MR. FIELD:

20     Q.   All right. Mr. Bolton, just a couple of

21 clarification questions.

22     You were asked some questions about any

23 conversations you had with members of -- or staff at

24 Cook County Jail about the incident after January 17,

**Page 90**

1 2014, do you recall those questions that counsel asked

2 you about any conversations you had after January 17,

3 2014, while you were still incarcerated?

4     A.   Did I have any conversation with anyone?

5     Q.   Any other correction officer or member of the

6 jail while you were incarcerated, do you remember

7 being asked those questions?

8     A.   No.

9     Q.   Well, was there a time that you were -- I

10 will ask it a different way. Was there a time when

11 you were interviewed on video after the incident about

12 the incident itself?

13     A.   Yes, I believe the sergeant maybe could have

14 interviewed me, but I don't know if he actually did it

15 on camera or not.

16     Q.   But you were interviewed?

17     A.   I believe -- I believe so.

18     Q.   You were asked some questions about a

19 complaint that you signed.

20     I just want to be clear, you filled out a

21 grievance while you were at the jail; is that correct?

22     A.   Yes.

23     Q.   Do you recall what date you filled out that

24 grievance?

**Page 91**

1     A.   That could have been the next day, January 18

2 or the 19th. The following day whenever I got to the

3 housing unit and got settled down, I filled the

4 grievance about the incident and what happened to me.

5     Q.   You were asked some questions about the

6 document that you filled out in March of 2015, when

7 those first two officers came to visit you.

8     Do you recall being asked questions about

9 that?

10     A.   Yes, they came to my house.

11     Q.   You were asked whether the description that

12 you wrote out in that grievance was accurate.

13     Do you remember that question?

14     A.   Yes.

15     Q.   You filled out that document to the best of

16 your knowledge at the time; is that correct?

17     A.   Yes.

18     Q.   You were asked questions about the lineup

19 where you identified Officer Ortiz.

20     That was a photographic lineup, correct?

21     A.   Yes.

22     Q.   Officer Ortiz was not there in person,

23 correct?

24     A.   No, it was with a picture. It was like a

**Page 92**

1 picture with six different individuals on the

2 picture -- piece of paper.

3     Q.   Do you recall if that photographic lineup

4 occurred before or after the meeting with Mr. Nastoff?

5     A.   It occurred after the meeting with

6 Mr. Nastoff.

7     Q.   You have no legal training; is that correct?

8     A.   Excuse me?

9     Q.   You have no legal training?

10     A.   No.

11     Q.   You are not an attorney?

12     A.   No.

13     Q.   When those first two investigators came to

14 see you, did they tell you that there were any other

15 steps that you needed to take in order to pursue your

16 complaints against Officer Ortiz?

17     A.   No. They just told me that I didn't have to

18 do anything and they was going to get back in contact

19 with me containing the issue at hand.

20     Q.   What about when the second set of

21 investigators came to see you.

22     Did they tell you that there were any

23 additional steps that you needed to take to pursue

24 your complaint against Officer Ortiz?

1    A.   No.
2    Q.   What did they tell you?
3    A.   They told me that they are investigating the
4  officer, and if I wanted to go through with the
5  charges -- or go through with what he did to me, that
6  they will be back in contact with me.
7    Q.   Was it your understanding at the time that
8  that second set of officers came to visit you, that if
9  you wanted to pursue charges against Officer Ortiz,
10  that you had to do what those investigators told you?
11        MR. COYNE:  Objection, form and foundation.
12  BY MR. FIELD:
13    Q.   You can answer.
14    A.   Excuse me?
15    Q.   Sure.  At the time that the second
16  investigators came to see you, Montanez and the other
17  investigator, was it your understanding that if you
18  wanted to pursue charges against Officer Ortiz, you
19  had to listen to what those investigators told you to
20  do?
21        MR. COYNE:  Same objection.
22        THE WITNESS:  Yes.
23        MR. FIELD:  That's it for me.
24        MR. COYNE:  I don't have anything.

93

1  MR. FIELD:  We'll waive.
2    (FURTHER DEPONENT SAITH NOT.)
3        (Whereupon the deposition
4        concluded at 3:12 p.m.)

94

1    STATE OF ILLINOIS        )
                              ) SS:
2    COUNTY OF COOK           )
3
4        I, Pamela L. Cosentino, Certified Shorthand
5  Reporter in the State of Illinois, do hereby certify
6  that on the 7th of March, A.D., 2017, the deposition
7  of the witness, LITROY BOLTON, called by the
8  Defendants, was taken before me, reported
9  stenographically and was thereafter reduced to
10  typewriting through computer-aided transcription.
11        The said witness, LITROY BOLTON, was first
12  duly sworn to tell the truth, the whole truth, and
13  nothing but the truth, and was then examined upon oral
14  interrogatories.
15        I further certify that the foregoing is a
16  true, accurate and complete record of the questions
17  asked of and answers made by the said witness, at the
18  time and place hereinabove referred to.
19        The signature of the witness was waived by
20  agreement.
21        The undersigned is not interested in the
22  within case, nor of kin or counsel to any of the
23  parties.
24

95

1        IN TESTIMONY WHEREOF:  I have hereunto set my
2  verified digital signature this 14th of July, 2017.

7        Pamela L. Cosentino, CSR

License No. 084-003601

96

Litroy Bolton 03/07/2017

---

**Exhibits**

**Bolton Exhibit 3**
3:10 43:21 44:1,2
45:11 60:1 71:15

**.**

**-57**
44:8
**-58**
44:9

**1**

**1**
46:6 48:13,18,24
49:15
**10**
11:5 34:22
**10:00**
11:5
**11**
7:9 48:7
**11-15-86**
5:9
**15**
6:21 34:22 72:7 77:8
**155**
28:4
**16**
46:1 50:15 67:10
72:9,17,22 73:17
75:19 79:2 80:23
81:7 84:1
**160**
28:4
**16th**
70:18 74:22 75:3
**17**
8:12 9:16,19 12:9,22
14:10,15,20 16:10
17:8,17,24 28:6
36:6,8 39:10 40:4,7,
21 45:18 68:12,16
72:11 89:24 90:2
**17th**
12:19 39:23 85:8
**18**
53:17 66:18 91:1
**1858**
5:13 47:9
**19th**
91:2

**2**

**2**
48:20,24
**2-A**
22:24 47:12,17,23
48:4
**20**
72:9 77:8
**2005**
64:5 66:9
**2014**
8:12 9:16,19 12:9,22
14:10,15 16:10
17:17 18:1 28:6 38:6
39:10 40:4,7,21
45:18 53:17 56:16
66:18 68:12,16
72:12,22 80:22 81:1
90:1,3
**2015**
46:1 50:15 67:3,11
70:19 72:16,17,23
73:17 75:3,14,15,19

**2016**
68:7 76:20 78:2 79:4
81:7 83:12,14 84:20
86:9,16
**26th**
66:10 83:3
**2:14**
53:18

**3**

**3**
43:21 44:2 45:11
48:7 56:16 60:1
71:15 72:7,12,16,20
81:1
**30**
5:19
**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**
7:7
**3:12**
94:4
**3rd**
40:22 72:22 80:22

**4**

**48**
23:24

**5**

**5-8**
28:4

**8**

**8**
79:22

**A**

**a.m.**
53:18
**ability**
9:1 33:17 66:19
**Academy**
5:23
**accident**
17:18 40:6
**accompanied**
81:8
**accurate**
37:1 47:14 49:4,16
50:16 53:19 63:21
86:20 91:12
**accurately**
9:2 24:10
**acting**
72:13,17 73:3
**action**
41:24
**actual**
44:21
**add**
58:1,4,11
**addition**
58:1
**additional**
92:23
**address**
4:14 5:10 47:7
**addressed**
73:8
**admitted**
12:13,18
**Advil**
40:2

**Affairs/inspector**
44:6
**affect**
8:24
**affected**
35:18
**agree**
4:23 11:24
**agreed**
80:9,10
**ailments**
12:12
**Allegations**
7:12
**alleges**
8:11
**allowing**
46:16
**Allyson**
87:24
**altercation**
10:24 12:1,5 40:9
41:6,9,12 88:8,23
89:5
**altogether**
65:4
**amount**
19:8
**Andrew**
81:22 82:9
**apartments**
63:13
**apologize**
88:11
**appeared**
37:18
**appears**
45:8 49:14
**applicable**
4:5
**appointed**
61:20
**appreciated**
59:2
**approach**
26:11
**approached**
26:23 42:11 50:3
**approaching**
25:20 27:4
**approval**
46:16
**approximately**
11:3 53:18 65:17
**April**
83:13 84:20
**area**
8:8 38:21
**Armando**
7:17
**arrest**
9:22 29:22
**arrived**
34:14,21
**arriving**
34:24
**aspect**
24:12
**aspects**
24:9
**assigned**
18:14 19:8 22:21
**assisted**
42:24
**assumed**
86:16
**assumption**
86:19
**attack**
36:22

**attempting**
42:16
**attendance**
6:7
**attention**
45:10 50:24 51:6,9
87:16
**attorney**
62:14 66:24 67:19,
21,22 68:1,2,5
78:18,20,21,24 79:7
81:21 84:13 85:13
86:2,12 92:11
**attorneys**
66:23 69:20,23,24
84:5
**attributable**
41:6
**audio**
24:19,20
**Avers**
5:13 47:9
**aware**
12:22 66:18

**B**

**back**
26:18 27:15 29:1
35:6,12 37:10,18
39:1,2 40:13 55:1,3
56:1 66:6 72:10
73:10 80:13 88:13
92:18 93:6
**backed**
31:4
**background**
6:20 63:22
**bad**
58:9
**banged**
36:18
**banging**
36:10 42:20
**bankruptcy**
87:3
**barber**
63:4,16,18
**barbershop**
63:3
**based**
34:20 45:3
**basement**
77:24
**basically**
22:20 41:13 53:12
63:8 69:7 80:14
86:16
**Bates**
44:8
**battery**
64:2
**bearing**
78:9
**beat**
43:4 54:22 59:8,11
**bed**
13:22,23 14:1 27:4
**begin**
4:23
**beginning**
83:24
**behalf**
8:11 81:9 68:22
72:14,18 73:3
**belief**
29:9,10 69:12 83:16
**beliefs**
69:17

**believed**
69:14 75:24 83:20
**believing**
29:3
**bench**
66:2,3
**beneficiary**
80:7
**biological**
62:8
**birth**
5:8
**bit**
28:17 57:12 72:10
**bleed**
38:1
**blessed**
59:18
**blows**
88:12,16,19
**body**
28:16 31:21 33:3,8,
13 41:8
**Bolton**
4:3,9,14 5:7 7:5 8:10
15:5 43:20,24 44:1
45:11 87:2 89:20
**boot**
64:21 65:8
**booth**
23:9,10,13,14,15,17,
19,20
**brain**
61:14,23
**briefly**
88:2
**bring**
81:22 82:1
**broke**
55:8
**broken**
55:8
**brother**
8:6
**brought**
82:7
**bulk**
26:7
**bullet-proof**
73:10
**bullpen**
51:23,24 52:6,9
**business**
74:12

**C**

**Cal**
83:3
**California**
66:10
**called**
11:13 36:5 63:21
76:24
**camera**
90:15
**camp**
64:21 65:9
**cannabis**
9:23 64:6
**capable**
5:2
**capture**
24:6
**captured**
24:10,15
**car**
40:6
**cards**
74:12

**care**
22:20 39:22 69:16
70:13 75:23
**career**
5:23 6:2
**case**
10:8,11,12 60:23
61:2 62:2 64:5,13
65:24 67:17 68:13,
14,17,18,23 87:6,8,
11
**catch**
20:11
**caused**
41:22 42:24 51:5
**cell**
13:11 18:5,9,14,16
19:9,11,12,15 20:3,
6,7,15,20,24 21:2,3,
4,5,11,16 22:14,19,
21,22,23 23:3 25:7,
12,14,17,18 30:12,
16 31:9,10 86:15
**Cermak**
51:10,19 53:4 54:8,
10
**chains**
59:17
**chance**
13:8 44:16
**changed**
52:10
**charge**
7:11 20:1
**charges**
81:23 82:1,2,3,4,7,
12,18,19 93:5,9,18
**Chicago**
5:14 8:7
**chief**
54:8,9
**child**
61:22 80:6
**children**
6:14
**choice**
80:12,14,15,17
**civil**
4:6 61:2,8 68:1,14,
17,20 69:3,11,18
70:14 75:20 76:1,15
78:4,10,16 82:2,19
83:17,22 84:3,13,14
85:7,12 86:3,12 87:6
**civilians**
86:15
**clarification**
89:21
**clean**
63:16
**clear**
90:20
**closed**
23:13 35:24
**clothes**
14:6
**clue**
47:19
**co-defendants**
10:7 64:13
**color**
37:16
**command**
59:18
**common**
58:24
**company**
61:3 63:21
**complaint**
10:23 24:7 44:7
45:3,9 47:4 48:18

---


McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1

Litroy Bolton 03/07/2017

60:2,4,7,11,17 71:8,
10,11 72:14,18 73:3
90:19 92:24
**complaints**
92:16
**complete**
5:2 49:16 50:16
58:12
**compliance**
4:4
**computer**
20:18,19,20 23:6
**concerned**
24:4,5
**concerns**
21:15
**concluded**
94:4
**concrete**
33:9,11 36:20 37:3,
4,5
**condition**
18:9 22:18
**conflict**
10:24
**confrontation**
21:21 22:1,3,4,11
24:23 25:22 35:7
38:2
**consisted**
32:22
**contact**
31:22 32:21 33:4,5
68:4 70:4,16,21
74:15,16 76:6 81:3
92:18 93:6
**contacted**
66:24 67:19 79:7
85:13
**contacting**
69:3
**contagious**
20:11 21:6,16
**contained**
72:2
**continue**
40:23 50:19
**conversate**
16:21
**conversation**
16:14,20 18:8,24
22:7 24:22 26:7
52:13,15,18 75:18
88:24 89:9 90:4
**conversations**
17:16 89:12,23 90:2
**convictions**
63:24 65:3
**Cook**
7:8 9:5,15,20 12:13
14:7,16,17 15:1,15
17:3,17 39:23 44:6,
21 45:20 53:23 56:6,
15 60:22 62:21
64:16 68:20 68:10
69:2 70:17 72:22
78:22 80:21 81:4,8
82:22 83:11,15,17,
21 84:17 86:11,24
89:24
**copy**
48:6 50:10 75:1
**correct**
14:5 26:21 37:19
68:1,14,18 71:11,15
74:21 75:7 79:8
81:15 84:5 85:17
88:9 90:21 91:16,20,
23 92:7
**correction**
45:2 90:5

**correctional**
13:9 18:14,21 42:9
43:4 54:22
**corrections**
11:1 13:10 16:9,12
42:14 64:20 71:5
**correctly**
22:13 76:4 78:3
**counsel**
7:14 15:5 44:1,3
81:8,14 90:1
**counsel's**
45:4
**county**
7:9 9:6,16,20 12:13
14:7,16,17 15:1,16
17:3,18 39:23 44:6,
21 45:20 53:23 54:4
56:7,15 60:22 62:22
64:16 66:20 67:16,
18 68:10 69:2 70:17
72:22 76:17,22,23
78:6,9,22 80:21
81:4,9 82:22 83:11,
15,17,21 84:17
85:10,14 86:11,24
89:24
**couple**
9:21 15:11 32:17
35:8 37:10,24 40:14
56:8 63:12,21 83:24
87:18,19 88:3 89:20
**Coyne**
4:2,8,9 12:7 19:19
33:21 36:17 43:23
44:23 45:1,7 69:24
83:5,10 87:14 93:11,
21,24
**created**
46:3,22 47:8
**criminal**
7:13 68:1,13,18,20
82:3,4,6,11,19
**CROSS-**
**EXAMINATION**
87:22 89:18
**crossed**
42:17
**cuffed**
26:21 33:14,16 55:3
**cuffs**
32:15 52:3
**current**
5:10,11 82:15
**custody**
7:8 8:16 12:13
14:16,17,22 62:21
**cutting**
63:17

**D**

**dad**
55:15 56:22 61:13
**daddy**
78:18,20
**daddy's**
61:22 80:1,6,7
**Daily**
56:19
**date**
5:8 7:20 8:19 9:18
14:13 40:9 41:5
45:17,19 46:1,3 68:4
71:1 72:7 75:11,13
77:4 79:4,5 81:1
88:6 90:23
**daughter**
62:8
**day**
72:5 73:6 74:21,23

75:7 91:1,2
**days**
9:21
**dead**
61:14,23
**dealing**
69:18
**death**
81:18 68:23 79:7,10,
11 87:10,11
**deceased**
8:9 55:15
**decide**
76:15
**decided**
78:4
**decision**
42:24 49:1 78:9
80:8,9
**defend**
57:5,8
**defendant**
12:1 87:5
**defendants**
4:10
**defender**
7:14,15,16
**defense**
7:14
**deliver**
10:2
**delivery**
64:11
**demonstrate**
33:17
**department**
60:22 64:19 68:10
69:2 70:18,23 73:1
81:5
**depicted**
25:2
**DEPONENT**
94:2
**deposition**
4:3,12,13,16 9:2
15:4,7 16:6 43:20
44:13 62:1 66:15
94:3
**depositions**
62:4
**deputies**
46:8
**describe**
37:1
**describing**
36:2
**description**
47:14 49:5,16 50:16
58:11 91:11
**desk**
20:18
**detained**
51:17
**Detainee**
45:9
**determine**
86:20
**diagnosis**
12:21
**Diaz**
69:22 70:7,8 74:24
75:6 76:24 77:3
80:24 81:2
**difference**
68:13,17,19
**dining**
77:24
**direct**
4:7 21:7 28:21

**directing**
45:10
**directly**
19:3 25:23 28:23
**discharge**
54:4 56:18
**discharged**
53:23 56:6,15 72:12,
21 80:21
**discovery**
61:7
**discuss**
9:5
**discussed**
57:18
**discussion**
83:6
**disease**
20:12
**dismissed**
10:13,17
**dispensary**
12:1 87:5
**disposition**
10:10
**distress**
55:19
**division**
7:9 9:8,10,11 11:8,
16 13:1,13,17 47:12,
23
**DOC**
32:18
**document**
44:10,19,22 45:8,12
46:3,23,24 47:3
48:14 50:14 60:16
71:14 91:6,15
**documents**
16:9,10,15,18,21
16:5 44:12 46:22
62:11
**domestic**
64:2
**door**
23:13 36:14
**dressed**
14:3,4
**dropped**
6:6
**drug**
64:5,8 66:24
**duly**
4:1

**E**

**ear**
37:19,21
**earlier**
36:19 47:8 51:4
53:13
**easily**
4:17
**Ecstasy**
64:9
**education**
5:21
**elapsed**
34:20
**Elementary**
5:22
**emotional**
55:19 57:19
**emotionally**
54:20 55:11,16
**employed**
60:21 62:22,23,24
63:1 83:16,21 84:16
86:23

**employees**
13:2 17:17 68:10
69:2 70:17,22 72:23
81:3
**encounter**
13:10 36:21
**end**
67:3 75:16
**ended**
10:11
**enter**
46:16
**entire**
44:19
**estate**
62:15
**et al**
4:10
**evaluated**
54:7
**evaluation**
53:16
**eventual**
10:10
**EXAMINATION**
4:7
**Excuse**
12:15 48:16 79:9
92:8 93:14
**Exhibit**
43:21 44:2 45:11
60:1 71:15
**experience**
86:5
**experienced**
41:5 57:20 58:9
**extend**
38:20
**eye**
35:9,15,20,21,22,24
36:3 38:17,22

**F**

**face**
25:24 27:23 29:16
35:9 38:3,4,5,8,11,
12,13,18,23 40:16
43:13 53:13,14
88:17
**facedown**
39:5
**fact**
21:3,6 45:19 78:21
**fail**
4:18
**fair**
4:21 7:9 11:1 14:2
18:6 21:7 22:2,5
32:24 41:11 45:5,11
47:6 56:16 69:1,4
78:5 84:20
**fall**
33:8,10 36:20 37:6
43:1
**falling**
79:14
**family**
80:1,13
**familywise**
63:3
**father**
61:5,10 62:9 79:13
80:3
**father's**
62:15 68:23 79:7,10,
11 80:20 87:9
**February**
40:22 55:16 72:12,
16,20,22 80:22 81:1

**Federal**
4:5
**feel**
42:3
**feeling**
56:22
**feelings**
58:4
**fell**
28:19 50:4,12 61:10
**felony**
63:24 65:3
**felt**
28:12,15 32:17 42:3
54:21 55:2 88:15,21
**FIELD**
12:4 19:17 44:20
45:6 59:22 87:16,20
89:19 93:12,23 94:1
**file**
41:22 66:20 73:3
76:15 78:10 79:7
80:18 84:13 86:2,12
**filed**
8:10 41:17 46:19
59:20 60:2,4,7,11,14
61:3,8,13 62:6
68:21,22 79:15
80:11 82:12 87:2,8
**filing**
24:7 60:23 72:14,18
80:4 83:22 85:7
**filled**
71:11,21,22,24
74:18,21,23 90:20,
23 91:3,6,15
**finding**
10:18,19 66:4
**finish**
86:22
**fix**
13:23
**fixing**
63:18
**flat**
27:18
**floor**
31:13
**force**
31:9
**forced**
37:2
**forget**
55:24 57:3
**forgive**
55:23
**forgot**
56:1
**form**
93:11
**formal**
5:20
**found**
65:13 75:1 84:6
85:14
**foundation**
93:11
**Frank**
62:18,19
**Franklin**
5:24 8:3
**frequently**
56:18
**friend**
55:22
**frightened**
27:11
**front**
25:23 43:10,12 83:1

full
5:4,6
fully
57:22 58:8

**G**

G-a-s-t-o-n
7:4
Gaston
7:2,4
gathered
35:4
gave
10:23 47:7 66:7
GED
6:8
general
19:1 44:7
generated
15:15 23:21
give
5:20 13:23 27:19
44:16 59:16 67:16
76:18 77:1 78:7,12
81:20
giving
5:1 81:23
governed
66:19
grab
30:8 32:18
grabbed
33:7,13
grabbing
42:20
graduate
6:5
graduated
5:22 6:6
grand
83:1,2
grandmother
5:17 63:2,5,7,9,10
73:19,22 74:10 77:9,
21
grass
63:14,16
grievance
16:3 41:18,23 44:21
46:19 48:6 50:11
59:13,20 60:3,14,16
71:12,16,22,24 72:1,
2,5 74:17,19 75:1
90:21,24 91:4,12
grievances
59:15 71:21
ground
26:19,20 27:1,2,3,
10,17 28:2,11,12
30:3,6,9,13,15,19,
20,22,23 31:1,5,7
32:20 33:3,9,11,15
36:11,19 37:2 42:8,
12,21,23 43:1,8,11
49:20,22,23 50:4,13
88:18
guess
20:19,24 26:19 41:1
guilty
66:4,5
guy
20:22 56:9
guys
87:14

**H**

hair
63:17

hallway
23:7,11,16,19
hand
92:19
hand-
11:18
handcuffed
11:16,19,21 28:18
32:1,3,5,8,10,11
33:24 34:5,8,11,21
52:1 55:1 89:7
handcuffing
32:13
handcuffs
30:2 31:17
handicap
78:18
hands
26:14,18 27:13,19
31:3 33:19 42:9,17
43:5,7,13 55:1,3
59:16
happen
33:22 55:5 58:14
59:4,9 86:8,17
happened
16:24 17:6,7 18:1
24:14,17 26:12 28:8,
9 33:24 49:9 52:24
55:14 56:1,3 57:2,3,
7,10,22 58:13,22,24
59:3 71:13 78:13,17
79:19,21,24 91:4
happening
10:11
head
32:19 33:8,10,14
35:9,11,12 36:10,18,
20 37:1,2,4,5,11,14
39:1,2 40:1,13 41:3
42:20 57:15
headaches
36:6 39:9
healed
35:22
health
12:21
hear
63:15
heard
24:21
hearing
10:12,15 82:23,24
88:24
hearings
65:11,17
hearsay
86:6
Heatherington
61:4
height
28:3
held
27:17
helped
27:17
helping
13:3
helpless
43:7
high
6:2,3,4
hit
28:13,14,15,22 29:3,
11,18,21 32:1,8,9,
10,11,19 33:5,14
37:1,4,5 42:8 89:2
hitting
28:12,19 29:13,17
31:19 32:22 42:19,
20

hold
50:19
holding
13:20,24 27:4 89:15
home
7:12 40:18,20 45:16
46:13,15,16,19 47:7
70:16 73:17 77:4,5,7,
23 80:24 81:2
Homewood
5:23 6:3
hospital
53:16 61:15
hospitalized
40:3
hours
23:24 51:16
house
63:8,11 67:3,9,13
69:7 70:2,10 75:9
77:6 79:22 84:1
91:10
houses
63:9 79:23
housing
53:22 91:3
hurt
40:1 55:11
hurting
40:1

**I**

IA
67:2 71:7 73:5 85:11
identification
43:22 61:7
identified
80:1,2 84:19 91:19
identify
85:4
Illinois
5:15 7:24 64:19
immediately
26:7 37:11 42:12
85:4
in-custody
12:8 15:1
inappropriate
42:4,7,10
incarcerated
9:17 17:4 54:13
71:23 86:15 90:3,6
incarceration
35:11 84:19
incident
8:11,16,18 9:4 10:22
11:4,20,24 12:1
13:20,21 14:24
16:16 17:8,21,24
18:1 21:23 22:1,3
23:22 24:6,9 26:8
28:10 31:11 35:19
38:10 41:20 45:17,
19 46:23 47:11,14,
24 48:5,7,8 49:17
50:17,21 51:1,11,18
52:4,14,16,19 53:3,
9,22 54:16 56:5
57:21,23 58:3,10
60:9 67:1 72:6 75:21
76:16 78:5 79:21
82:13 83:23 84:23
88:7 89:11,15,24
90:11,12 91:4
incidents
14:23
including
5:4 88:1
indicating
20:19 38:24 39:5

47:1
individually
76:14
individuals
16:15 73:7 85:1 92:1
indulged
27:13
information
13:16 21:7,10 81:24
86:4
informed
20:24 21:13
initial
5:5
injure
41:8
injuries
35:6 41:12 51:4
54:15,17,18,19
57:18 58:2,6,9
injury
53:9,10
inmate
9:5
inside
18:16 31:9 33:3
51:23,24 58:17
instigated
79:17,23
instructed
30:5 48:23
instructions
13:15
intent
10:2,5 27:9,14,16
64:10,12
interaction
88:4
internal
44:6
interviewed
90:11,14,16
invasion
7:12
investigating
76:12 86:1 93:3
investigation
62:12 86:1
investigator
93:17
investigators
71:5,6 92:13,21
93:10,16,19
involved
64:8 89:1
issue
92:19
issued
14:6
items
13:20
ivory
13:9,11,16 14:12
16:12 18:21 19:20
25:2 26:2 34:10,23
43:14 52:21 88:1,4,
7,16 89:8

**J**

jail
7:9 9:6,16,20,22
12:14 13:2 14:7,16,
17 15:2,16 17:3,18
44:21 45:20 53:23
54:4 56:7,16 59:10
62:22 70:22 71:17
72:22 78:22 80:22
81:9,12 83:11,15
89:24 90:6,21

January
8:12 9:16,19 12:9,
19,22 14:10,15,20
16:10 17:8,17,24
28:6 36:6,8 39:10,23
40:4,7,21 45:18
53:17 60:8 66:18
68:6,12,16 72:11
76:20 78:2 79:2,4
81:7 83:11,13,14
85:8,16 89:24 90:2
91:1
jaw
38:21,23
job
20:19 85:24
John
4:9
judge
10:20
jumped
31:4
junior
6:7,17,18
jury
66:2 83:1,2

**K**

kind
32:19
kindly
44:15
Kindred
61:15,16
kitchen
77:24
knee
28:15,16 31:20 33:1,
3
kneed
32:24
knew
16:22 20:17,23
29:17 69:6
knot
37:13
knots
35:8 37:10,22 39:5
40:13
knowing
78:16
knowledge
20:15 28:24 46:18
47:2,18 67:24 82:6,
11 85:6 91:16

**L**

labor
63:20
landed
41:3
lawsuit
8:10 60:23 61:8
62:5,12 66:20 68:22
69:11 75:20 76:1,15
78:4,10 79:8,14,17,
24 80:5,11,18 83:18,
23 84:3,14 85:8
86:3,13 87:12
lay
27:18
laying
88:13
leave
74:12,17
led
24:6 86:5

left
35:24 37:12,14,18,
19,21 43:15,17,19
61:24 80:7,19
legal
92:7,9
level
31:14,15
lieutenant
20:1 21:15,19 34:3,
14
life
36:7 56:11,13 58:16
80:20
lift
32:19
lifted
33:7,13 36:20
lifting
33:19
light
58:19
limited
17:16
limits
33:16
lineup
63:12 84:20 85:2
91:18,20 92:3
listed
47:11
listen
93:19
Litroy
4:3,14 5:6
live
6:22
lived
7:23
living
56:11 77:24 78:1
location
31:11 47:11,23
locked
55:11
log
20:20
long
9:15,17,20 35:17
37:22 40:16,23 44:9,
18 45:4 51:8,11,13,
14 52:3 77:6
looked
15:10
loose
27:17
lot
8:15 58:20 59:14

**M**

M-a-t-t-i-e
5:17
made
18:17,18 37:5 43:7
80:18
majority
65:1
make
22:17,18 45:2 58:11
71:20 80:7,9
making
4:11 60:17
males
73:14
man
56:9 73:11,13
manner
26:12



Litroy Bolton 03/07/2017

Marcelle
5:7
March
46:1 50:15 67:10
70:18 72:7,9,17,22
73:17 74:22 75:3,19
80:23 84:1 91:6
marked
43:21 44:1,2
married
6:10,12
matter
4:15 7:20
Mattie
5:17
meant
76:9,11
medical
40:10 41:4 50:22,24
51:6,9 53:15
medication
39:8,13,14,17,18,20,
24
medications
8:22 12:9 39:16
meeting
73:20,23 74:2,5 77:9
81:11,14,17 83:15
92:4,5
member
90:5
members
13:2 89:23
memory
9:1
men
73:11
mental
12:21
messed
35:22
met
72:23 77:3
middle
5:5,6 37:16 49:19
midst
55:6
migraine
36:5
migraines
35:10 36:4,5,9 40:23
41:5
Miguel
4:10 11:1 14:9 16:9
17:20,22 81:23 82:4,
7
mind
56:1
mine
87:21
minutes
34:22 77:8
misunderstood
79:12
mom
55:14 56:22
moment
36:12
moments
25:21
Montanez
69:22 70:7,8 74:24
75:6 76:24 77:3
80:24 81:2 93:16
month
41:12,14,16 56:21
65:2
Monthly
56:20

months
6:21 37:24 40:14
41:16
Montrose
61:17
mother
6:23,24
mother's
7:1
motion
30:10,21,24
move
13:3 29:16
moved
13:17 52:11
moving
28:16 30:20
mow
63:14,16

N

named
61:3
names
46:11 75:4
narrative
49:14
Nastoff
81:22 82:10 92:4,6
nature
82:15
neck
41:9
needed
92:15,23
nervous
26:15 27:11,22
night
11:6
nose
38:15,16,17,20,22
notary
48:21
notes
77:12,16 87:16
notice
4:4
notification
45:9
number
4:24 5:1 7:6 22:23

O

oath
85:20 66:1,13
object
12:4
objection
93:11,21
objective
27:20,21
objects
36:13
occurred
10:23 11:4 13:21
15:1 16:16 19:1
25:22 31:11 45:19
47:15 48:5,9 49:5,16
50:16 53:17 92:4,5
occurring
8:18 17:21
Office
44:6
officer
10:14,20 11:1 13:5,
7,9,11,12,16 14:9,12
16:9,12,19,20 17:15
18:14,15,21 19:13,

14,20 20:6,13,14,17,
22 21:9,13 23:5
24:7,22 25:1,4,6
26:2,5,8,11 27:12
28:13,20,22 29:3
32:13 33:2 34:4,16
35:3,5 41:18 42:2,3,
9,14 43:9,17 48:20
47:4 49:17,19 50:5
52:11,16,19,21 53:6
54:5,22 60:5,8 67:12
88:4,7,8,16,20
89:10,12,14 90:5
91:19,22 92:16,24
93:4,9,18
officers
43:4 67:9 70:7,8
71:5 74:10 75:2,19
77:21 84:1,4 88:1
89:1 91:7 93:8
older
57:12
one's
68:20
one-half
38:13
opinion
4:14 50:19
order
13:23 16:5 49:11
57:22 58:5,8 59:17
86:19 92:15
originally
18:5
Ortiz
4:10 11:1 12:2 14:9
16:9 17:21,23 18:15,
18 19:3,6,14,21
20:7,14,16,18,24
21:10,13,22 22:5,9,
11,14,18 23:5 24:7,
22 25:6 26:9,11
27:12 28:20,22 29:3,
9,18 30:1,5 32:18,22
33:6 34:4,23 41:18
42:4 43:9 46:20 47:4
49:17,20 50:5 52:16
53:6 64:5 60:5
72:14,19 73:4 81:23
82:4,7,12 84:14,19
85:8 86:8 91:19,22
92:16,24 93:9,18
outcome
81:17,19
over-the-counter
39:9,12
overheard
18:8,12
overnight
40:3
owns
63:12

P

P-56
45:5
P-57
45:5,23
P-58
45:8
p.m.
94:4
P56
44:8
pack
11:14
pages
44:9,18 45:4,11
pain
12:18 35:12 36:10

39:18,24 41:3
pains
35:10 39:1,6 41:1
paper
47:1 92:2
paperwork
15:11,12 50:11 72:6
paragraph
43:19
parents
8:7
parole
65:13,16
part
38:23 41:8 44:20
80:18
parties
4:4
pass
56:23 87:14
passed
61:10,14
past
23:24 56:2
pause
36:12
pending
7:21,22
Penn
5:22
people
58:14 59:8,15 63:17
71:1 73:5 84:9 86:7,
9,10,14
period
64:18 73:2 84:6
persist
56:6
person
59:5 61:3 91:22
person's
58:16
personal
13:20 16:14 80:10
87:2
pertain
8:16
pertaining
47:4
photographic
91:20 92:3
phrase
11:23
physical
12:12,17 22:4 31:21
32:21 33:5 35:6 40:9
41:12 51:3,6 54:15
57:18 58:6 88:8,12,
15,19,23 89:5
physically
37:2 43:3
physician
39:15,22
picture
81:24 92:1,2
piece
92:2
pieces
15:11
pill
64:9
place
8:11 13:6 18:13,24
24:23 62:5 77:23
81:18 88:24
plagued
57:1
plaintiff
4:3 87:12

plaintiff's
45:3
point
18:8 19:11,23 21:2
24:2 25:2 26:3,21
27:21 29:24 31:17
32:7,15,24 42:16
49:21 54:5 62:1
88:15,19
police
33:2
possession
9:23 10:1,2,5 64:10,
12
prefer
4:21
preliminary
10:12,15 82:23,24
preparation
15:4,7 44:13
prepare
15:8 18:5
prescribed
39:16,19
prescription
8:21 39:12,14
presence
52:8
present
16:15 18:20,22 46:5,
9 73:19 74:9 77:10,
20 81:14 85:1 88:7
presently
7:8 8:21 17:3
pretty
14:3 43:9 60:14
68:19
prevent
60:23
prevented
85:7
previous
67:10
previously
73:6 88:6 89:10
primary
39:22
prior
12:18,22 13:16
14:10,13,15,19 15:1
17:21,24 22:10 23:3
24:23 26:8 30:7,8
31:6 32:1 34:24
39:9,23 40:4,9 42:12
46:23 54:4 59:20
60:8 82:21 77:4,5
private
7:13
probable
10:18,19
probation
65:6,7,10
problem
68:23
problems
12:17 51:3
procedure
4:6 85:24
proceeding
82:18
proceedings
49:11
process
13:3 69:9 70:1,14
proper
59:17
protest
25:7
protocol
41:24

provide
63:6 78:15
provided
66:12 74:20
psychiatrist
54:8,9
psychological
54:20
public
7:14,15,16 48:21
punched
32:2
punching
32:13
purpose
9:12 81:11 83:22
pursuant
4:4
pursue
49:12 78:4 92:15,23
93:9,18
put
9:22 19:9,14 22:14,
21 25:18 26:14
30:12,15 42:17 43:4,
6 52:11 57:20
putting
42:8 43:12

Q

quarantine
18:16 20:6,8,9
quarantined
20:14 25:13,15 31:9,
10
question
4:20,24 48:20 58:8
84:11 91:13
questions
4:17 8:15 44:19
87:15 88:3 89:21,22
90:1,7,18 91:5,8,18

R

Ramos
16:19,20 17:15
18:14,18 19:3,13,21
20:7,13,16,22 21:9,
13 22:9 25:4 26:5
34:7,23 43:14 52:19
88:1,4,7,20 89:8,11,
12
reach
26:14 27:23 30:7,10
reached
27:24
reaching
31:1,3 49:23,24
read
36:16 44:16 83:9
rear
37:11,21
reason
10:18 11:11 40:11
65:21 66:16
reasons
28:2,4,14
recall
9:8 11:3 12:23 13:3
30:4 38:10 39:15
64:14 73:7 74:13
75:4,12 79:4 85:2
88:24 89:7,14 90:1,
23 91:8 92:3
recalling
61:6
receive
39:20 41:4 51:9



**received**
31:19,21 88:12,20
**receiving**
40:10
**recently**
17:4 44:17
**recollection**
8:17 14:2 25:1 32:23
36:24 36:19 45:18
46:2 54:8 60:15
**record**
4:2 19:18 33:18
36:15 37:15 44:8
45:2 77:14,18 83:5,
7,8
**recording**
24:21 74:1,4
**refer**
47:17
**referring**
11:24 17:8 22:4
25:21 36:21 50:5
60:4 68:9 70:6
**reflect**
4:2
**register**
44:7 45:3
**regular**
39:24 86:7,14,15
**remember**
10:4,6 11:18 24:15
35:16 40:20 45:15
46:9,11 52:9,11
54:14 60:10,20
62:13 73:12 75:13
89:2,3 90:6 91:13
**removed**
52:4
**repeat**
4:20
**rephrase**
4:20 12:16
**represent**
4:10 83:17,22 87:24
**representation**
45:4
**representative**
61:21 80:10
**representatives**
70:17 81:4,12
**represented**
7:13 62:15
**representing**
7:16
**request**
50:24 51:6 78:8
**requested**
36:16 83:9
**reside**
5:16 8:7
**residence**
5:10,11
**resisting**
29:22,24 30:4
**resolved**
37:23 40:14,17
55:20
**respond**
17:12
**response**
19:6,13,20 25:16
46:19 50:12
**restricted**
38:5
**result**
35:19 38:1 41:9,20
42:23 48:14,24 51:1
57:21,23 58:10 62:5
75:20 76:16 78:5
79:6,10,11,13 82:12
83:14,23 87:8

**resulted**
40:10 69:13
**resulting**
68:23
**results**
17:5
**retain**
84:13
**review**
15:8,10 23:21,24
**reviewed**
15:13,18 44:12
**reviewing**
18:5
**rights**
42:13
**rip**
59:15
**rise**
10:23
**Rockwell**
61:17
**roll**
13:22 14:1 27:5,18
**room**
23:6,10,12 77:24
78:1
**roughly**
41:11
**rules**
4:5
**Run**
49:2

**S**

**S-h-y-e-r-a**
7:4
**SAITH**
94:2
**Sandoval**
7:17,18
**Santilli**
62:18,19
**sat**
80:13
**scared**
27:22
**scene**
35:1
**school**
6:2,3,4
**scooted**
34:2
**section**
49:15 79:22
**Security**
7:5
**seg**
54:1
**segregation**
53:22,24
**sentence**
50:2
**separate**
36:21,22 44:22 45:8
54:15 71:21 75:6
**separating**
23:19
**September**
75:16
**sergeant**
19:24 21:14,18 25:9
34:3,13,17 50:3,6,7,
9 90:13
**sergeant's**
50:12
**served**
64:18,24

**set**
92:20 93:8
**settled**
91:3
**sharp**
35:10,12 36:10 39:1,
6 40:24 41:3
**sheriff**
46:8 73:9
**sheriff's**
44:5 60:22 68:10
69:2 70:18,22 73:1,
10 81:4
**sheriffs**
49:6 67:3 69:18
85:11
**shift**
48:8 52:10
**shirt**
25:10 33:7 34:18,21,
24 52:23 53:3
**shop**
43:4,17,18
**shovel**
63:16
**show**
43:24 44:1,3
**showed**
24:16 63:22 71:18
**shut**
36:13
**Shyera**
7:2
**siblings**
8:2
**sick**
20:12 21:15 25:15
**side**
23:20 37:12,14 38:5,
7,11,12,18 43:18
67:16 68:8 76:18
77:1 78:7 80:1 81:20
**sides**
38:6
**sign**
62:11
**signature**
45:22
**signed**
15:19,20,21,24 46:3,
7,23 47:1,3 50:14
60:16 74:18 90:19
**similar**
14:3
**single**
6:10,11
**sir**
4:22 5:3,21 6:9,11,
13,15,19 7:10,15
8:1,14,20,23 9:3,7,
24 10:9 11:9 12:11,
20 16:11,13 20:4
23:23 24:1,3,8 26:22
34:19 41:7,10,14
42:5 44:10 45:21,24
47:5,9,16 48:10
50:18,20 66:21 68:3,
11 73:18
**sister**
62:7,8
**sister's**
79:21
**sisters**
8:8
**sitting**
51:20,23,24 52:1
**situation**
17:1,2 55:17
**skull**
37:11,17

**slammed**
37:7
**snow**
63:16
**Social**
7:5
**son**
57:11
**sort**
12:18
**sound**
37:8 53:19
**South**
5:13 47:9
**speak**
19:24 21:14,18
42:18
**speaking**
15:5 19:3
**special**
53:22 61:20
**specific**
8:17 60:15
**specifically**
33:11 37:7,8 41:22
42:6 84:8,12
**spell**
7:3
**spelling**
5:5
**spoke**
88:2
**spoken**
16:8
**staff**
89:23
**stairs**
61:11 79:14
**stamped**
44:8
**standing**
23:9
**start**
5:4,6
**started**
26:11 30:19
**starting**
30:23
**state**
20:15 21:5,11
**state's**
81:21
**statement**
18:17 22:17,18
**states**
7:23
**Stateville**
64:24 65:2
**status**
12:8 82:16
**stayed**
65:1
**stays**
6:23 15:1
**stepped**
26:18
**steps**
60:22 92:15,23
**stick**
63:8
**stomach**
27:18 88:13,14
**story**
67:16 68:6 76:18
77:2 78:7 81:20
**straight**
10:1
**stress**
55:18 56:4 57:20
58:7

**stressed**
41:2 54:21
**stressful**
55:12,16
**strike**
22:7 23:1 52:14
53:15 72:9
**striking**
28:19 29:10
**struck**
32:3,16
**stuff**
13:22 54:23 57:6,7
58:13 59:18,19
83:19 70:4 71:7
85:15
**subject**
11:20,23 21:24 22:3
75:20
**substantially**
28:5
**successfully**
32:7
**sued**
61:3 87:5
**suffered**
36:5
**suit**
61:18 69:3
**summary**
71:18
**support**
60:17
**supposed**
21:11 54:23 81:19,
22
**surprised**
58:22 59:13 79:19
**sustain**
35:6
**sustained**
36:4 41:13 51:5
54:16,17 57:19 58:2
**swelling**
35:23 38:5,15,20
40:16
**swing**
29:15
**swinging**
32:6
**swollen**
35:9,15,20,21 36:3,
4,13 53:13,14
**sworn**
4:1

**T**

**taking**
8:24 88:23
**talk**
27:24 34:3 52:23
55:14 61:23
**talked**
53:2 73:5 80:14,22,
23
**talking**
35:4 56:5 73:17 80:4
82:2
**telling**
70:2,11
**term**
12:4
**terminated**
65:8
**terms**
72:18
**test**
86:19

**testified**
11:10 22:10 26:1
31:20 58:1,6 65:20,
24 66:15 83:1 88:6
89:10
**testify**
9:1 10:14 57:24 62:1
65:10,16 82:18,21
**testifying**
10:21
**testimony**
22:13 65:19 66:6,8,
12 75:3 78:3,12
**text**
48:23 49:14
**thing**
6:1 30:14,17,18 37:9
46:24 57:4 58:17
61:12 80:13
**things**
38:24 58:9 68:20
**thinking**
55:13 56:22
**thought**
54:24 55:4,10 56:8,
10,24 69:9,23 70:5,
13 78:15 79:24 84:2
85:10,18,23 86:8
**thoughts**
58:19 57:1
**threaten**
31:6 53:6 54:5
**threatened**
31:8
**time**
9:4,17,23 11:3,17,20
12:8,10,13,24 13:19,
21,24 14:10,12 16:9,
15,17 20,22 18:2,13,
17 19:4,8 20:13
21:1,21 23:2 26:23
27:5 28:22 29:11,19,
21 30:1 32:4,16
34:13,20,21 35:17
36:6,8 40:18 41:17
42:11,13 43:9,10,14
48:7 49:2,17 50:14,
17,21 51:18 54:11,
12 55:20 58:21 59:1,
20 60:24 61:14
62:22,24 64:18 65:1
68:24 67:2,10 68:16,
21 70:21 72:6,11,12,
16,21 73:2,13,15,16
75:18 77:4,7 78:3
79:18,22 83:19,20
84:6,17,22 87:16
90:9,10 91:16 93:7,
15
**timeline**
66:19
**times**
14:15,18,19,22
31:24 32:2,12,17,23
33:5,22 55:3 56:8
58:21 59:14 63:22
**today**
4:12 5:18 8:16 9:5
16:6 28:3 65:19,20
66:13 71:15,19 72:3
**told**
11:14 17:11 18:15
19:8 20:7,13,16
25:6,11,14 30:7,12,
22 49:6,8,9,10,12
50:2 67:4,7,11,15
69:6,13,15 71:6,9
74:14 75:22 76:5,12
78:17 86:11 92:17
93:3,10,19
**top**
55:13



Litroy Bolton 03/07/2017

totally
55:8
touch
28:1 30:11 31:4 43:2
50:1 74:15
touched
43:8 57:9
training
92:7,9
transfer
11:12 13:14
transferred
9:13 11:8,15 18:3
53:21,24 54:1
transferring
9:11
transported
12:24 18:5 51:12,19
53:4
transporting
13:4,5
traveled
46:15
treated
39:23
treatment
40:10
trial
7:20 66:2,3
troubled
56:19
true
18:9 42:4 49:4,15
50:15 61:4 70:19
75:4
truthful
5:2
truthfully
9:1
turn
26:20 27:16,19
turned
59:13
Tylenol
40:2
type
54:18 57:7 78:12
types
54:17,19

**U**

uncle
63:3
understand
4:18 8:13 10:22 11:7
12:15 13:19 14:24
18:4 22:2 33:16
44:5,9 57:22 61:2
68:15 71:4,20 75:3
understanding
11:11 93:7,17
understood
5:1 10:7 22:13 38:14
68:12,17 69:1,19
78:2 79:13 84:4
uniforms
73:9
unit
91:3
unobstructed
28:21
unsatisfactory
65:8
upset
29:6
upwards
33:19,20

**V**

vague
12:5
vest
73:10
VI
9:10,11 11:8,16
13:1,13,17
vicinity
19:1
video
23:21 24:5,6,11,15,
16,18 25:2,3,5 67:4
90:11
view
28:21 83:12
VIII
9:11 11:8,16 13:1,17
47:12,23
Vince
79:1
violated
65:6
violation
65:10,16
violator
65:14
visible
53:8
vision
35:18
visit
75:11 80:23,24 91:7
93:8
visited
74:13 75:2,6,19 81:2
vocational
6:2,4

**W**

waist
33:20
waited
34:3
waive
94:1
walk
23:14,15 26:24
walked
30:1 35:3
walking
25:19
wall
34:2
wanted
13:6 37:4 49:12
67:4,5,11,15 68:7
69:8 71:8 76:15
80:18 88:3 93:4,9,18
watch
24:4
watched
24:18
wearing
14:6
week
35:20
Weekly
56:19
weeks
40:19
weight
28:3,5
West
87:19,23,24 89:17
Westinghouse
5:23 6:2,3

whichever
4:21
white
25:9 34:18,21,24
52:23 53:3
William
5:22
wings
20:23,24
woman
73:11
Woods
5:17
word
14:24 21:24 76:3,8
words
38:21 49:10 53:10
work
63:20,23
worry
69:15 70:2,11,12
75:22 76:5
wrist
32:16
write
47:20,22 48:1,2,11,
17,23 49:3,4,6,8,9,
10,13 59:14
writing
48:13 73:22 74:7
written
47:20
wrongful
61:18 68:22
wrote
36:19 45:12,14 46:5,
6,7 48:3 50:3,5,6,7,9
71:17,18,24 72:5,8
91:12

**Y**

year
6:5,7 64:22,23 66:7
years
63:1 79:21





## Planet Depos
We Make It *Happen*

# Transcript of Rodrigo Ramos

**Date:** March 22, 2017
**Case:** Bolton -v- The Sheriff of Cook County, et al.

Planet Depos
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES



EXHIBIT
C

Transcript of Rodrigo Ramos
Conducted on March 22, 2017

1 (1 to 4)

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4  ---------------------------x
 5  LITROY BOLTON,            :
 6             Plaintiff,     :
 7       v.                   :
 8  THE SHERIFF OF COOK       :
 9  COUNTY, individually and  :
10  in his official capacity; :
11  COOK COUNTY; DR. NNEKA    :
12  JONES TAPIA;           : Case No. 16 CV 5012
13  (Caption continued on next page)
14
15       Deposition of RODRIGO RAMOS
16            Chicago, Illinois
17         Wednesday, March 22, 2017
18              2:03 p.m.
19
20
21
22  Job No.: 139309
23  Pages: 1 - 84
24  Reported by: Tiffany M. Pietrzyk, CSR RPR
```

**Page 3**

```
 1     Deposition of RODRIGO RAMOS, held at the
 2  location of:
 3
 4     LOEVY & LOEVY
 5     311 North Aberdeen, 3rd Floor
 6     Chicago, Illinois 60607
 7     (312) 243-5900
 8
 9
10
11
12
13     Pursuant to notice before Tiffany M. Pietrzyk, a
14  Certified Shorthand Reporter, Registered
15  Professional Reporter, and a Notary Public in and
16  for the State of Illinois.
17
18
19
20
21
22
23
24
```

**Page 2**

```
 1  (Caption continued from previous page)
 2  DR. NNEKA JONES TAPIA,        :
 3  individually and in her       :
 4  official capacity as          :
 5  Executive Director of the     :
 6  Cook County Department of     :
 7  Corrections; JAMES CIUKAJ;    :
 8  Correctional Officers         :
 9  MIGUEL ORTIZ, RODRIGO         :
10  RAMOS, CODY LETTIERE,         :
11  CHRISTOPHER IVORY and         :
12  UNKNOWN EMPLOYEES OF COOK     :
13  COUNTY JAIL; Internal         :
14  Affairs Investigator         :
15  JUAN F. DIAZ; Internal        :
16  Affairs Investigator         :
17  ESTHER MONTANEZ; UNKNOWN      :
18  EMPLOYEES OF COOK COUNTY;     :
19  UNKNOWN EMPLOYEES OF THE      :
20  OFFICE OF PROFESSIONAL        :
21  REVIEW OF THE COOK COUNTY     :
22  SHERIFF'S OFFICE;            :
23         Defendants.          :
24  ------------------------  x
```

**Page 4**

```
 1          A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4     VINCENZO FIELD, ESQUIRE
 5     LOEVY & LOEVY
 6     311 North Aberdeen Street
 7     3rd Floor
 8     Chicago, Illinois 60607
 9     (312) 243-5900
10
11  ON BEHALF OF THE DEFENDANTS:
12     MEGAN MCGRATH, ESQUIRE
13     COOK COUNTY STATE'S ATTORNEY'S OFFICE
14     500 Daley Center
15     50 West Washington Street
16     Chicago, Illinois 60602
17     (312) 603-5967
18
19
20
21
22
23
24
```

Transcript of Rodrigo Ramos
Conducted on March 22, 2017

37

1 superintendent at any point after that day?
2    A. No.
3    Q. What about with anybody -- well, let me ask
4 you this first: Have you reviewed the video again
5 at any point since the time you reviewed it with the
6 superintendent?
7    A. No.
8    Q. Have you discussed the video with anyone
9 since that day that you reviewed it with the
10 superintendent?
11    A. Yes.
12    Q. Who did you discuss the video with?
13    A. My commander.
14    Q. Who is your commander?
15    A. Dominguez, Commander Dominguez.
16    Q. Anyone else?
17    A. That's it.
18    Q. When did you discuss the video with
19 Commander Dominguez?
20    A. I don't recall the exact date or time frame.
21    Q. Well, was it shortly after the incident
22 itself or --
23    A. Yes.
24    Q. Do you recall the conversation that you had

38

1 with Commander Dominguez about the video?
2    A. I don't recall the conversation.
3    Q. Do you recall any of the details of that
4 conversation whatsoever?
5    A. Yeah. We just talked about the incident
6 itself and the -- what was seen on the video and the
7 incident itself.
8    Q. Okay. Did you bring up the issue, or did
9 Commander Dominguez bring it up?
10    A. Commander Dominguez.
11    Q. And what did Commander Dominguez want to
12 know about the video?
13    A. He -- I basically -- he basically wanted to
14 know what occurred in the situation, what occurred.
15    Q. And what did you tell Commander Dominguez?
16    A. Exactly what was on my report that I stated
17 earlier to you.
18    Q. Which was?
19    A. That the inmate was refusing housing and
20 that another officer got involved, which was
21 Officer Ortiz -- got involved, and the inmate was
22 taken down to the ground.
23    Q. Did you indicate to Commander Dominguez that
24 Officer Ortiz punched Mr. Bolton?

39

1    A. I didn't tell him.
2    Q. Did you -- beyond telling
3 Commander Dominguez that Mr. Bolton had been taken
4 to the ground by Officer Ortiz, did you provide any
5 other details about Officer Ortiz's actions towards
6 Mr. Bolton?
7    A. No.
8    Q. Did Commander Dominguez ask you about
9 whether or not Officer Ortiz had struck Mr. Bolton?
10    A. No, because he seen it on the video.
11    Q. During the incident itself, did you witness
12 Officer Ortiz strike Mr. Bolton?
13    A. I did.
14    Q. We got off track a little bit. I want to go
15 back to you started to describe the incident itself.
16 We got to the point where you went back into the
17 tier, made a phone call to classification.
18       I believe your testimony was that you
19 confirmed that the inmate could be placed in that
20 cell; is that correct?
21    A. Yes.
22    Q. And then you came back out of the tier; is
23 that right?
24    A. That's correct.

40

1    Q. And who did you inform that the inmate or
2 that Mr. Bolton could be placed in that cell?
3    A. The inmate, Ivory, and Ortiz. We were all
4 present outside the tier.
5    Q. And did Officer Ivory say anything to you at
6 that point when you said that the classification had
7 confirmed that you could put the inmate in that
8 cell?
9    A. I don't remember.
10    Q. What about Officer Ortiz? Did he say
11 anything?
12    A. I believe he told the inmate that he
13 couldn't refuse because the inmate was continuing to
14 refuse. He was asking to speak to a sergeant --
15    Q. Okay.
16    A. -- at that point.
17    Q. Mr. Bolton was asking to speak to a
18 sergeant?
19    A. Yes.
20    Q. And Officer Ortiz told him that he could not
21 refuse to go into the cell; is that correct?
22    A. I believe -- I don't recall the words. I
23 don't recall the statement that was being --
24    Q. But in some way he told him that he was

Transcript of Rodrigo Ramos
Conducted on March 22, 2017

11 (41 to 44)

41

1 going to be put in that cell?
2     A. I don't recall.
3     Q. Well, I think you indicated a minute ago
4 that Officer Ortiz said something about the inmate
5 having to go into that cell, so I just -- I'm just
6 trying to figure out what exactly it is that you
7 remember.
8     A. I don't remember the exact words, but I
9 believe he was told he couldn't refuse housing.
10     Q. And that was from Officer Ortiz?
11     A. Yes.
12     Q. As part of your assignment that day, was it
13 your responsibility to put Mr. Bolton in the cell
14 that he was assigned to?
15     A. Yes.
16     Q. It wasn't Officer Ortiz's assignment; is
17 that correct?
18     A. That is correct.
19     Q. When Mr. Bolton asked to speak to a
20 sergeant, whose responsibility was it at that point
21 to determine whether or not a sergeant should be
22 contacted?
23     A. That would be my responsibility.
24     Q. And at any point before the incident itself

42

1 where Officer Ortiz took Mr. Bolton to the ground,
2 had you made a decision one way or the other about
3 contacting a sergeant?
4     A. Yes.
5     Q. What decision had you made?
6     A. I was going to call the sergeant.
7     Q. Fair to say then that Officer Ortiz acted
8 before you had an opportunity to call the sergeant?
9     A. Yes.
10     Q. Fair to say that if left to you, you would
11 have attempted to call the sergeant rather than
12 attempting to take Mr. Bolton to the ground; is that
13 correct?
14     MR. COYNE: Objection. Foundation,
15 speculation.
16     MS. McGRATH: Joined.
17     A. Can you ask that again?
18     Q. Fair to say that if it was left up to you to
19 handle the situation on your own, that you would
20 have called the sergeant rather than attempting to
21 take Mr. Bolton to the ground based on the situation
22 presented to you?
23     MR. COYNE: Same objection.
24     A. Sure, yes.

43

1     Q. And, in fact, that's what you planned to do,
2 to call the sergeant; is that correct?
3     A. I'm assuming at the time, yes.
4     Q. When you say you're assuming at the time,
5 what do you mean by that?
6     A. The way the incident played out, yes, I
7 would have called the sergeant.
8     Q. And had you been given the opportunity to do
9 so without any other officer acting, you would have
10 done so; is that fair to say?
11     MR. COYNE: Same objection.
12     MS. McGRATH: Joined.
13     A. That's fair to say, yes.
14     Q. After you came out of the tier to indicate
15 that classification had cleared the cell, did you
16 say anything to Mr. Bolton beyond what you've
17 already testified to?
18     A. No.
19     Q. Did Mr. Bolton say anything to you beyond
20 what you've already testified to about asking for a
21 sergeant?
22     A. No.
23     Q. Did Officer Ortiz -- again, this is after
24 you've come out of the tier to indicate that

44

1 classification had cleared the cell.
2     Did Officer Ortiz -- beyond what you've
3 already testified to, do you recall if Officer Ortiz
4 said anything else to Mr. Bolton?
5     A. I don't recall.
6     Q. Do you recall Mr. Bolton saying anything
7 else, beyond what you've already testified to, to
8 Officer Ortiz?
9     A. They had a discussion but I just don't
10 recall the exact words of the conversation that they
11 had.
12     Q. So you recall there being a conversation;
13 but as you sit here today, you don't recall the
14 content of that conversation; is that correct?
15     A. That's correct.
16     Q. Do you recall if Officer Ivory had said
17 anything to Mr. Bolton again after you came out of
18 the tier and cleared the cell?
19     A. I believe he did not.
20     Q. And do you recall if Mr. Bolton said
21 anything to Officer Ivory at that point?
22     A. I have no -- I don't remember.
23     Q. So I've gotten to the point where you've
24 come out of the cell. You indicated to everyone

Transcript of Rodrigo Ramos
Conducted on March 22, 2017                     12 (45 to 48)

45

1  that the cell was clear and Mr. Bolton has indicated
2  that he still wants a sergeant called and he does
3  not want to go into that cell.
4        Can you describe to me, based on your memory
5  as you sit here today, what happened next?
6     A. I'm sorry. Yes. Ortiz went to grab
7  Inmate Bolton by the elbow to secure him, and Bolton
8  went and threw himself on the floor. That's when
9  Ortiz went on top of Bolton. Ivory went to secure
10 his legs. I walked around to assist in securing the
11 inmate.
12    Q. When Mr. Bolton went to the floor, was he on
13 his back or his stomach?
14    A. His stomach.
15    Q. When Mr. Bolton went to the floor, did he
16 put his arms behind his back?
17    A. No, he did not.
18    Q. Well, when you went to handcuff Mr. Bolton,
19 did you have to struggle with him to handcuff him?
20    A. We did.
21    Q. So you said you viewed the video; is that
22 correct?
23    A. Yes.
24    Q. So your testimony as you sit here today is

46

1  that video will show you struggling with Mr. Bolton
2  to handcuff him; is that correct?
3     A. That's correct.
4     Q. But your testimony is that when Mr. Bolton
5  went to the ground, he was on his stomach, correct?
6     A. That's correct.
7     Q. I'm going to ask you a hypothetical. Take
8  Officer Ortiz out of the picture altogether.
9        Based on everything we've talked about up
10 until this point, if, before you had a chance to
11 call the sergeant, if Mr. Bolton had just thrown
12 himself to the ground on his stomach, would it have
13 been an appropriate use of force on your part to
14 handcuff Mr. Bolton after he threw himself on the
15 ground?
16    MR. COYNE: Objection. Form, foundation.
17    MS. McGRATH: Same objections. Calls for
18 speculation.
19    A. Yes.
20    Q. It would have, correct? The use-of-force
21 training you received as an officer would have
22 allowed you to do that, correct?
23    MR. COYNE: Same objection.
24    A. To handcuff him, yes.

47

1     Q. When Mr. Bolton was on the ground, did you
2  strike him in any way?
3     A. No.
4     Q. Did Officer Ivory -- based on what you
5  witnessed, did Officer Ivory strike Mr. Bolton in
6  any way?
7     A. No.
8     Q. When you were handcuffing Mr. Bolton, did
9  you feel like in any way that you needed to strike
10 him in order to handcuff him?
11    A. No.
12    Q. In fact, you were able to handcuff him
13 without striking him; isn't that correct?
14    A. That's correct.
15    Q. The only officer on the scene to strike
16 Mr. Bolton was Officer Ortiz; is that correct?
17    A. That is correct.
18    Q. And your testimony is that you witnessed
19 Officer Ortiz striking Mr. Bolton; is that correct?
20    A. Yes.
21    Q. How many times did you see Officer Ortiz hit
22 Mr. Bolton?
23    A. I don't recall how many times.
24    Q. Do you recall whether he hit him with a

48

1  closed or open fist?
2     A. I don't recall.
3     Q. And that's -- you've reviewed the video,
4  correct?
5     A. Yes.
6     Q. Even based on your review of the video, as
7  you sit here today, you don't recall; is that
8  correct?
9     A. I don't remember the video itself right now.
10    Q. When you were handcuffing Mr. Bolton, did
11 you say anything to him that you can remember?
12    A. Yeah. I asked him to give up his hands.
13    Q. Okay. Did he say anything to you?
14    A. No.
15    Q. Do you recall if Officer Ivory said anything
16 to Mr. Bolton while you were attempting to handcuff
17 him?
18    A. I don't recall.
19    Q. Do you recall -- during the period of time
20 that you were attempting to handcuff Mr. Bolton, do
21 you recall him saying anything at all during that
22 period?
23    A. No.
24    Q. Do you recall if Officer Ortiz said anything



## Planet Depos®
We Make It *Happen*™

# Transcript of SGT. James Ciukaj, Jr.

**Date:** March 21, 2017
**Case:** Bolton -v- The Sheriff of Cook County, et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVI

EXHIBIT

D

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

1 (1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LITROY BOLTON,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )  No. 16-cv-5012
                                        )
THE SHERIFF OF COOK COUNTY,             )  Hon. Judge
individually and in his official        )  Ronald A. Guzman
capacity; COOK COUNTY; DR. NNEKA        )
JONES TAPIA, individually and in        )  Hon. Mag. Judge
her official capacity as                )  Maria Valdez
Executive Director of the Cook          )
County Department of Corrections;       )
SGT. JAMES CIUKAJ; Correctional         )
Officers MIGUEL ORTIZ, RODRIGO          )
RAMOS, CODY LETTIERE,                   )
CHRISTOPHER IVORY and UNKNOWN           )
EMPLOYEES OF COOK COUNTY JAIL;          )
Internal Affairs Investigator           )
JULIAN DIAZ; Internal Affairs           )
Investigator ESTHER MONTANEZ;           )
UNKNOWN EMPLOYEES OF COOK               )
COUNTY; UNKNOWN EMPLOYEES OF            )
THE OFFICE OF PROFESSIONAL              )
REVIEW OF THE COOK COUNTY               )
                                        )
SHERIFF'S OFFICE,                       )
        Defendants.                     )

        The deposition of SGT. JAMES CIUKAJ, JR.,
taken before David J. Demski, Certified Shorthand
Reporter, and Notary Public, pursuant to the
provisions of the Rules of Civil Procedure of the
State of Illinois and the Rules of the Supreme Court
thereof, pertaining to the taking of depositions
for the purpose of discovery, at the Law Offices of
Loevy & Loevy, 311 North Aberdeen Street, Chicago,
Illinois, at 2:00 p.m. on Tuesday, March 21, 2017.

**Page 2**

APPEARANCES:

    LOEVY & LOEVY

    BY: MR. VINCENZO FIELD

        311 North Aberdeen Street

        Chicago, Illinois 60607

        (312)243-5900

        E-mail: vince@loevy.com

            Appearing on behalf of the Plaintiff


    LAW OFFICES OF JOHN C. COYNE

    BY: MR. JOHN C. COYNE

        53 West Jackson Boulevard

        Chicago, Illinois 60604

        (312)583-9500

        E-mail: jcc@johncoynelaw.com

            Appearing on behalf of the Defendants


    COOK COUNTY STATE'S ATTORNEY

    BY: MS. MEGAN MCGRATH

        500 Richard J. Daley Center

        Chicago, Illinois 60601

        (312)603-5967

        E-mail: meganmcgrath@cookcountyil.gov

            Appearing on behalf of the Defendants

**Page 3**

                    I N D E X

WITNESS                                      PAGE

SGT. JAMES CIUKAJ, JR.

Examination by Mr. Field                        4
Examination by Mr. Coyne                        97
Reexamination by Mr. Field                     100

                E X H I B I T S

                (None Offered)

**Page 4**

 1          SGT. JAMES CIUKAJ, JR.
 2   having been first duly sworn by the court reporter,
 3   was examined and testified on his oath as follows:
 4               EXAMINATION
 5   BY MR. FIELD:
 6      Q   Sergeant, can you please state and spell
 7   your full name, for the record?
 8      A   James A. Ciukaj, C-i-u-k-a-j, Jr.
 9      Q   Have you been deposed before?
10      A   Yes.
11      Q   How many times have you been deposed
12   before?
13      A   At least twice.
14      Q   When was the last time previous to today?
15      A   A couple years.
16      Q   Was it in relation to your work at the
17   Cook County Jail?
18      A   I'm trying to remember.  I work for
19   another police department so it was probably for
20   that.  No, I've not been -- anything here at Cook
21   County Jail.
22      Q   I know you said you've been deposed a
23   couple times before.  I'll just go over the basic
24   ground rules so we can get through this as quickly

Transcript of SGT. James Ciukaj, Jr.
Conducted on March 21, 2017

13 (49 to 52)

---

**49**

1 boxes that they checked off the first page of the
2 report with their narrative on the second page, is
3 that correct?
4    **A  Correct.**
5    Q  Looking at page 21. Does Officer Ramos
6 include any description in his narrative of the
7 punches that were delivered to Mr. Bolton by
8 Officer Ortiz?
9    **A  No.**
10    Q  Fair to say that per the jail's policy,
11 he should have included a description of that,
12 Officer Ortiz's punches onto Mr. Bolton?
13    **A  It would be speculation. I don't know if**
14 **he saw it. So if he saw it, yes, but right now it's**
15 **speculation. I don't know what Officer Ramos had**
16 **saw.**
17    Q  But your testimony as you sit here today
18 is that if he witnessed Officer Ortiz strike
19 Mr. Bolton, that he should have included that in
20 his narrative on this response to resistance use of
21 force form, is that correct, if he witnessed it?
22    **A  Correct.**
23    Q  And if he witnessed it and he did not
24 include it in his narrative, that would have been

**50**

1 a violation of the jail's policy, is that correct?
2    **A  Correct.**
3    Q  If we go to page 26 and 27, the response
4 to resistance use of force form for Officer Ivory
5 that we went through a couple of minutes ago,
6 looking at page 27. Does Officer Ivory include in
7 his narrative any description of the strikes that
8 were delivered to Mr. Bolton by Officer Ortiz?
9    **A  No.**
10    Q  And just to be clear. Again because
11 Officer Ivory did not strike Mr. Bolton with a
12 closed fist, he had no -- he was under no
13 requirement for checking off closed hand strike
14 punch on his own use of force report form, is that
15 correct?
16    **A  Maybe he didn't see it. I don't know,**
17 **it's speculation at this point.**
18    Q  So maybe I was assuming -- I was assuming
19 too much. Going back to Officer Ramos. If he had
20 scene Officer Ortiz punching Mr. Bolton, was he
21 required to check off on his use of force report
22 closed hand strike punch?
23    **A  No. Because he did not do that closed**
24 **hand strike punch.**

**51**

1    Q  That's why I was asking about
2 officer -- I apologize. I probably didn't ask the
3 question correctly.
4    **A  Well, no, actually you asked me if he put**
5 **it in here. And if he didn't see it then, no, it**
6 **would not be in here. So, you know, I can't**
7 **speculate what they saw. I can only go by what they**
8 **memorialized and wrote on paper right now.**
9    Q  Sure. But just to be clear, again I
10 think it was because I didn't ask the question
11 correctly. But if Officer Ivory never struck
12 Mr. Bolton with a closed fist, he was under no
13 obligation to indicate on this form, to check out
14 closed punch, hand strike punch, is that correct?
15    **A  That's correct.**
16    Q  Because that was not his response?
17    **A  That's correct.**
18    Q  Okay. I understand your testimony is
19 that if he did not witness Officer Ortiz punching
20 Mr. Bolton, he would not have to include that in
21 his narrative, correct?
22    **A  That's correct.**
23    Q  Because the narrative is only for what
24 that particular officer witnessed?

**52**

1    **A  That's correct.**
2    Q  But similar -- the same question as I
3 asked you about Officer Ramos. If Officer Ivory
4 witnessed Officer Ortiz punching Mr. Bolton and he
5 did not include that information in his narrative,
6 that would be a violation of the jail's policy,
7 correct, again, if he witnessed it?
8    **A  If he witnessed it, sure.**
9    Q  When you review these forms -- well, let
10 me ask this first just to be clear. You were not
11 on the scene when this incident with Mr. Bolton
12 occurred, correct?
13    **A  That's correct.**
14    Q  So when you review these forms, you don't
15 know one way or another what each of the particular
16 officers witnessed, is that correct?
17    **A  That's correct.**
18    Q  When you review these forms do you speak
19 to the officers at all while you're reviewing them?
20    **A  Not while I'm reviewing them.**
21    Q  Do you recall when you reviewed Officer
22 Ortiz's form in this case? I know again it's going
23 back a couple of years. As you sit here today, do
24 you recall reviewing that form?